# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

| | | |
|---|---|---|
| **LEONARD TAYLOR,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **No. 4:12CV2278 RWS** |
| | ) | |
| **TROY STEELE,** | ) | **CAPITAL HABEAS** |
| | ) | |
| **Respondent.** | ) | |

## PETITION FOR A WRIT OF HABEAS CORPUS BY A PRISONER IN STATE CUSTODY UNDER A SENTENCE OF DEATH

COMES NOW petitioner, Leonard Taylor, by and through his counsel, Kent E. Gipson and Kevin L. Schriener, and pursuant to 28 U.S.C. § 2254, submits the following petition for a writ of habeas corpus by a petitioner in state custody under a sentence of death.  Petitioner, Leonard Taylor (hereinafter "petitioner" or "Taylor"), is confined at Potosi Correctional Center, Missouri Department of Corrections, 11593 State Highway O, Mineral Point, Washington County, Missouri 63660, by Superintendent Troy Steele, and is being denied his liberty due to unconstitutional convictions and sentences of death.

The allegations contained in this petition are in substantial compliance with the model form for use and application for habeas corpus under § 2254.

1

# I.

## PROCEDURAL HISTORY

Petitioner Leonard Taylor is a Missouri prisoner under a sentence of death who was convicted in 2008 in the Circuit Court of St. Louis County, Missouri of four counts of first degree murder and four counts of armed criminal action involving the 2004 shooting deaths of his girlfriend Angela Rowe and her three children, Alexus, Acqreya, and Tyrese at a home at 2039 Park Lane in St. Louis County. Petitioner is currently incarcerated at the Potosi Correctional Center in the custody of respondent, Superintendent Troy Steele.

The bodies of Angela Rowe and her three children were found in their home in St. Louis County, Missouri on December 3, 2004. All four of them had been shot to death. (Tr. 821-826). On December 9, 2004, petitioner was arrested in Madisonville, Kentucky. (*Id*. 1316-1319). Petitioner had an airtight alibi from November 26, 2004, when he took a flight to to Los Angeles, California until the victims' bodies were found.[1] (*Id*. 1254-1288).

The state charged petitioner with four counts of first degree murder and four counts of armed criminal action by way of complaint on December 10, 2004. (L.F.

---

[1] Before the prosecution or law enforcement learned of this alibi, the medical examiner's initial report placed the time of death as two to three days before the bodies were discovered. (Tr. 1199-1201, 1206-1207).

39-43).  Petitioner was subsequently indicted for these offenses on March 30, 2005 (*Id*. 54-57).

While serving time on an unrelated Missouri conviction, petitioner requested a speedy disposition of his murder charges in July of 2005 pursuant to the Uniform Mandatory Disposition of Detainers Act (UMDDL), codified under § 217.450 R.S.Mo. (2000).  (*Id*. 76-77).  This request was filed and delivered to the circuit court and prosecuting attorney on July 22, 2005.  (*Id*. 77).

After the initial charges were brought, petitioner retained private counsel Joseph Hogan to represent him.  Mr. Hogan entered his appearance on February 14, 2005.  (L.F. 48).  Mr. Hogan was allowed to withdraw on August 11, 2005. (8/11/05 Tr. 2-6).

After the state filed its notice of intent to seek the death penalty, three capital public defenders, Robert Wolfrum, Bevy Beimdek, and Karen Kraft entered their appearance for petitioner on September 15, 2004.  (L.F. 81).  Several continuance requests were subsequently granted by the trial court, over petitioner's objection, to give these public defenders additional time to prepare for trial.  (*Id*. 96, 228; Tr. 76).

Petitioner's trial commenced February 20, 2008 in the Circuit Court of St. Louis County before a jury and Judge James Hartenbach.  (L.F. 690).  On February 28, 2008, the jury found petitioner guilty on all charges.  (*Id*. 1186-1209).

The trial immediately proceeded to a sentencing phase before the same jury. On February 29, 2008, the jury issued a sentencing phase verdict, finding that death sentences should be imposed on each of the four counts of first degree murder.  (Tr. 1851-1853).

On April 17, 2008, Judge Hartenbach subsequently sentenced petitioner to death on each of the four murder charges and imposed consecutive sentences of life imprisonment on the armed criminal action charges.  (*Id*. 1854-1861). Petitioner's convictions and death sentences were thereafter affirmed by the Missouri Supreme Court on direct appeal.  *State v. Taylor*, 298 S.W.3d 482 (Mo. banc 2009).  The United States Supreme Court subsequently denied petitioner's petition for a writ of certiorari on May 24, 2010 in *Taylor v. Missouri*, 130 S. Ct. 3323 (2010).

In the meantime, petitioner filed a timely Rule 29.15 motion in the Circuit Court of St. Louis County on March 18, 2010.  (29.15 L.F.1).  After holding an evidentiary hearing on some of petitioner's claims and denying a hearing on others, Judge Hartenbach denied petitioner's 29.15 motion on September 19, 2011.  (*Id*.

323-354).  The Circuit Court's judgment was affirmed on appeal by the Missouri

Supreme Court in *Taylor v. State*, 382 S.W.3d 78 (Mo. banc 2012).  The Missouri

Supreme Court subsequently denied rehearing on December 4, 2012.  The United

States Supreme Court subsequently denied certiorari on June 10, 2013.  *Taylor v.*

*Missouri*, 133 S. Ct. 2798 (2013).

Petitioner initiated the present federal habeas proceeding by filing a motion

for appointment of counsel pursuant to *McFarland v. Scott*, 512 U.S. 849 (1994).

The undersigned counsel were appointed to represent petitioner pursuant to the

Criminal Justice Act.  The present timely petition for a writ of habeas corpus is

now before this Court for its review.

## II.

## PETITION FOR A WRIT OF HABEAS CORPUS

Petitioner's convictions and sentences of death were obtained in violation of

his rights secured and guaranteed under the Fifth, Sixth, Eighth, and Fourteenth

Amendments to the United States Constitution in the following respects:

## CLAIM 1

**PETITIONER'S CONVICTIONS AND SENTENCES WERE IMPOSED IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS DUE TO THE TRIAL COURT'S FAILURE TO DISMISS THE CHARGES DUE TO THE DENIAL OF PETITIONER'S RIGHT TO A SPEEDY TRIAL UNDER THE UMDDL AND THE SIXTH AMENDMENT BECAUSE PETITIONER WAS NOT TRIED WITHIN ONE HUNDRED**

**EIGHTY (180) DAYS AFTER DEMANDING A SPEEDY TRIAL AND THE DELAYS WERE ATTRIBUTABLE TO THE STATE WHO FAILED TO DILIGENTLY PROVIDE PETITIONER FULL DISCOVERY, WHICH CREATED AN UNCONSTITUTIONAL HOBSON'S CHOICE COMPELLING PETITIONER AND TRIAL COUNSEL TO CHOOSE TO EITHER FORFEIT HIS RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL OR HIS RIGHT TO A SPEEDY TRIAL.**

Under the UMDDL, once a prison inmate files a request for a speedy disposition of a pending detainer, he must be brought to trial within one hundred eighty (180) days or else the trial court loses jurisdiction and the pending charges must be dismissed.  *See* § 217.450 et seq. R.S.Mo. (2000).  The facts surrounding this claim, which were not in dispute, are as follows.

It is clear and the state conceded that petitioner properly invoked his right to a speedy trial under the UMDDL on July 22, 2005.  (L.F. 99).  Petitioner objected to the trial court's decision to allow his retained counsel to withdraw and to each of his new defense attorneys' continuance requests until August 24, 2006.  Petitioner again objected to a continuance ordered by the trial court on May 9, 2007 due to the state's failure to diligently conduct and disclose DNA test results on the sunglasses seized from petitioner at the time of his arrest until nearly two years later.  (Tr. 59-60; L.F. 666).  Therefore, the 180 day deadline under UMDDL expired on January 18, 2006 and the trial court lost jurisdiction to try the case. Despite this chronology of events, the trial court denied petitioner's motions to

dismiss on speedy trial grounds and allowed the trial to proceed more than three years after charges were brought.  (L.F. 611).

The first continuance was granted by the trial court on the date that private counsel was allowed to withdraw on August 11, 2005.   (8/11/05 Tr. 2-6). Petitioner objected to the removal of his private counsel and informed the trial court that he had asserted his right to a speedy trial and would not waive that right. (*Id*.).   The prosecution also objected to allowing private counsel to withdraw in light of the speedy trial request.  (*Id*. at 5).   Nevertheless, the trial court permitted retained counsel to withdraw, ordered petitioner to be screened for public defender services, and continued the case for good cause until September 16, 2005.  The court also ordered that the time be tolled under the UMDDL.  (*Id*. at 6).

On September 16, 2005, petitioner's public defenders requested a trial setting beyond the 180 day deadline under the UMDDL.  (9/16/05 Tr. 3-4).  In response, petitioner again refused to waive his speedy trial rights and objected to this setting.  (*Id*. at 5).  The trial court granted this request for a trial setting and set the case for trial for October 11, 2006, noting that the continuance was for good cause and that petitioner's constitutional and statutory right to a speedy trial was outweighed by the trial court's obligation to ensure that petitioner had effective trial counsel.  (*Id*. at 4; L.F. 96).

7

On November 15, 2005, the prosecution requested reconsideration of this trial setting, explicitly noting that petitioner had a right to a speedy trial and, under the UMDDL the case had to be tried by January of 2006.  (*Id*. 99-100).   On November 22, 2005, the trial court held a hearing on the prosecutor's motion.  At this hearing, the trial court noted that petitioner objected to the prior continuance and also acknowledged that the 180 day deadline under the UMDDL, unless properly tolled, would expire January 18, 2006.  (11/22/05 Tr. 5-15).   The prosecution argued that defense counsel's heavy caseload that was advanced as the reason for the continuance was not justifiable because defense counsel had very few capital cases actually set for trial and urged the court to conduct the trial before the 180 day deadline expired to avoid violating petitioner's speedy trial rights.  (*Id*. 15-16).   Nevertheless, the trial court denied the state's motion to reconsider the trial date and the case remained docketed for trial in October of 2006.  (*Id*. at 18).

On July 24, 2006, more than a year after petitioner's demand for a speedy trial was filed, trial counsel requested a continuance of the October 11, 2006 trial date. (L.F. 200-214).  This continuance request cited counsel's obligations in other capital cases, budget cuts, the need for further investigation, the state's delay in disclosing aggravating evidence and the need to depose witnesses and review discovery not yet provided by the prosecution.  (*Id*.).  This continuance motion also

8

stated problems with visitation with petitioner at the Potosi Correctional Center because of the distance trial counsel had to travel and the institution's limited visitation hours.  (*Id*. 210-211).

On August 1, 2006, the trial court held a hearing on this continuance request. (8/01/06 Tr. 33-61).  Petitioner once again adamantly refused to waive his right to speedy trial and objected to the continuance.  (*Id*. 60).  Based upon petitioner's refusal to consent to the continuance and waive his right to a speedy trial, the trial court denied this continuance request.  (*Id*. 60-61; L.F. 228).

On August 22, 2006, trial counsel filed a motion to reconsider and attached petitioner's written consent to the continuance, in which petitioner maintained that his speedy trial rights had already been violated and he again emphasized that he did not waive his prior request under the UMDDL for a speedy trial.  (8/24/06 Tr. 63-64; L.F. 237-240).  The court then continued the trial until May 30, 2007.  (*Id*. 65. L.F. 443).

On September 19, 2006, the case was transferred from Judge Kendrick to Judge Hartenbach.  (L.F. 452).  On October 2, 2006, petitioner filed a *pro se* motion to dismiss due to a violation of his right to a speedy trial.  (*Id*. 454-489).

Approximately two months before the trial setting in March of 2007, the prosecution disclosed a lab report indicating that petitioner's sunglasses had tested

9

presumptively positive for blood.  (*Id*. 646).  The prosecution had not submitted the sunglasses to the lab for testing until November of 2006.  (*Id*. 647).  On April 12, 2007, petitioner filed another *pro se* motion to dismiss under the UMDDL. (L.F. 598-603).  The trial court denied this motion.  (*Id*. 611).

On April 24, 2007, the prosecution disclosed a DNA report dated April 19, 2007 indicating that Angela Rowe could not be excluded as the donor of DNA material on petitioner's sunglasses.  *Id*. 646.  Trial counsel moved that the DNA evidence be excluded due to the prosecution's two year delay in seeking the testing.  (*Id*. 645-648).  This motion also noted that petitioner had not waived his demand for a speedy trial.  *Id*.  After the trial court refused to exclude the evidence, trial counsel was compelled to request a continuance, again over petitioner's objection.  (L.F. 663-667).  The trial court granted the continuance, "in the interest of justice."  (Tr. 76).  The case was continued until February 20, 2008 when the trial actually commenced that resulted in petitioner's convictions and sentences of death.  (L.F. 690).

Based on the foregoing chronology of events, it is clear that petitioner's constitutional and statutory rights to a speedy trial were violated by the state's failure to try petitioner within one hundred eighty (180) days.  The 180 day clock under the UMDDL was not properly tolled from August 11, 2005 until October 11,

2006 because petitioner did not consent to any of the continuances and consistently refused to waive his right to a speedy trial.  *See State ex rel. Clark v. Long*, 870 S.W.2d 932, 941 (Mo. App. S.D. 1994).  Only after the 180 day period expired and the court had, in petitioner's view, already lost jurisdiction did petitioner reluctantly agree to one continuance.  (L.F. 239).

Even assuming that the clock was stopped during the aforementioned period, these time limits under UMDDL were not properly tolled between May 30, 2007 and February 20, 2008 because this delay was caused solely by the state's late disclosure of DNA evidence.  Petitioner's sunglasses were seized from his luggage on the date he was arrested on December 9, 2004.  (L.F. 645).  There is no excuse for the state waiting nearly two years, until November 8, 2006, to test the glasses. (*Id.* 646).  This two hundred sixty-six (266) day delay alone violates the UMDDL and demonstrates that petitioner was denied a speedy trial.  Courts from several jurisdictions have held that a defense continuance does not waive a defendant's right to a speedy trial where there has been an inexcusable delay in providing discovery or there was some other violation of discovery rules by the prosecutor. *See, e.g.*, *State v. T.G.*, 990 So.2d 1183, 1184 (Fla. App. 2008); *Commonwealth v. Edwards*, 595 A.2d 52, 54-55 (Pa. 1991); *State v. Price*, 620 P.2d 994, 996 (Wash. 1980).

11

This line of cases rests upon clearly established Supreme Court precedent finding that it is unconstitutional to place a defendant in a situation where he must waive one constitutional right in order to assert another. *See Simmons v. United States*, 390 U.S. 377, 391-393 (1968).  In such situations, reviewing courts have held that it is fundamentally unfair to place a defendant, due to the state's failure to provide discovery, to either go to trial unprepared or waive his right to a speedy trial. *See Marshall v. State*, 759 N.E.2d 665, 669-670 (Ind. App. 2001).  For speedy trial and UMDDL purposes, a continuance that is compelled by a state's lack of diligence in providing discovery must be charged against the state. *State v. Allen*, 134 P.3d 976, 982 (Or. App. 2006); *see also State v. Wamsley*, 594 N.E.2d 1123, 1126 (Ohio App. 1991).

The foregoing facts and applicable law indicate petitioner was denied due process and his right to a speedy trial under the UMDDL and the Sixth and Fourteenth Amendments to the Constitution.  The UMDDL created a liberty interest entitling petitioner to procedural due process protection under the Fourteenth Amendment. *Vitek v. Jones*, 445 U.S. 480 (1980).  Because of this clear UMDDL violation, St. Louis County, Missouri lacked the legal authority and power to bring petitioner to trial in February of 2008, which denied petitioner due process of law. *Blackledge v. Perry*, 417 U.S. 21, 30-31 (1974).

12

The foregoing facts also clearly set forth a Sixth Amendment violation under clearly established Supreme Court jurisprudence.  *See Barker v. Wingo*, 407 U.S. 514 (1972).  Under the *Barker* test, reviewing courts must assess the length of delay, the reasons for the delay, the defendant's assertion of the right, and prejudice.  *Id*. at 530.  Each of these four factors weigh heavily in favor of petitioner on this Sixth Amendment claim.

First, since the length of the delay was over three years, this lapse of time is presumptively prejudicial.[2]  *See State ex rel. Garcia v. Goldman*, 316 S.W.3d 907, 911 (Mo. banc 2010).  The reasons for the delay are not attributable to petitioner, and petitioner asserted his right to a speedy trial more than two and a half years before trial commenced.   Because the foregoing facts and applicable law demonstrate that petitioner was denied due process and his Sixth Amendment right to a speedy trial, habeas relief is warranted.

## CLAIM 2

**PETITIONER'S SIXTH AND FOURTEENTH AMENDMENT RIGHT TO PRESENT A COMPLETE DEFENSE WAS VIOLATED BY THE TRIAL COURT'S EXCLUSION OF RELEVANT EXCULPATORY EVIDENCE OF PETITIONER'S INNOCENCE THAT THE VICTIMS**

---

[2] Petitioner was also prejudiced, as he alleged in one of his *pro se* motions to dismiss, because the videotaped statements of defense witnesses Gerjuan Rowe and Beverly and Sherry Conley taken by police either mysteriously disappeared or were accidentally erased.  (L.F. 463-464; Tr. 1054-1058).

13

**WERE STILL ALIVE AFTER NOVEMBER 26, 2004 AND UNDERMINED OTHER ASPECTS OF THE PROSECUTION'S CASE.**

Petitioner's defense at trial, based upon statements given by several witnesses that they either saw the victims or spoke to them on the phone after November 26, 2004, was that someone else committed the crime because petitioner had an airtight alibi that established he had flown to California on November 26, 2004. Angela Rowe's sister, Gerjuan Rowe, told police that she saw Angela on the weekend of November 27-28. Gerjuan later testified that Angela came to her house on the 27th to lend her fifty dollars. (G.R. Depo 26, 52-53, 73).[3] Gerjuan also testified that she got a phone call from her sister on the 28th of November at 3:00 or 4:00 a.m. (*Id*. 60-61, 73-74).

Angela Rowe's neighbor, Elmer Massey, told police he saw Angela and the children the weekend after Thanksgiving, which would have been November 27th or the 28th.[4] (Tr. 1602-1603). During the week of November 29th, Mr. Massey also observed a light-skinned black male leave Angela's house but, after this man was observed by Mr. Massey, he went back inside. (*Id*. 1603-1610). The children's aunts Beverly and Sherry Conley also testified that they had spoken with

---

[3] Portions of Gerjuan Rowe's pretrial deposition were presented at trial because she could not be located to provide live testimony.

[4] Thanksgiving in 2004 was November 25. (Tr. 1597).

Alexis and Angela on the weekend of the 27th or the 28th.  (Tr. 1673-1682, 1689-1691, 1708).

At trial, petitioner's counsel attempted to present portions of Gerjuan's deposition testimony indicating that when she spoke to Angela by phone early on Sunday November 28th, that Angela indicated she was calling her from a payphone at an Amoco gas station.  Petitioner also sought to introduce portions of Gerjuan's deposition where she stated that petitioner was often gone on trips for long periods and that it was not unusual for him not to call Angela when he was out of town.  Trial counsel also tried to introduce a portion of Gerjuan's deposition where she stated that Leonard's brother or cousin often lived or stayed at Angela's house.  (G.R. Depo 29-30, 33; Tr. 48-50, 1637-1638, 1643-1645).

Trial counsel also sought to introduce into evidence Angela Rowe's calendar, which recorded previous dates earlier that year that Leonard was out of town and did not call her.  The defense also attempted to introduce into evidence and show to the jury Angela Rowe's checkbook, which contained a carbon copy of a check she had written that was dated November 27, 2004.  (*Id*.).  The trial court excluded the evidence from Gerjuan's deposition regarding the phone call from the Amoco station and the fact that petitioner was often gone without calling and that

someone else was staying at the house as inadmissible hearsay.  (*Id.* 1638, 1640, 1646-1647, 1653, 1655).

The prosecution in its case in chief and in argument effectively attacked the credibility of Gerjuan and the other witnesses with phone records indicating that there were no calls from Angela's home phone to or from any of the three relatives on the dates in question.  (*Id*. 1677-1678, 1691-1692).  The prosecutor emphasized in closing argument that the phone records established that Gerjuan was mistaken because there was no record of a call to or from Gerjuan on November 28th from Angela Rowe's home phone number.  (*Id*. 1724, 1746-1747).

Defense counsel attempted to introduce the Gerjuan Rowe deposition and Angela Rowe's calendar to establish the fact that it was not uncommon for petitioner to go out of town for lengthy periods of time without calling Angela to rebut the prosecution's theory that, since Angela's phone records indicate that petitioner did not call her after November 26th, petitioner must not have called because he knew Angela was dead because he had killed her.  (D. Ex. II; Tr. 1643-1647).   Angela Rowe's calendar notations would have also rebutted the prosecutor's argument that Angela missed work on the November 26th because she was already dead.  (L.F. 1399).  The calendar notation indicated Angela Rowe was not at work because she thought she had the day off.  Likewise, the check, which

was dated after the state theorized the murder occurred and a date on which petitioner had an airtight alibi, was obviously powerful exculpatory evidence indicating that petitioner could not have committed the murder.   After the prosecutor lodged a hearsay objection to this evidence, the trial court ruled that the jury could not view this calendar or the check.  (Tr. 1643, 1646-1647).

Finally, the testimony from Gerjuan Rowe that someone else, either a cousin or brother of petitioner, lived at the house would have rebutted the state's argument that, because there was no forced entry and the house was locked and secure when the bodies of the victims were found this evidence indicated only petitioner could have committed the murder.  In fact, this theory was emphasized by the prosecutor in opening statement, during their case in chief, and during argument that, if an alternative perpetrator had committed the crime, there would have been evidence of forced entry or a robbery or burglary.  (Tr. 786-789, 1736-1739, 1779-1780).

Clearly established federal law holds that due process and the Sixth Amendment prohibits states from mechanistically applying its rules of evidence, such as the hearsay rule, to prevent a criminal defendant from presenting relevant and reliable evidence in his defense.  *See, e.g.*, *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973).  In *Crane v. Kentucky*, 476 U.S. 683 (1986), a unanimous court unequivocally ruled that:  "(w)hether rooted directly in the due process clause of

the Fourteenth Amendment, or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" (*Id*. at 690) (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)).  The court in *Crane* also held that it is unconstitutional to exclude exculpatory evidence based upon state evidentiary rules in the absence of any valid state justification.  (*Id*. at 690-691). Neither the trial court nor the Missouri Supreme Court on direct appeal applied the appropriate balancing of interests test in clear contravention of clearly established Supreme Court precedent.  Instead, both courts mechanistically applied the hearsay rule "to defeat the ends of justice." *Green v. Georgia*, 442 U.S. 95, 97 (1979).

Contrary to the reasoning employed by the Missouri Supreme Court in rejecting petitioner's constitutional claim, even assuming that all of this evidence was correctly deemed to violate state hearsay rules, the excluded evidence was reliable and admissible under *Chambers* for several reasons.  With regard to the exclusion of Gerjuan Rowe's testimony that her sister Angela told her she was calling her from an Amoco station, the reliability of this evidence is corroborated by Gerjuan Rowe's phone records that indicate she made a phone call at 4:36 a.m. on November 28, 2004 to phone number 314-381-2823.  (See Def. Exh. BB).  The white pages website, reverse lookup, indicates that this number belongs to an

18

Amoco gas station in St. Louis. *See* http://www.whitepages.com/search/ ReversePhone?full-phone'314-381-2823&localtime'survey (last visited on 11/26/13). In addition, courts from several jurisdictions have ruled that similar hearsay testimony regarding the substance of phone calls are admissible because they are reliable because they indicate present sense impressions. *See State v. Newell*, 710 N.W.2d 6, 19 (Iowa 2006); *McBeath v. Commonwealth*, 244 S.W.3d 22, 37 (Ky. 2007).

The calendar notations were also reliable because their substance was corroborated by other evidence. Angela Rowe's sister, Gerjuan Rowe, identified the calendar as belonging to her sister Angela and confirmed that notations in the calendar were in Angela's handwriting. (G.R. Depo 33). Entries in Angela Rowe's handwriting such as repeated indications indicating "no call, no show" and "didn't come home yet L.T." would have contradicted the state's theory that the reason petitioner did not call Angela's home after November 26th was because he had killed her. (Tr. 644-647, 1724). Many other reviewing courts have admitted similar written entries, such as diaries or journals, because they have a great deal of reliability because they demonstrate the author's present sense impressions. *See, e.g.*, *Parle v. Runnels*, 387 F.3d 1030, 1040 (9th Cir. 2004); *Davis v. Allsbrooks*, 778 F.2d 168, 177-178 (4th Cir. 1985).

19

The carbon copy of the check dated November 27, 2004 was also reliable exculpatory evidence that should not have been excluded.  It was not disputed that this check was authentic and was in Angela Rowe's handwriting.  Moreover, several other reviewing courts have admitted similar evidence as reliable under the state of mind and verbal act exceptions to the hearsay rule.  *People v. Howard*, 575 N.W.2d 16, 30 (Mich. App. 1997); *United States v. Pang*, 362 F.3d 1187, 1192 (9th Cir. 2004).

Because the evidence submitted by the prosecution was primarily circumstantial, this constitutional violation cannot be considered harmless.  Three of the state's witnesses, including petitioner's brother Perry and the medical examiner gave conflicting testimony on important issues.  The medical examiner's initial report indicated that he believed the victims were only dead a few days when they were found.  (Tr. 1199-1201, 1205-1207).  In an "about face" at trial, the medical examiner testified that the bodies could have been in the house two to three weeks.  (*Id*. 1196).

Perry Taylor's recanted statement to police was unreliable because it was coerced and because he gave inconsistent accounts as to how and when petitioner allegedly admitted to him that he killed the victims.  (*Id*. 855-893).  Coupled with other exculpatory evidence from relatives and neighbors that indicate the victims

20

were killed at a time when petitioner had an alibi, it is clear that this additional

exculpatory evidence could have tipped the balance in favor of acquittal.  Habeas

relief is warranted.

## CLAIM 3

**PETITIONER WAS DENIED HIS SIXTH AND FOURTEENTH AMENDMENT RIGHTS TO EFFECTIVE ASSISTANCE OF COUNSEL BECAUSE HIS TRIAL ATTORNEYS FAILED TO OBJECT TO THE ADMISSION OF THE CHARTER AND SPRINT PHONE RECORDS AND TESTIMONY REGARDING THEM, AND TO  INVESTIGATE THE PHONE RECORDS FOR USE ON CROSS-EXAMINATION FOR THE PURPOSE OF IMPEACHING WITNESSES AND ADDUCING EVIDENCE FAVORABLE TO THE PETITIONER.  ALSO, PETITIONER WAS DENIED DUE PROCESS ARISING FROM THE FALSE TRIAL TESTIMONY ELICITED FROM THE CHARTER  RECORDS CUSTODIAN.**

Trial counsel was ineffective for failing to object to the admission of the

Charter and Sprint phone records and testimony regarding them because they

contained omissions and inaccuracies.  Furthermore, trial counsel was ineffective

for failing to adequately examine the phone records so that the records custodians

could be cross-examined  as to the omissions and inaccuracies contained within

them.   Also, trial counsel failed to elicit from the records custodians that Charter

and Sprint could not guarantee the accuracy of its records.    In addition, trial

counsel failed to elicit favorable evidence from the State's witnesses regarding the

phone records.    Finally, the Charter records custodian testified falsely that Charter's records of the victims' telephone contained all outgoing calls.

The prosecution's case was based on circumstantial evidence and the phone records were a crucial part of that evidence.   At trial, the State argued that petitioner killed the victims before he left the St. Louis area on November 26, 2004, and used the phone records to support its contention.

## A.   *Trial Evidence*

At trial, the State called Cathy Herbert, a records custodian for Charter Communications, who testified that Angela Rowe's landline records contained all of the outgoing calls from her residence and some, but not all, incoming calls. (St. Ex. 220).  The records were admitted into evidence without defense objection.  (Tr. 1512-13).  The prosecutor created several graphs from the Charter records which indicated calls from Angela Rowe's landline to: i) check her own voicemail; ii) her sister, Gerjuan Rowe's number on November 24, 2004; iii) Beverly Conley's numbers on three occasions on November 21, 2004; iv)  Sherry Conley's numbers which indicated two calls on November 13, 2004 and a final call on December 3, 2004; and v) Valerie Burke  (two occasions), Perry Taylor (two occasions), and Southwest Airlines (two occasions) all on November 24, 2004.  (St. Exh. 213, 215, 217, 218, 219).  State's Exhibit 212 showed outgoing calls from Angela Rowe's

landline from November 1 through December 4, indicating that from 9:50 a.m. on November 25, 2004 through November 29, 2004  at 8:54 a.m., there were only calls forwarding to voicemail on Angela Rowe's landline. Ms. Herbert testified that Charter was unaware of any outgoing calls and incoming calls during that time frame**.** (Tr.1530-31).

Ms. Herbert testified that the Charter records included incoming calls that were highlighted yellow and that these records were provided to Charter by another carrier for internal billing purposes.  (Tr. 1523-24,1532). The only calls reflected on the Charter records, between the final outgoing call to Perry Taylor on November 25, 2004, and the final incoming call on December 3, 2004 were calls to voicemail except six calls highlighted yellow.  (Tr. 1531-33). Ms. Herbert went through each of the six "yellow" calls and speculated that each likely went into Angela Rowe's voicemail, except one with a duration of "0." (Tr. 1533-38). Because Charter did not have all information about those "yellow" calls, it was unknown whether those calls were answered or went to voicemail.[5]

At trial, two defense witnesses testified that they changed their initial statements to the police regarding contact with Angela Rowe's household after

---

[5] Ms. Herbert testified that prior to trial she reformatted and corrected the duration of the yellow calls from the outside carriers using different equipment.

reviewing the Charter records.  Beverly Conley, the children's aunt, testified that Alexus called her late one evening.  (Tr. 1673).   Beverly Conley told the police that the call occurred at approximately midnight on November 27, 2004.  (Tr. 1674).  Later, after Beverly Conley spoke to the prosecutor and viewed the Charter records, she believed she was mistaken about the date of Alexus' phone call.  (Tr. 1674-77).   The Charter records indicated that the last call between her number and Angela Rowe's landline was on November 21, 2004.  (Tr. 1677).

Sherry Conley, another aunt, testified that she saw the Charter records and State's Exhibit 219, a graph of the calls made to and from Angela Rowe's landline. (Tr. 1680, 1691-92).  According to the records and graph, no calls were made to or received from Sherry Conley's numbers and Angela Rowe's landline between November 26 through the 30.   (Tr. 1691-92).   After seeing the graph, Sherry Conley changed her prior statement that she had talked to the victims on November 27 and 28.   (Tr.1691-92).

The State also called Dan Jensen, a records custodian for Sprint Nextel.   He brought into court the Sprint call detail records, which is raw data directly from the phone switch, for petitioner's cell phone and his brother, Perry Taylor's cell phone. (St. Exhs. 223, 224, 260).  He also brought the Sprint billing records for Gerjuan

24

Rowe's cell phone (Exh. 252).  These records were admitted into evidence without objection.

The Sprint records captured all outgoing and incoming calls in the network. Gerjuan Rowe's records indicated the number she dialed when making outgoing calls but did not indicate the number for incoming calls. Rather, Gerjuan Rowe's records reflected an incoming call only by the designation "incoming." (Tr.1450-51).   On November 23, Gerjuan Rowe's cell called Angela Rowe's landline seventeen times.  From November 24 through December 3, there were no outgoing calls from Gerjuan Rowe's cell to Angela Rowe's landline.  Mr. Jensen testified that there was one outgoing call from petitioner's cell to Angela Rowe's landline on November 22 and none thereafter.

The records of petitioner and Perry Taylor's cell phones reflected several calls during the late night of November 23,  the early morning of November 24, and December 4, between petitioner, his brother, their mother, and petitioner's wife.  (St. Exhs. 220, 223, 224, 233, 234, 235, 236, 237, 238, 242, 252, 260).

**B.**    ***Post-Conviction Evidenc*e**

At petitioner's post-conviction hearing, Christopher Avery, Senior Counsel for Charter, testified that Charter began its telephone service (the service provided to Angela Rowe) in the St. Louis area in the summer of 2004.   (PCR Tr. 89-91).

25

At the time of the post-conviction hearing in 2011, Charter included a standard disclaimer in response to records requests that advised that Charter:

> ...DOES NOT keep or have records for every incoming or outgoing call made or received by our telephone subscribers. The absence of a record for a particular call(s) on the attached log does not mean that such call(s) was not made or received but, rather, means that a record of such call(s) was not recorded by our system. Further, some of the information contained herein is provided by third-party carriers and is subject to error. These records are provided "as is" without representations and/or warranties of any kind.

(Mov. Exh. 11). Charter began using the above specialized disclaimer in 2009.  At some point after June 2005 and before March 2006 (and at the time of trial in February 2008), Charter routinely included in its response letter for telephone records, the following disclaimer language:

> Please be aware that Charter's billing records from which the above information is obtained are subject to human error and Charter cannot always guarantee the accuracy of such records. You should not rely solely on this information and should always independently corroborate the information Charter provides you with other information you have concerning the identity of the individual.

(Mov. Exh. 12).  Charter used the disclaimer language to make clear to the requesting party that Charter's records may contain errors or omissions.  Mr. Avery further testified that, from mid-2005 through 2008, if any attorney asked him whether Charter guaranteed the accuracy of its telephone landline records or for any disclaimer language used by Charter, he would have told them that Charter

does not guarantee the accuracy of its records and would have provided them with the relevant disclaimer language.  He would have been available to testify at the trial in February 2008.  Mr. Avery acknowledged that he had previously appeared at the pre-trial depositions of Cathy Herbert and did not mention the disclaimer language or that Charter did not guarantee its records.

Cathy Herbert, the Charter records custodian who testified at trial, also testified at the post-conviction hearing.  Ms. Herbert testified that when she worked at Charter, she was aware that Charter used disclaimers and did not guarantee the accuracy of its records.  At the time of the trial, Ms. Herbert believed that the Charter records contained all outgoing calls.  At the post-conviction hearing, Ms. Herbert compared Charter's records for Angela Rowe's landline with Sprint's records for Perry Taylor and petitioner's cell phones.  Ms. Herbert testified, contrary to her trial testimony, that "there is obviously a discrepancy, and it is possible that one or the other [record] could be incorrect or not contain all [phone calls]." (PCR Tr. 41-53).  Specifically, Ms. Herbert acknowledged that certain outgoing calls made from Angela Rowe's landline appeared on the Sprint's records of Perry Taylor and petitioner's cell phones that received the call (as an incoming call), but do not appear on Charter's records of Angela Rowe's landline

as an outgoing call.  Those calls occurred between November 22nd and December 3rd, the time period charged in petitioner's indictment.

Had trial counsel asked Ms. Herbert to compare Sprint's records of Perry and Leonard's cell phones with Charter's records, she would have been willing to do so.  She would have testified at trial that "there is obviously a discrepancy" and, evidently, the Charter records did not contain all outgoing calls.  Ms. Herbert could not explain why the Charter records did not show all outgoing calls.

At the hearing, Ms. Herbert also compared Charter's records of Angela Rowe's landline with Sprint's records of Gerjuan Rowe's cell (314-517-1270).  When Gerjuan Rowe's cell phone records (314-517-1270) reflected an outgoing call to Angela's landline (314-395-1512), Charter's records reflected an incoming call from a different number (314-878-1575).  This happened for seventeen calls.

There were several reasons why the incoming number reflected on Charter's records might be a number other than the actual calling number.   It was possible that, in 2004, that incoming number was a routing number, a "spoof number," or could have belonged to a different carrier (PCR Tr. 65, 84).

Had trial counsel asked Ms. Herbert to compare Sprint's records of Gerjuan Rowe's cell phone with Charter's record of Angela Rowe's landline, she would have done so.   She would have informed the jury that Charter's records, on

28

seventeen occasions, showed an incoming call different from the actual number calling Angela Rowe's landline.

In addition, certain outgoing phone calls made from Angela Rowe's landline to Gerjuan Rowe's cell were not reflected on Sprint's record of Gerjuan Rowe's cell as "incoming" calls.  According to the records, that occurred seven times. (Mov. Exhs. 2A, 9; St. Exhs. 220, 252).   Ms. Herbert testified that she would have been willing to make the above comparison and would have testified at trial that Sprint's records for Gerjuan Rowe's cell did not reflect all incoming calls.

Dan Jensen, the Sprint records custodian, who testified at trial also testified at the post-conviction evidentiary hearing.  Mr. Jensen testified at trial that the Sprint call detail records of petitioner and Perry Taylor's cell phones captured all incoming and outgoing calls in the Sprint network.  Mr. Jensen also testified at trial that Sprint's billing records for Gerjuan Rowe's cell phone did not indicate the telephone number for incoming calls but rather designated them merely as "incoming."  He was not asked at trial whether the word "incoming" would show up every time someone called Gerjuan Rowe's cell phone, but he testified at the post-conviction hearing initially that "that's exactly how it works" (PCR Tr. 105).

Mr. Jensen further testified (as Ms. Herbert had) that certain outgoing phone calls made from Angela Rowe's landline to Gerjuan Rowe's cell are not reflected

29

on Sprint's records as "incoming" calls.  (PCR Tr. 112-15).  Mr. Jensen was not able to definitively answer why that occurred.  However, he believed that some incoming calls are not billed so would not appear on the bill, such as calls not answered or calls to a phone that has been powered off.  Mr. Jensen was also asked about the fact that when Gerjuan Rowe's cell called Angela Rowe's landline, Charter's records showed a different incoming number, and he was unable to explain that.  (PCR Tr. 111-12).

Mr. Jensen compared Charter's records of Angela Rowe's landline with Sprint's records of petitioner and Leonard Perry's cell phones.  (PCR Tr. 106-08; Mov. Exhs. 2A, 7).  Like Ms. Herbert, Mr. Jensen acknowledged that Sprint's records of both petitioner and his brother's cell phones showed incoming calls from Angela Rowe's landline and yet Charter's record of Angela Rowe's landline did not show corresponding outgoing calls.  (PCR Tr. 106-110; Mov. Exhs. 2A, 7, 8).

Mr. Jensen compared Perry Taylor's cell phone records with petitioner's cell phone records.  (PCR Tr. 116).  Perry Taylor's record showed an incoming call from petitioner's cell on November 24 at 1:05 a.m., Eastern Time, but Leonard Taylor's record did not show a corresponding outgoing call.  In addition, Perry

Taylor's record showed an outgoing call to petitioner's cell on November 25 at 9:10 a.m., but a corresponding call was not reflected on petitioner's records.

Mr. Jensen explained that Sprint does not guarantee one hundred percent accuracy of its records.  (PCR Tr. 117).  One Sprint record could show a call while another record does not show the corresponding call, because the call was roaming on another wireless carrier's network.  The Sprint records may have also contained an error due to hardware or software failure.  Mr. Jensen would have been willing to make the above comparisons at trial and would have testified at trial as he did at the hearing.

Trial counsel, testified that the defense strategy was to determine any potential for activity in the home after petitioner left the area on November 26.  It was also important to review the State's evidence and investigate the entire crime period charged, which began on November 22.  The defense strategy was "based on the information [counsel] had at the time."  Counsel were not aware that the Charter records did not show all outgoing calls and that Ms. Herbert's testimony that the Charter landline records showed all outgoing calls was false.  If they had known, they would have brought that out at trial.

If the Charter records did not show all outgoing calls, then the Charter records were not reliable to prove calls not made.  Furthermore, any inaccuracies

31

or omissions of the Charter records would have also aided the defense, because "the records gave us problems with some of the other testimony that we needed from people such as Beverly Conley, Sherry Conley,…and Gerjuan Rowe" (PCR Tr. 182-83). When Charter's records of Angela Rowe's landline were discussed among the team members, counsel viewed those records as being devastating to the defense.

Before trial, counsel were not aware that on seventeen occasions Gerjuan Rowe's cell showed up as a different incoming number on Charter's records of Angela Rowe's landline. Also, counsel were not aware that Sprint's billing records for Gerjuan Rowe's cell did not indicate an "incoming" for every time she was getting an incoming call, such that there were times that Charter's record of Angela Rowe's landline indicated that Angela Rowe's landline made an outgoing call to Gerjuan Rowe's cell but there was no corresponding "incoming" on Gerjuan Rowe's records. If they had known of this, they would have brought that out at trial.

Trial counsel were not aware that there were instances where Perry Taylor's records indicated calls to or from petitioner's cell and there was not a corresponding call reflected on petitioner's records. Counsel would have brought that out at trial.

Counsel were not aware that Charter employed a disclaimer regarding its records and did not guarantee the accuracy of its records.   Rather, Charter represented to counsel that the Charter records included all outgoing calls.  Had counsel been aware of disclaimer language employed by Charter, and that Charter did not guarantee the accuracy of its records, they would have adduced evidence of that.  Similarly, if counsel had known about the issues with Charter's and Sprint's records, they would have objected to the admission and use of the records at trial based upon the lack of sufficient reliability as there was no trial strategy reason for not doing so.

Counsel did not recall having any kind of admission from the Sprint records custodian that Sprint could not guarantee the accuracy of its records.  (PCR Tr. 149). If she had known, she would have adduced such evidence at trial. (PCRTr.149).  Finally, counsel testified that five weeks before trial, the prosecutor called and indicated that Ms. Herbert had created a new set of records.  Counsel did not consider objecting to these records or to Ms. Herbert's testimony regarding them due to the unreliability of the records not being known at that time.

## C.  *Failure to Discover Omissions and Inaccuracies in the Phone Records and Object to the Admission of the Records.*

In reviewing this claim, the court must be guided by the familiar test of *Strickland v. Washington*, 466 U.S. 668, 694 (1984).   Under the two-part *Strickland* test, the court must consider whether trial counsel's performance was

33

objectively unreasonable and whether the defendant was prejudiced thereby.  *Id*. Trial counsel can be found to be ineffective for failing to perform an adequate investigation and in failing to adequately cross-examine a State's witness.  *See, e.g.*, *Driscoll v. Delo*, 71 F.3d 701 (8th Cir. 1995).

Trial counsel should have discovered and adduced evidence of the omissions and inaccuracies in the Charter and Sprint phone records and objected to the admission of the records.  Trial counsel's objection to these records would have been successful because: 1) a comparison of the available phone records demonstrated that the records contained inaccuracies and omissions; and 2) the State adduced no evidence that the companies' computer systems reliably produced accurate results.  In fact, the records custodians testified at the post-conviction hearing that their companies did not guarantee one hundred percent accuracy of their records.  Mr. Jensen also testified at the post-conviction motion hearing that, in his five years of experience, he previously observed discrepancies between the phone records of two different companies and had been asked to explain discrepancies between two sets of Sprint's records.

The Missouri Court of Appeals has held that the reliability of a computer system or accuracy of the computer system's results is a prerequisite to the admission of computer-generated records.  *See State v. Dunn*, 73 S.W.3d 427, 431-32 (Mo. App. W.D. 1999).  In petitioner's case, a comparison of the available

34

records demonstrated that they contained inaccuracies and omissions.  Because of these problems with the records, the State was required to produce evidence that the computer systems which collected the data were reliable or produced accurate results.   The State did not produce any such evidence at trial.   At the post-conviction hearing, the records custodians testified that their companies do not guarantee one hundred percent accuracy of their records.  (PCR Tr. 38-9, 117, 129).

Trial counsel's failure to discover and adduce evidence of the phone records' deficiencies and inaccuracies, and object to them on the basis of an insufficient foundation was unreasonable.   *Strickland v. Washington,* 466 U.S. at 687.   If counsel had made an objection to these records, the trial court would have sustained it or admitted the records only for a limited purpose.  Petitioner suffered prejudice because these records were used by the State to argue the Angela Rowe made no outgoing calls on or after November 26, 2004 because she had been killed and that Gerjuan Rowe did not talk to Angela Rowe after petitioner left town.   The State also used these records to convince Sherry and Beverly Conley to change the dates they last remember speaking to the victims.   But for counsel's deficient performance, there is a reasonable probability that the outcome of the trial would have been different.

D.    *Failure to Object to Ms. Herbert's Testimony Regarding Six Incoming Calls*

Trial counsel was also ineffective for failing to object to Ms. Herbert's testimony regarding her changes to the durations of the six incoming "yellow" calls and her opinion that five of the "yellow" calls that occurred after petitioner left town went into voicemail and one had a duration of "0."

Ms. Herbert possessed insufficient knowledge of the outside carrier's operations and methods of calculating the durations of the phone calls to revise the durations of the "yellow" incoming calls and offer an opinion about whether those calls were picked up or went into voicemail.  Ms. Herbert's primary duty was providing records upon requests to third parties.

Charter did not have all the information regarding the "yellow" calls because they were not recorded by the same equipment as the other calls Charter provided. The information that Charter received from outside carriers was not readable until it was formatted by Charter's equipment.   Upon review of the information, Ms. Herbert discovered that the calls had been improperly formatted and the "time was way off."  (PCR Tr. 75-76).  She reformatted the calls using other equipment but was unable to determine how the new program determined the length of the calls from outside carriers or why there were changes in duration after they were reformatted.  After reformatting, she believed that the "yellow" calls likely went to

voice mail because the duration of these calls were the same as preceding calls that went into voicemail.

Ms. Herbert's testimony indicated that she did not have a sufficient understanding of the outside carriers' methods or computer systems to correct or interpret the data regarding the duration of the "yellow" incoming calls.  Under *Cach, LLC v. Askew*, Ms. Herbert was required to have some understanding or information about the computer program that could be used to correctly interpret the outside carriers' data.  *See Cach, LLC v. Askew,* 358 S.W. 3d 58, 60 ( Mo. banc. 2012).  She could not simply run the data through a different carrier until she got the result she wanted.

Trail counsel's failure to object to Ms. Herbert's testimony regarding her changes in the durations of the "yellow" calls and her opinion that calls went into voicemail was unreasonable.  *Strickland,* 466 U.S. at 687.  Petitioner was prejudiced  by this deficient performance because her testimony was used by the State to argue that calls to Angela Rowe's house went into voicemail after petitioner left town.  If trial counsel had made objections, they would have been sustained and there is a reasonable likelihood that the outcome of the trial would have been different.

**E.**    ***Failure to Adequately Examine Phone Records and Cross-Examine Records Custodians Regarding Omissions and Inaccuracies in the Records and that the Phone Carriers Could not Guarantee Accuracy of Records***.

Trial counsel did not conduct an adequate review and investigation of the phone records.  Due to counsel's inadequate examination and investigation of the records, counsel failed to adduce, through cross-examination of Ms. Herbert and Mr. Jensen, evidence that: Sprint and Charter did not guarantee the accuracy of their phone records; at the time of trial, Charter routinely provided a disclaimer with its records to advise the requesting party that Charter's records may contain errors or omissions; Charter's records of Angela Rowe's landline did not show all outgoing calls; the Sprint call detail records did not show all calls; Gerjuan Rowe's billing records did not reflect an "incoming" for every incoming call; and when Gerjuan Rowe's cell called Angela Rowe's landline, a different number showed up as the incoming number on Charter's records of Angela Rowe's landline.

Trial counsel's dual failure to carefully review the records and to cross-examine Ms. Herbert and Mr. Jensen about the inaccuracies and omissions in the records, and evidence that Charter and Sprint did not guarantee the accuracy of its records, was unreasonable.  *Strickland,* 466 U.S. at 687; *Driscoll*, 71 F.3rd at 709. Petitioner was prejudiced because these records were used by the State to argue that Angela Rowe did not make any outgoing calls on or after November 26, 2004, because she had been killed, that petitioner did not attempt to call the victims after November 26, 2004, and that Gerjuan Rowe did not talk to Angela Rowe after petitioner left town.  The prosecution also used these records to convince Sherry

38

and Beverly Conley to change the date of their last contact with Angela Rowe's household and to discredit their original statements to the police.   Also, trial counsel could have used the deficiencies in the record to attack Ms. Herbert's testimony, particularly her opinion that the last outgoing call to Perry Taylor went to voicemail.   But for trial counsel's omissions regarding the phone records, there is a reasonable probability of a different outcome at trial.

**F.** ***Failure to Adduce Through Cross-Examination Favorable Evidence from Phone Records***

Trial counsel was ineffective for failing to adduce through cross-examination of the State's witnesses (Cathy Herbert, Dan Jensen, and Betty Byers) favorable evidence from the available telephone records, including evidence: 1) to impeach Betty Byers' testimony that Perry was at her home on Thanksgiving (November 25) and told her that Leonard confessed; 2) that there was a phone call to Southwest Airlines from the victims' landline on November 23 (and calls attributable to Angela were made after that); and 3) that, according to Charter's records of the victims' landline, there was no call to or from Leonard from October 17 (the date that the Charter records began) through November 5, a twenty-day period of time.   Trial counsel's failure to adduce this favorable evidence fell below the standard of care that a reasonably competent attorney would exercise under similar circumstances.  *Strickland v. Washington, supra.*

39

Petitioner suffered prejudice from this failure because Perry Taylor's phone records could have been used to impeach Ms. Byers testimony that Perry Taylor told her of petitioner's confession at her home on Thanksgiving.  Also, evidence that a call was made to Southwest Airlines as early as November 23, 2004 from Angela Rowe's number would have rebutted the State's theory as to the murders and aided the defense.  Finally, the fact that there was no call from petitioner's phone to Angela Rowe's phone for a prior twenty-day period would have rebutted the State's argument that the petitioner did not call Angela Rowe after he left St. Louis because she was dead.  If counsel would have adduced all of this favorable evidence from the phone records, there is a reasonable probability that the outcome of the trial would have been different.

## G.   *False Testimony*

Petitioner's conviction was obtained in violation of his right to due process because the jury relied on false testimony to find petitioner guilty of the charged offenses.  *See Napue v. Illinois*, 360 U.S. 264, 269 (1959).  As noted earlier, the jury relied on Ms. Herbert's false testimony regarding the Charter phone records of Angela Rowe's landline to find petitioner guilty.

At trial, Ms. Herbert testified that the Charter records of Angela Rowe's landline telephone contained all outgoing calls.  As a result of that testimony, the

State used the Charter records to mislead the jury.   As noted above, the evidence adduced at the 29.15 hearing demonstrated that Ms. Herbert's testimony was false.

It is well settled that a conviction based on false testimony violates due process if it affected the judgment of the jury.  *See United States v. Bagley*, 473 U.S. 667, 678 (1985); *see also Durley v. Mayo*, 351 U.S. 277 (1956).   Petitioner has also clearly established that he was prejudiced by this false testimony.  *See Sanders v. Sullivan,* 863 F.2d 218 (2nd Cir. 1988).

The phone records, according to trial counsel, were devastating to the defense.  These records were used by the State to argue that Angela Rowe made no outgoing calls after November 26, 2004 and that Gerjuan Rowe did not speak with Angela Rowe after petitioner left town.  The records were also used to convince Sherry and Beverly Conley to change the dates they spoke with Angela Rowe's household and discredit their original statements to the police.   This false testimony regarding the phone records clearly had a pervasive effect on the inferences to be drawn from the records and altered the evidentiary landscape in favor of the State.  During its four and one-half hours of deliberations, the jury requested, and received, the phone records.  It is therefore clear that this false testimony "affected the judgment of the jury." *Bagley*, 473 U.S. at 678.

Finally, Ms. Herbert's false testimony also implicates the Eighth Amendment's ban on cruel and unusual punishment.  A decision in a capital case

must reflect a heightened degree of reliability to satisfy the Eighth Amendment's prohibition of cruel and unusual punishment in all stages of a capital proceeding. *McClesky v. Kemp*, 107 S. Ct 1756, 1795 (1987); *Schiro v. Farley,* 114 S. Ct. 783, 793 (1994).  Ms. Herbert's false testimony infected the trial with unfairness that also impacted the result of the penalty phase.  Habeas relief is warranted.

## CLAIM 4

**THE TRIAL COURT VIOLATED THE PETITIONER'S FIFTH, SIXTH, AND FOURTEENTH AMENDMENT RIGHTS WHEN IT DENIED PETITIONER'S MOTION TO EXCLUDE TESTIMONY AND EVIDENCE REGARDING BLOOD AND DNA TESTING ON PETITIONER'S SUNGLASSES AND HIS OBJECTIONS TO THIS EVIDENCE BECAUSE OF ITS LATE DISCLOSURE, LACK OF PROBATIVE VALUE, UNRELIABILITY, AND SPECULATIVE AND MISLEADING NATURE.**

At trial, the State was allowed to present evidence, taken from a pair of petitioner's sunglasses, of blood and DNA testing done almost two years after the seizure of the sunglasses and two months prior to trial.  Furthermore, not only was the disclosure of this testing late, but the results of the tests lacked probative value and denied petitioner a fundamentally fair trial.  Specifically, the sunglasses tested weakly for the possible presence of blood and the DNA testing could not confirm that the substance on the sunglasses was blood or that Angela Rowe was actually the donor.

42

### A.   *Blood and DNA Testing Should Have Been Excluded Due to Late Disclosure.*

When petitioner was arrested in Kentucky on December 9, 2004, the police seized a pair of sunglasses from the car in which he was a passenger.  (St. Ex. 158, Tr. 1331).  The next day, the police brought the sunglasses and other items seized from the car to Missouri.  The defense filed its first discovery request on February 16, 2005, seeking all reports or statements of experts, including results of physical and scientific tests, experiments or comparisons.  (L.F. 50).  On September 15, 2005, the defense requested notice as to whether the State would use DNA evidence at trial, and, if so, all information regarding this evidence. (L.F. 87-88, 91-93, 95).  On May 25, 2006, petitioner filed a request for the return of his personal property that was seized as the time of his arrest.   (L.F. 181-94).  Subsequently, in response to this request, on August 16, 2006, the prosecutor sent an investigator to get the travel bag and its contents from the police department and bring it to the prosecuting attorney's office.  (Tr. 931, 1355).  After having the travel bag and sunglasses for almost three months, the investigator took the bag and sunglasses to the crime laboratory for testing on November 8, 2006.  (Tr. 1355-56, 1361; L.F. 647).  By this time, the trial had been continued several times and the trial was scheduled to commence on May 30, 2007.  (8/11/05 Tr. 6; 9/16/05 Tr. 4; 8/24/06 Tr. 65; L.F. 96, 443).

On March 22, 2007, about two months before petitioner's trial, the State disclosed a January 26, 2007 laboratory report indicating that petitioner's sunglasses had tested presumptively positive for blood after a phenolphthalein test has been performed.  (L.F. 646).  On April 24, 2007, the State disclosed an April 19, 2007, DNA lab report indicating that Angela Rowe could not be excluded as the donor of the substance found on the petitioner's sunglasses.  (L.F. 646). Subsequently, the State disclosed additional DNA testing material.

The defense filed a motion to exclude the results of the phenolphthalein and DNA testing due to the two-year delay in testing the sunglasses.  (L.F. 645-48).  If this evidence was not excluded, the defense argued that they would have to seek another continuance to prepare for this new evidence in spite of petitioner's previous assertion of his right to speedy trial.  (L.F. 645-48).  At the May 9, 2007 hearing on petitioner's motion, the prosecutors stated that the delay in turning over the evidence was petitioner's fault because of his May 2006 request to return his property.  (Tr. 74-75).  In addition, the prosecution stated that they did not know the crime laboratory was going to do the DNA testing and did it on their own initiative.  (Tr. 73-74).  The trial court denied petitioner's motion to exclude this evidence.  (*Id.*)  Because of this ruling, defense counsel sought and received a continuance over petitioner's objection.

The trial court's failure to exclude the blood and DNA test results from petitioner's sunglasses - evidence  that the prosecution had in its possession for two-years - violated petitioner's rights to due process, a fair trial,  and a speedy trial under the United States Constitution.   The late disclosure of this evidence disadvantaged petitioner's defense.   The State disclosed the "presumptive blood" test ten weeks before trial and the DNA results five weeks before trial.  (L.F. 646). The State's reasons for its delay in testing and disclosure were nonsensical.  On the one hand, the prosecution stated that petitioner was at fault for the delay because of his request for the return of his property and on the other hand, indicated that the crime laboratory took it upon themselves to do the testing.

In determining whether disclosure was timely enough to satisfy due process, one of the factors reviewing courts consider is the prosecution's reasons for late disclosure.  *See Ashker v. Class*, 152 F.3d 863, 867 (8th Cir. 1998).  Given the unexplained delay in testing petitioner's glasses and the fact petitioner had strenuously asserted his speedy trial rights, the State's delay in testing was in bad faith. Clearly, the State had no rational reason for its delay in testing the sunglasses and its proffered reasons did not explain the delay.

Furthermore, because of the technical nature of this evidence and its potential impact upon the jury, the prosecution knew that the defense would have no other alternative but to request a continuance to prepare for this evidence.  The

results of these tests could not have been expected, and once they were disclosed, trial counsel could not have been prepared for trial within five weeks given counsel's other pre-trial duties. The trial court knew that by denying petitioner's motion to exclude, it would force counsel to seek a continuance.  The trial court granted a continuance stating it was doing so "in the interest of justice… understanding that the request is being made reluctantly and only due to the facts and circumstances that gave rise to this motion." (Tr. 76).  Because of petitioner's previous assertion of his speedy trial rights, the continuance was not a remedy but a further violation of his constitutional rights.  (See Claim 1, *infra*.)

Although the State was aware of petitioner's speedy trial request, it inexcusably waited almost two years to send his sunglasses to the crime laboratory for testing and then only weeks before the May 30th trial date disclosed the results. Again, the trial court's denial of petitioner's motion to exclude forced the defense to seek another continuance over petitioner's objections.   The State's late disclosure violated the fair notice requirement of the due process clause and petitioner's rights to a fair and speedy trial.  *See, e.g.*, *Lankford v. Idaho*, 500 U.S. 110, 120-121 (1991).

**B.**   ***Blood and DNA Testing Should Have Been Excluded Because Its Admittance Deprived Petitioner of a Fundamentally Fair Trial***

The sunglasses seized from petitioner had no visible forensic evidence on it, however, a chemist swabbed them in nine places getting a weak positive reaction

46

for the possible presence of blood from a minuscule speck of material.  (Tr. 1376-77, 1391).  The chemist conducted the test using phenolphthalein, a chemical that reacts positively to blood and other substances.  (Tr. 1395, 1400-01).  Because this was a presumptive blood test, a confirmatory test would have to be performed to determine whether the substance on petitioner's sunglasses was in fact blood.  Because the sample was so small (.03 nanogram per microliter), any confirmatory blood test performed would have expended it.   Rather than do the confirmatory blood test, the State sent the sample for DNA testing.  (Tr. 1467, 1480).  The test results indicated the presence of two or more DNA profiles.  (Tr. 1467-68, 1500, 1505).   The chemist compared the DNA profiles of the victims to the results and excluded the children as the donors, however, he could not exclude Angela Rowe. (Tr. 1468).  Furthermore, the chemist could not confirm the DNA was Ms. Rowe's DNA and, even if it was her DNA, it could have come from a source other than her blood.  (Tr. 1468, 1484, 1487, 1503,

Prior to trial, defense counsel sought to exclude any evidence that the substance found on petitioner's sunglasses was blood or was even presumptively blood.  (L.F. 723-27).  In response to petitioner's motion, the trial court conducted a hearing under *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), and took evidence regarding the phenolphthalein test.  (1/30/08-Tr. 70).   Although a phenolphthalein test is sensitive to blood, it will also give the same reaction to a

47

myriad of other substances such as semen, potato, tomato sauce, red kidney bean, horseradish, or bleach. (1/30/08 Tr. 86-88, 90). Evidence further showed that this test for blood is generally accepted within the forensic scientific community as a presumptive test for blood but that it cannot confirm a substance as blood. (1/30/08-Tr. 73-75, 98). The trial court denied the defense's motion to exclude the evidence of the presumptive presence of blood. (L.F. 998).

At trial, the defense lodged objections to State's exhibits 176 (swabbing), 178 (report regarding phenolphthalein test), and 179 (DNA test report). (Tr. 1378-79, 1381, 1469-70). The trial court overruled these objections as well as testimony regarding the speck found on the sunglasses and that the evidence was so minuscule it lacked any probative value.

The trial court erred in failing to exclude the evidence of the blood and DNA testing of petitioner's sunglasses. This evidence lacked any probative value, was unreliable, speculative and misleading denying petitioner of due process and a fundamentally fair trial.

The United States Supreme Court has stated that a writ of habeas corpus will be granted for erroneous admission of evidence where the "testimony is almost entirely unreliable and . . . the fact finder and the adversary system will not be competent to uncover, recognize, and take due account of its shortcomings." *Barefoot v. Estelle*, 463 U.S. 880, 899 (1983). Such is the nature of the evidence

48

of the blood and DNA testing in petitioner's case.   Specifically, the phenolphthalein test was used by the State to show that the speck of material on petitioner's glasses was in fact blood even thought the test was only presumptive and not conclusive.   Also, because no confirmatory test was performed on the material, any probative value the evidence had was outweighed by its prejudicial nature.   Due process mandates that guilt be established by probative evidence. *Estelle v. Williams,* 425 U.S. 501, 503 (1976).   This evidence misled the jury into believing that the material on petitioner's glasses was in fact blood.   Also, the fact that the State performed a DNA test on the material did not make this evidence any more admissible because the DNA test could not confirm that it was blood instead of some other substance.

Finally, the speck on petitioner's glasses was not relevant because it did not tend to make the existence of any material fact more or less probable that it would be without the evidence.   *State v. Sladek,* 835 S.W.2d 308, 314 (Mo. banc. 1992). The speck on petitioner's sunglasses was infinitesimally small and was never confirmed as blood.   The phenolphthalein test registered only a weak positive reaction.   Also, given the size of the material only a partial DNA profile could be developed which contained DNA from at least one other donor. Although the Ms. Rowe could not be excluded as a donor, the test could not confirm her as the donor.   Also, even if the DNA material belonged to Ms. Rowe it could have been

49

skin, hair, or saliva, and given that she and petitioner lived together, there was a number of ways it could have been transferred to the glasses.  Finally, it is uncertain how long the material had been on the sunglasses.

By admitting the evidence of the phenolphthalein and DNA tests, the trial court denied petitioner due process and a fair trial because the State obtained his conviction with speculative evidence, wholly lacking probative value, which misled and confused the jurors.  This constitutional error clearly was prejudicial as demonstrated by the emphasis of the prosecutor on this evidence in closing argument, where the state misleadingly contended this evidence was blood spatter from the crime scene.  (Tr. 1744-1746).  Habeas relief is warranted.

## CLAIM 5

**PETITIONER'S SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS WERE VIOLATED BY THE TRIAL COURT'S EXCLUSION OF PROSPECTIVE JUROR KATHLEEN TUMMINIA BASED UPON HER VIEWS ON THE DEATH PENALTY BECAUSE HER PERSONAL BELIEFS DID NOT SUBSTANTIALLY IMPAIR HER ABILITY TO PERFORM HER DUTIES AS A JUROR OR FOLLOW THE COURT'S INSTRUCTIONS.**

During *voir dire*, venireperson Kathleen Tumminia stated that she opposed the death penalty.  However, this juror indicated that she could be fair and follow the court's instructions.  (Tr. 203).  Nevertheless, the trial court struck this juror for cause when requested to do so by the state, over petitioner's objection.  (*Id*. 212).

Clearly established federal law holds that a constitutional violation occurs where a capital juror is removed because of personal opposition to death penalty. It is permissible to remove a death-scrupled juror only if the juror's views would substantially impair the juror's performance of his or her duties in accordance with the instructions and oath. *See Wainright v. Witt*, 469 U.S. 412, 424-426 (1985).  In order to exclude a death-scrupled juror, the trial court must have a definite impression that the juror's views on the death penalty would substantially impair the juror's performance and the juror would be unable to faithfully and impartially apply the law. *Id*.  When a death-scrupled juror is excluded who is otherwise qualified and willing to perform their duties as a capital juror, the capital prisoner's resulting death sentence is unconstitutional and must be reversed. *See Witherspoon v. Illinois*, 391 U.S. 510, 522, n.21 (1968).  In other words, a *Witherspoon* violation can never be treated as harmless error. *See Fuller v. Johnson*, 114 F.3d 491, 500 (5th Cir. 1997).

The record from the *voir dire* colloquy between this juror and the attorneys clearly indicates that a *Witherspoon* violation occurred.  Ms. Tumminia did not immediately respond to the state's question regarding whether any of the veniremen were personally opposed to the death penalty.  (Tr. 165-166).  Later, during this same line of questioning, Ms. Tumminia indicated she had qualms about the death penalty and was unsure she could impose it.  (*Id*. 166).  Ms.

Tumminia stated that she found the question overwhelming and indicated that whether she could consider both possible punishments was not a black and white issue.  (*Id*. 166-167).   When asked if she could consider the full range of punishment, this juror responded:  "I'm just saying I'm on the fence, and I don't know if I could be open to the whole range of possibilities you're offering."  (*Id*. 168-169).

 When questioned by defense counsel, the following exchange occurred:

| Tumminia: | "I think I could be fair and firm, I think I could isolate what takes place from my emotional concerns about life, my more – I guess spiritual leanings toward my faith and such.  I think I could be fair, if I had a balance sheet in front of me. |
|---|---|
| Defense Counsel: | Do you think you could follow the court's written instructions— |
| Tumminia: | Yes. |
| Defense Counsel: | - as they've been described to you here this morning? |
| Tumminia: | I think I could deal realistically with it." |

(*Id*. 203).

 Shortly thereafter, the trial court sustained the prosecutor's motion to strike Ms. Tumminia for cause.  (*Id*. at 212).   The prosecution contended that Juror Tumminia equivocated during the state's questioning and did not directly state she could consider both punishments.  (*Id*. 210).  Under *Witt* and *Witherspoon*, the trial

court violated petitioner's constitutional rights in striking this death-scrupled juror because her answers clearly did not indicate her views on the death penalty would substantially impair or prevent the performance of her duty as a juror.  *Witt*, 469 U.S. at 424.  While she expressed general reservations about the death penalty, there was no showing she could not faithfully and impartially apply the law.  *Id*. at 426.

Contrary to the trial court's finding, this juror did not equivocate.  This juror clearly was grappling with a complicated issue which, in her words, was not black or white.  (Tr. 166-167).  A death-scrupled juror's failure to immediately give full and unequivocal answers to these difficult questions does not support a strike for cause.  Thus, it is constitutional error to "exclude jurors whose only fault was to take their responsibilities with special seriousness."  *See Adams v. Texas*, 448 U.S. 38, 50-51 (1980).

The key passage from *voir dire* establishing a constitutional error is Juror Tumminia's unequivocal answer that she could follow the court's instructions.  *See Gray v. Mississippi*, 481 U.S. 648, 653 (1987).  Although Ms. Tumminia never expressly stated she could impose the death penalty, she did emphatically state she could follow the court's instructions and "realistically deal with it."  (Tr. 203).

Where a trial court strikes a venireman who opposes the death penalty who indicates he or she can set aside their beliefs and follow the law, this action

53

violates *Witherspoon* and requires that the petitioner's death penalty be set aside under the Sixth, Eighth, and Fourteenth Amendments.  *See Lockhart v. McCree*, 476 U.S. 162, 176 (1986).  This improper strike for cause requires that petitioner's death sentence be set aside because this action improperly tipped the scales toward a death sentence by creating a jury "uncommonly willing to condemn a man to die." *Witherspoon*, 391 U.S. at 521.  Habeas relief is warranted.

## CLAIM 6

**PETITIONER'S FIFTH, EIGHTH, AND FOURTEENTH AMENDMENT RIGHTS WERE VIOLATED BY THE PROSECUTOR'S IMPROPER ARGUMENTS.  TRIAL COUNSEL WAS ALSO INEFFECTIVE IN FAILING TO OBJECT TO THESE ARGUMENTS.**

A prosecutors' duty in a criminal proceeding is to seek justice.  *Berger v. United States,* 295 U.S. 78, 88 (1935).  Although the prosecutor should "prosecute with earnestness and vigor," he may not use "improper methods calculated to produce a wrongful conviction."  *Id.*  It is also settled that a prosecutor must not argue to a jury by appealing to its passion or prejudice. *See* ABA Standards for Criminal Justice § 3-5.8(c) (2d ed. 1982).  Ordinarily, the use of such methods is grounds for reversal of a conviction or sentence if it results in an unfair trial violating the Due Process Clause.  Reversal is required where, as here, a prosecutor's comments have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Berger*, 295 U.S. at 88.

In capital cases, closing arguments must receive a greater degree of scrutiny than those delivered in a noncapital case. *Caldwell v. Mississippi*, 472 U.S. 320, 329 (1985). In this case, the prosecution repeatedly crossed the line by arguing facts he knew to be false and injecting his personal opinions. (Tr. 1776, 1744-1746, 1846). Undoubtedly, the most egregious and prejudicial argument delivered by the prosecution was his argument that no phone records existed to corroborate Gerjuan Rowe's testimony that she spoke with her sister on November 28 because the call did not show up on Angela Rowe's home phone records. (Tr. 1746-1747, 1773-1775). The prosecution also argued that petitioner's failure to call Angela meant he must have known she was already dead, despite the fact that this theory was expressly contradicted by entries on Angela's calendar. (*Id*. at 1735). As noted under Claim 2, it was the state who successfully prevented Gerjuan Rowe from testifying about the fact that she received a call from her sister from an Amoco station, a fact corroborated by Gerjuan Rowe's phone records. The state also kept the jury from reviewing the entries from Angela's calendar that would have rebutted its argument about petitioner's failure to call Angela while he was out of town. It is obviously improper, and a violation of due process, for a prosecutor to deliberately argue a fact it knows is false to sway the jury to convict.[6]

---

[6] The prosecutor also misled the jury by contending that the trace evidence found on petitioner's sunglasses was blood spatter from the victim Angela Rowe. (Tr. 1744-1746). (See also Claim 4, *infra*.)

*See, e.g.*, *Brown v. Borg*, 951 F.2d 1011, 1017 (9th Cir. 1991).  It is also patently unfair for the state, after keeping out exculpatory evidence or documents by lodging a hearsay objection, to later argue that the excluded evidence did not exist. *See State v. Luleff*, 729 S.W.2d 530, 535-536 (Mo. App. W.D. 1987).

The prosecutor also made an improper and prejudicial remark during *voir dire* suggesting to several small panels of jurors that it was appropriate and proper for them to lean in favor of the death penalty because this case involved the murders of three small children.  (Tr. 229, 295-300, 459-461).  Two veniremen who heard these improper and prejudicial remarks, Raymond Hartgraver and Arthur Pruett, served on the jury.  (*Id*. 216, 280-281; L.F. 1070).

The prosecutor also delivered a clearly improper remark calling attention to petitioner's failure to take the stand at the penalty phase to express remorse.  (Tr. 1846).  This was an improper comment on petitioner's failure to testify.  *See Lesko v. Lehman*, 925 F.2d 1527, 1544-1545 (3rd Cir. 1991).

The final improper argument from the state urged the jury to convict because the defense did not call an independent expert witness to challenge the time of death testimony provided by medical examiner Dr. Phillip Burch.  (See Tr. 1778). This argument was clearly improper and unconstitutionally shifted the burden of proof from the state to the defense.  The record clearly indicated that Dr. Burch,

although he was called by the prosecution, gave testimony that supported both the prosecution's and defense's theories regarding the time of death of the victims.

Defense counsel stressed the fact that Dr. Burch's initial report indicated that the victims' death occurred only two to three days before their bodies were discovered. (Tr. 1199-1201, 1206-1207). At trial, the prosecution elicited a new opinion from Dr. Burch that the victims could have been shot two to three weeks before their bodies were found. (Tr. 1196). It is patently unfair under these circumstances to allow the state to draw an adverse inference from the defense's failure to hire an independent medical expert to refute Dr. Burch. This argument coupled with the other improper arguments "so infected the trial with unfairness as to make the resulting convictions [and death sentences] a denial of due process." *Darden v. Wainright*, 477 U.S. 168, 181 (1986).

Trial counsel was also ineffective in failing to object to these improper arguments. A reasonably competent attorney would have objected to these improper arguments based upon settled precedent from both the state and federal courts. *See, e.g.*, *State v. Weiss*, 24 S.W.3d 198, 199-200 (Mo. App. W.D. 2000); *Brown v. Borg*, *supra*; *Lesko v. Lehman*, *supra*.

*Strickland* prejudice is established in two ways. Had proper objections been made and had trial counsel sustained the objections and admonished the jury to disregard these inflammatory arguments, there is a reasonable probability of a

different outcome at trial. Had proper objections been overruled, there is a reasonable likelihood that petitioner's convictions or sentences would have been reversed on appeal had constitutional objections to these improper arguments been properly preserved. Habeas relief is warranted.

## CLAIM 7

**PETITIONER'S EIGHTH AND FOURTEENTH AMENDMENT RIGHTS WERE VIOLATED BECAUSE THE BAILIFF HANDCUFFED PETITIONER IN THE PRESENCE OF THE JURY AT THE CONCLUSION OF THE GUILT PHASE OF TRIAL.**

The record is clear that, after the verdicts were issued at the guilt phase, a court bailiff placed handcuffs on petitioner's wrists in front of the jury. (Tr. 1785-1786). Defense counsel immediately moved for a mistrial. (*Id*. 1786-1787). The trial court denied this request, noting: "He's just been convicted of four counts of murder in the first degree." (Tr. 1786).

There was no justification for handcuffing petitioner in front of the jury, which was obviously prejudicial by suggesting to the jury that petitioner was dangerous. This visible act of shackling, which occurred just before the penalty phase commenced, denied petitioner his due process and his Eighth Amendment right to a fair and reliable sentencing proceeding. *See Deck v. Missouri*, 544 U.S. 622, 632 (2005).

In *Deck*, the Supreme Court held that: "the Constitution forbids the use of visible shackles during the penalty phase, as it forbids their use during the guilt

58

phase, unless that use is 'justified by an essential state interest' - - such as the interest in courtroom security - - specific to the defendant on trial."  *Id*. at 624. Where a defendant is improperly shackled after the guilt phase in a capital case "the defendant need not demonstrate actual prejudice to make out a due process violation."  *Id*.  Where a court has shackled a capital defendant without adequate justification, penalty phase relief is warranted.  *Id*. at 635.

There was no evidence or pretrial hearing suggesting that there was any justification for handcuffing petitioner in front of the jury.  Petitioner did not disrupt the proceedings or do anything to warrant this prejudicial action.  Shackling is inherently prejudicial and undermines the integrity of the penalty phase by suggesting to the jury that the defendant is a danger to the community.  *Id*. at 633. Habeas relief is warranted.

## CLAIM 8

**TRIAL COUNSEL WAS INEFFECTIVE IN WAIVING CLOSING ARGUMENT AT THE PENALTY PHASE BECAUSE THE EVIDENCE PROVIDED COUNSEL WITH THE AMMUNITION TO RAISE COMPELLING REASONS FOR THE JURY TO REJECT THE DEATH PENALTY BASED UPON RESIDUAL DOUBT AND PETITIONER'S GOOD CONDUCT IN PRISON.**

During the penalty phase, pursuant to petitioner's wishes, defense counsel waived closing argument.  (Tr. 1849-1850).  This waiver, for the following reasons, constituted deficient performance and was prejudicial under the familiar test of *Strickland v. Washington*, 466 U.S. 668, 694 (1984).

59

In *Jones v. Barnes*, 463 U.S. 745 (1983) the Supreme Court made it clear that the defendant has the "ultimate authority" to decide "whether to plead guilty, waive a jury, testify in his or her own behalf, or take an appeal."  *Id*. at 751. Conversely, strategic decisions that would benefit from the "professional judgment," and "superior ability of trained counsel" are better left to lawyers.  *Id*. Thus, tactical decisions such as the best theory of defense or how to argue the case to a jury are decisions that counsel must make, regardless of the defendant's wishes. *See Florida v. Nixon*, 543 U.S. 175, 187 (2004).

Despite petitioner's desire that counsel make no effort to spare his life, counsel had a professional duty to deliver a closing argument raising available arguments supported by the evidence to try to convince the jury to reject the death penalty.  Based upon the facts set forth under Claim 2, *infra*, a powerful argument could have been made to the jury that they should spare petitioner's life based on residual or lingering doubt of guilt.  Defense counsel could have also advanced another, albeit less compelling argument, that petitioner's good behavior during his prior incarcerations was a mitigating factor.  (Tr. 1800).

Due to the weaknesses in the prosecution's case, the viability of petitioner's alibi defense, and prevailing case law, it is clear that trial counsel's failure to present any closing argument was objectively deficient under *Strickland's* performance prong.  On the issue of prejudice, there is a reasonable likelihood that

at least one juror would have rejected the death penalty if a persuasive argument had been advanced, based upon the evidence presented in the guilt phase, that petitioner's life should be spared because there were substantial and lingering doubts about his guilt.

In similar circumstances, reviewing courts have found counsel ineffective in failing to introduce any mitigating evidence and waiving oral argument in a capital case.  *See U.S. ex rel. Emerson v. Gramley*, 883 F.Supp. 225, 243 (N.D. Ill. 1995); *see also Kubat v. Thieret*, 867 F.2d 351, 367-368 (7th Cir. 1989) (defense counsel called no character witnesses at sentencing hearing and his closing argument was "grossly substandard.").  Counsel's waiver of closing argument in a capital case is also contrary to the ABA guidelines regarding the performance of counsel in capital cases.  *See* Commentary to ABA Guideline 10.11.  ("Personal argument by counsel in support of a sentence less than death is important.").

Although there is no Eighth Amendment right to present residual doubt evidence, Missouri's statutory scheme and jury instructions clearly contemplate that a capital jury can consider any factor supporting a sentence less than death. *See Williams v. State*, 168 S.W.3d 433, 443 (Mo. banc 2005).  In fact, petitioner's jury was specifically instructed in a final "catch all" instruction that they can reject the death penalty for any reason.  (L.F. 1285-1288).  *See also Jones v. State*, 784

61

S.W.2d 789, 793 (Mo. banc 1990) (finding catch-all instruction sufficient to encompass lingering doubt and that a more specific instruction was unnecessary).

In light of the foregoing facts, counsel's failure to deliver a closing argument at the penalty phase was professionally inexcusable, objectively deficient and prejudicial.  Habeas relief is warranted.

## **CONCLUSION**

WHEREFORE, for all the foregoing reasons, petitioner, Leonard Taylor, prays:

1.      That petitioner be permitted to file an amended petition;

2.      That a writ of habeas corpus be directed to respondent;

3.      That the State of Missouri be required to appear and answer the allegations in the petition for a writ of habeas corpus;

4.      That Mr. Taylor be afforded reasonable discovery and a full and fair evidentiary hearing on the allegations in the petition;

5.      That Mr. Taylor be discharged from his unconstitutional convictions and sentences of death; and

6.      That Mr. Taylor be allowed such other and further relief as may seem just, equitable, and proper under the circumstances.

Respectfully submitted,


/s/  *Kent E. Gipson*
KENT E. GIPSON, #34524
Law Office of Kent Gipson, LLC
121 East Gregory Boulevard
Kansas City, Missouri 64113
816-363-4400 / fax 816-363-4300
kent.gipson@kentgipsonlaw.com

*/s/ Kevin L. Schriener*
KEVIN L. SCHRIENER, #35490
Law & Schriener, LLC
141 N. Meremac, Suite 314
Clayton, MO 63105
314-721-7095 / fax 314-863-7096
kschriener@schrienerlaw.com

COUNSEL FOR PETITIONER

## CERTIFICATE OF SERVICE

I hereby certify that on the 3rd day of December, 2013, this petition was electronically filed using the CM/ECF system which sent notification to all counsel of record.

*/s/Kent E. Gipson*
Counsel for Petitioner