UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

LEONARD S. TAYLOR,                    )
                                      )
        Petitioner,                   )
                                      )
    v.                                )        No. 4:12 CV 2278 RWS
                                      )
TROY STEELE,                          )
                                      )
        Respondent.                   )

## MEMORANDUM AND ORDER

This matter is before me upon the petition of Missouri state prisoner

Leonard Taylor for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  (Doc.

19).  After carefully considering Taylor's petition, Respondent's brief (Doc. 29),

the underlying record (Doc. 29, Ex. A-JJ), and Taylor's reply (Doc. 46), I will

deny the petition for the reasons set forth below.

## BACKGROUND

### 1. Investigation & Arrest

On the evening of December 3, 2004, police investigated the St. Louis

County home of Angela Rowe and her three children at the request of family

members and school officials.  (Doc. 29, Ex. P at 23)  The investigating officers

observed that the front yard "was covered with the daily paper[,]" "[the] [mailbox]

was full of mail[,]" and that all the windows and doors were locked.  (*Id.*)  With

the assistance of the fire department, the investigating officers forced entry into the house through a window.  (*Id.*)

Inside, they discovered the bodies of Rowe and her children: Alexus Conley, age ten; Acqreya Conley, age six; and Tyrese Conley, age five.  (*Id.*, Ex. P at 24)  Each had sustained gunshot wounds to the head.  (*Id.*)  Rowe had sustained additional gunshot wounds to the torso and left arm.  (*Id.*, Ex. Q at 28)  The officers observed that the temperature inside the house was "very cold," that the television was on, and that there were no indications of burglary or previous forced entry.  (*Id.*, Ex. P at 25)  Based on information from Rowe's family that a fifth person, Taylor, lived at the house, the officers searched the residence and found no one else present.  (*Id.*)  Taylor then became a person of interest within the investigation.  (*Id.*, Ex. Q at 12)

The investigation quickly established a) that Taylor had an outstanding arrest warrant for a parole violation; b) that he had a wife, Debrene Williams, in California; c) that he had been driven to Lambert International Airport by his sister-in-law, Elizabeth Williams, on November 26; and d) that he had departed St. Louis that day on a flight to California under the alias "Louis Bradley."  (Doc. 29, Ex. P at 21)  Using cell phone records, the investigating officers determined that Taylor subsequently traveled from California to Kentucky.  (*Id.*)

In conjunction with United States Marshals, the investigating officers set up surveillance of several residences in Madisonville, Kentucky that Taylor had been known to frequent in the past. (Doc. 29, Ex. R at 11) On the morning of December 9, 2004, members of the surveillance team observed Taylor attempting to leave one of the residences by hiding on the floorboard of a car's passenger compartment. (*Id.* at 12) The car was stopped and Taylor was subsequently arrested. (*Id.* at 15) At the time of his arrest, Taylor was traveling under the alias "Jason Lovely" and possessed pamphlets, documents, and other materials laying out procedures for creating additional aliases and fraudulent vital documents. (*Id.*, Ex. at 15-17)

Taylor was charged with four counts of first-degree murder and four counts of armed criminal action for the killings of Angela Rowe and her children. (Doc. 29, Ex. A at 55-58) While awaiting trial for their murders, Taylor was tried and convicted on an unrelated charge of forcible rape and sentenced as a persistent sex offender to a prison term of one hundred years without parole. *See State v. Taylor*, 238 S.W.3d 145 (Mo. 2007) (summarizing underlying facts and affirming conviction on direct review); *see also Taylor v. State*, 344 S.W.3d 217 (Mo. App. 2011) (noting length of sentence and affirming denial of post-conviction relief). After multiple continuances were granted to Taylor's defense team to ensure

adequate representation, his murder trial began on February 25, 2008. (Doc. 29, Ex. P at 11)

The guilt phase of Taylor's trial for first-degree murder and armed criminal action concluded on February 28, 2008. The jury deliberated for four and half hours before finding Taylor guilty on all counts. (Doc. 29, Ex. S at 59-60) The jury reconvened the next day, February 29, 2008, for the penalty phase of the trial. (Doc. 29, Ex. T) The jury heard evidence of Taylor's prior convictions, testimony from the victim in the aforementioned forcible rape case, and testimony from family members of Angela Rowe and her children. (*Id.* at 7-12) On Taylor's orders, his trial team did not present any argument in mitigation and entered as their sole evidence a written stipulation of Taylor's good conduct while incarcerated. (*Id.* at 5-6, 12, 19) The jury deliberated for three hours before recommending the death penalty on each of the four counts of first-degree murder. (*Id.* at 20) On April 17, 2008, the trial court sentenced Taylor to death on each of the four murder charges and imposed consecutive sentences of life imprisonment on the armed criminal action charges. (*Id.* at 21-22)

### 3. Direct Appeal

Taylor raised eleven grounds in his direct appeal. (Doc. 29, Ex. U at 2) I briefly outline Taylor's arguments on direct appeal as follows:

In his first, second, third, and fourth grounds, Taylor argued that the trial court abused its discretion in excluding certain witness statements and other evidence as hearsay. (Doc. 29, Ex. U at 36, 62, 77, and 84)

In his fifth ground, Taylor argued that the trial court erroneously admitted forensic test results "that lacked probative value and [were] unreliable, speculative, and misleading." (*Id.* at 89)

In his sixth ground, Taylor argued that the trial court erroneously denied his motions to exclude those forensic test results based on the timing of their disclosure to the defense. (*Id.* at 99)

Seventh, Taylor argued that his speedy trial rights under Missouri state law and under the Missouri and United States Constitutions were violated by the multiple continuances granted to his defense counsel. (*Id.* at 107)

Eighth, Taylor argued that the trial court erroneously admitted a conversation between his brother Perry and the police, during which Perry stated that Taylor had confessed to the murders of Angela Rowe and her children, because the interrogating detective allegedly expressed an opinion as to Perry's credibility as a witness. (*Id.* at 118)

Ninth, Taylor argued that the trial court erroneously allowed a cause strike of a potential juror who had expressed reservations about her ability to consider capital punishment during voir dire. (*Id.* at 124)

Tenth, Taylor argued that the State made improper arguments during closing and that the trial court plainly erred by not intervening *sua sponte*. (Doc. 29, Ex. U at 129)

Finally, Taylor argued that the trial court abused its discretion by denying his request for a mistrial when, upon being found guilty by the jury, he was handcuffed in view of the jury while being removed from the courtroom. (*Id.* at 133)

The Missouri Supreme Court[1] addressed each of Taylor's claims on the merits and affirmed the trial court's judgment on October 27, 2009. *State v. Taylor*, 298 S.W.3d 482 (Mo. 2009).

*4. Post-Conviction Review*

Taylor raised eighteen grounds in his amended motion for post-conviction relief, which incorporates his prior pro se motion for post-conviction relief. (Doc. 29, Ex. Z at 42-114, Ex. AA, Ex. BB at 5-27) Two of these grounds are related to claims Taylor raises in his habeas petition. The first is that he received ineffective assistance of trial counsel when his defense team failed to adequately examine phone records used at trial and adduce allegedly favorable evidence from cross-examination of the phone records' custodians. (Doc. 29, Ex. AA at 5) The second ground that Taylor's waiver of evidence / counsel at the penalty phase of the trial

[1] Because Taylor was sentenced to death, the Missouri Supreme Court held exclusive appellate jurisdiction. *See* Mo. Const. art. V, sec. 3.

was not knowing, voluntary, and unequivocal is related to an ineffective assistance of counsel claim Taylor raises for the first time in his habeas petition.

The post-conviction court conducted an evidentiary hearing on May 20, 2011, on three of Taylor's claims: two ineffective assistance of trial counsel claims and a claim that the death penalty as administered in Missouri is unconstitutional. (Doc. 29, Ex. DD, Ex. EE)  The post-conviction court denied Taylor's motion for relief on September 19, 2011.  (Doc. 29, Ex. CC at 38-69)

### 5. *Appeal of Post-Conviction Review*

Taylor appealed the denial of post-conviction relief to the Missouri Supreme Court.  (Doc. 29, Ex. FF)  He raised four grounds in his appeal.  His first and second grounds disputed the post-conviction court's findings on claims raised at the evidentiary hearing.  (*Id.* at 37-40, 43-82, 83-116)  His third and fourth grounds alleged that the post-conviction court erred in refusing to grant an evidentiary hearing on additional claims.  (*Id.* at 41-42, 117-129, 130-138)  The Missouri Supreme Court affirmed the post-conviction court's decision on October 30, 2012. (Doc. 29, Ex. II)

### 6. *Petition for Writ of Habeas Corpus*

Taylor raises eight claims in his petition for habeas relief.

First, that his speedy trial rights under Missouri state law and under the Sixth Amendment of the United States Constitution were violated by the delay of

approximately thirty-one months between his invocation of his speedy trial right in July of 2005 and his trial in February 2008.  (Doc. 19 at 5-13)

Second, that his constitutional right to present a complete defense under the Sixth and Fourteenth amendments was violated by the exclusion of allegedly favorable evidence as hearsay.  (*Id.* at 13-21)

Third, that his trial counsel was constitutionally ineffective for failing to object to the admission of phone records and for failing to adequately investigate those records to identify their utility for cross-examination, and that his rights to due process of law and to be free of cruel and unusual punishment under the Fourteenth and Eighth Amendments were violated by allegedly false testimony given by a phone records custodian.  (*Id.* at 21-42)

Fourth, that his constitutional rights to due process of law and a fundamentally fair trial under the Fifth, Sixth, and Fourteenth Amendments were violated when the trial court denied his motion to exclude forensic test results on the basis of their late disclosure and allegedly misleading nature.  (*Id*. at 42-50)

Fifth, that his constitutional rights to due process of law and to be free of cruel and unusual punishment under the Sixth, Eighth, and Fourteenth Amendments were violated by the exclusion of a prospective juror on the basis of her views on capital punishment, because those views allegedly did not impair her ability to abide by her duties as a juror.  (Doc. 19 at 50-54)

Sixth, that his constitutional rights to due process of law and to be free of cruel and unusual punishment were violated by the State's allegedly improper arguments during voir dire and at closing, and that his trial counsel was constitutionally ineffective for failing to object to those arguments. (*Id.* at 54-58)

Seventh, that his constitutional rights to due process of law and to be free of cruel and unusual punishment were violated when he was handcuffed in front of the jury at the conclusion of the guilt phase of his trial. (*Id.* at 58-59)

Eighth, that his trial counsel was constitutionally ineffective for failing to disregard Taylor's directive to not make a closing argument at the penalty phase of the trial. (*Id.* at 59-62)

**LEGAL STANDARD**

A federal district court's power to review state court criminal decisions in a federal habeas corpus proceeding is limited. *Harrington v. Richter*, 562 U.S. 86, 92 (2011) ("Under 28 U.S.C. § 2254(d), the availability of federal habeas relief is limited with respect to claims previously 'adjudicated on the merits' in state-court proceedings"). "As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 102.

A federal court's power to grant a writ of habeas corpus is governed by 28

U.S.C. § 2254(d), which provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim – (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination  of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The Supreme Court construed § 2254(d) in *Williams v. Taylor*, 529 U.S. 362

(2000).  With respect to the "contrary to" language, a majority of the Court held

that a state court decision is contrary to clearly established Federal law "if the state

court arrives at a conclusion opposite to that reached by [the Supreme Court] on a

question of law" or if "the state court decides a case differently than [the] Court

has on a set of materially indistinguishable facts." *Williams,* 529 U.S. at 413.

Under the "unreasonable application" prong of § 2254(d)(1), a writ may issue if

"the state court identifies the correct governing legal rule from [the Supreme

Court's] cases but unreasonably applies [the principle] to the facts of the particular

state prisoner's case."  *Id.*  Thus, "a federal habeas court making the 'unreasonable

application' inquiry should ask whether the state court's application of clearly

established federal law was objectively unreasonable." *Id.* at 409. Although the Court failed to specifically define "objectively unreasonable," it observed that "an unreasonable application of federal law is different from an incorrect application of federal law." *Id.* at 410.

Moreover, "a determination of a factual issue by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). In addition, claims in a habeas petition "that have not been presented to the state courts, and for which there are no remaining state remedies, are procedurally defaulted." *Skillicorn v. Luebbers*, 475 F.3d 965, 976 (8th Cir. 2007). "Unless a habeas petitioner shows cause and prejudice or that he is actually innocent of the charges, a court may not reach the merits of procedurally defaulted claims in which the petitioner failed to follow applicable state procedural rules in raising the claims." *Id.*

Finally, several of Taylor's claims assert that he received constitutionally ineffective assistance of counsel. To prevail on a claim alleging ineffective assistance of counsel, a defendant must satisfy the two-part test of *Strickland v. Washington*, 466 U.S. 668 (1984). For a convicted defendant to prove that his counsel was ineffective, the defendant must first show that the counsel's performance was deficient. *Strickland*, 466 U.S. at 687. This requires the

defendant to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* A defendant can demonstrate that counsel's performance was deficient where counsel's performance "[…] 'fell below an objective standard of reasonableness.'" *Wiggins v. Smith*, 539 U.S. 510, 522 (2003) (quoting *Strickland*, 466 U.S. at 688). But "[…] '[strategic] choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.'" *United States v. Rice*, 449 F.3d 887, 897 (8th Cir. 2006) (quoting *Strickland*, 466 U.S. at 690). And "[…] [there] is a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Id.* (quoting *Strickland*, 466 U.S. at 689). If the defendant fails to show that his counsel was deficient, the court need not address the second prong of the *Strickland* test. *Brown v. United States*, 311 F.3d 875, 878 (8th Cir. 2002).

In that second prong, a defendant must demonstrate that the deficient performance was "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

The Eighth Circuit has described the *Strickland* test as follows: the questions a court must ask are "[whether] counsel's performance was in fact deficient and, if so, whether the defendant was prejudiced by the inadequate representation. If we can answer 'no' to either question, then we need not address the other part of the test." *Fields v. United States*, 201 F.3d 1025, 1027 (8th Cir. 2000). When evaluating counsel's performance, the court "must indulge in a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. Considered objectively, counsel's performance is gauged by "whether it was reasonable 'under prevailing professional norms' and 'considering all the circumstances.'" *Fields*, 201 F.3d at 1027 (quoting *Strickland*, 466 U.S. at 688). "[We] avoid making judgments based on hindsight." *Id.* A reviewing court's "scrutiny of counsel's performance must be highly deferential." *Strickland*, 466 U.S. at 689.

**ANALYSIS**

*1. An alleged violation of Taylor's state statutory rights is not cognizable in a federal habeas petition, and his federal constitutional right to a speedy trial was not violated by the grant of multiple continuances where those continuances protected his constitutional right to effective assistance of counsel and where he failed to identify prejudice resulting from the delay.*

Taylor was arrested in December of 2004.  He asserted his right to a speedy trial in July of 2005.  He was not tried until February of 2008.  He argues that this delay violated his statutory rights under the Uniform Mandatory Disposition of Detainers Law (UMDDL), which provides that a prisoner may request the disposition of pending charges within one hundred and eighty days.  "If the [charge] is not brought to trial within the [one hundred and eighty day] period and if the court finds that the offender's constitutional right to a speedy trial has been denied, no court of this state shall have jurisdiction of such [charge]… and the court shall issue an order dismissing the same with prejudice."  Mo. Rev. Stat. § 217.460 (2009); *see also* Doc. 19 at 6.  Taylor also argues that this delay violated his federal constitutional right to a speedy trial under the Sixth and Fourteenth Amendments.  (Doc. 19 at 5-6)

The Missouri Supreme Court summarized the facts relevant to this claim in its denial of Taylor's direct appeal.

> In December 2004, a complaint was filed charging Taylor with four counts of first-degree murder and four counts of armed criminal action.  In February 2005, private counsel entered his appearance on Taylor's behalf.  The complaint was superseded by an indictment filed on March 30, 2005.  In April 2005, Taylor began serving a 100-year sentence on an unrelated conviction and in July 2005, filed a request for disposition of the pending charges.
>
> In August 2005, private counsel filed a motion to withdraw on the basis that inadequate financial resources

prevented him from providing adequate representation for Taylor. The court granted the motion and continued the case until September 16, 2005, for entry of new counsel. The court ordered that the period from August 11th to September 16th be tolled for purposes of the Uniform Mandatory Disposition of Detainers Law (UMDDL).

A public defender entered an appearance on August 26, 2005. On September 15, 2005, the State filed notice of intent to seek the death penalty, and three public defenders from the capital trial division entered an appearance.

A hearing was held on September 16, 2005, at which Taylor's counsel requested a continuance based on the complexity of the capital murder case, the need for extensive discovery for both the guilt and penalty phases, and the additional trial obligations of the next year. Taylor objected to this request. The court granted the request, and trial was set for October 11, 2006.

In November 2005, the State filed a motion to reconsider the order extending the trial date, arguing that Taylor properly filed his speedy trial request and that as a result, the case should be tried before January 21, 2006. The State was also concerned with whether Taylor's counsel's caseload was sufficient good cause to continue the case. After a hearing was held, the trial court denied the State's request.

In July 2006, Taylor's trial counsel filed a motion to continue, requesting additional time for investigation and preparation for trial. After a hearing, the trial court overruled the motion. A motion to reconsider this denial was filed and included "Defendant's Consent to Continuance" signed by Taylor, requesting that the case be continued, "as additional time is needed for defense counsel to prepare for trial." Judicial notice was taken of the arguments raised at the previous hearing, and the case was continued to May 2007.

In September 2006, the case was transferred to a different judge. In October 2006 and April 2007, Taylor filed pro se motions to dismiss for violating the UMDDL; the trial court overruled both.

Taylor's counsel's final request for a continuance occurred in April 2007 in connection with the State's disclosure of [blood & DNA] test results. Taylor objected to this continuance. The trial court, after overruling Taylor's motions to exclude the evidence, granted the continuance, and trial was held on February 25, 2008.

*State v. Taylor*, 298 S.W.3d 482, 502-503 (Mo. banc 2009).

In his habeas petition, Taylor argues that the one hundred and eighty day clock imposed by the UMDDL was not properly tolled between August 11, 2005, and October 11, 2006, because:

[Taylor] did not consent to any of the continuances and consistently refused to waive his right to a speedy trial. *See State ex rel. Clark v. Long*, 870 S.W.2d 932, 941 (Mo. App. S.D. 1994). Only after the 180 day period expired and the court had, in [Taylor's] view, already lost jurisdiction did petitioner reluctantly agree to one continuance.

(Doc. 19 at 11) In the alternative, Taylor argues that the UMDDL time limit was not properly tolled between May 30, 2007, and February 20, 2008, because:

[This] delay was caused solely by the state's late disclosure of DNA evidence. [Taylor's] sunglasses were seized from his luggage on the date he was arrested on December 9, 2004. [Doc. 29, Ex. D at 57]. There is no excuse for the state waiting nearly two years, until November 8, 2006, to test the glasses. [*Id.*, Ex. D at 58]. This two hundred sixty-six (266) day delay alone violates the UMDDL and demonstrates that petitioner was denied

16

a speedy trial. Courts from several jurisdictions have held that a defense continuance does not waive a defendant's right to a speedy trial where there has been an inexcusable delay in providing discovery or there was some other violation of discovery rules by the prosecutor. *See, e.g.*, *State v. T.G.*, 990 So.2d 1183, 1184 (Fla. App. 2008); *Commonwealth v. Edwards*, 595 A.2d 52, 54-55 (Pa. 1991); *State v. Price*, 620 P.2d 994, 996 (Wash. 1980).

(*Id.* at 11) Taylor cites *Simmons v. United States*, 390 U.S. 377 (1968), for the proposition that "it is unconstitutional to place a defendant in a situation where he must waive one constitutional right in order to assert another." *See* Doc. 19 at 12; *see also Simmons*, 390 U.S. at 394 (holding that defendant's self-incriminating testimony offered in support of his motion to suppress evidence on Fourth Amendment grounds could not later be admitted against him at trial). Taylor also cites *Marshall v. State*, 759 N.E.2d 665 (In. App. 2001), *State v. Allen*, 134 P.3d 976 (Or. App. 2006), and *State v. Wamsley*, 594 N.E.2d 1123 (Ohio App. 1991), as support for his argument that "it is fundamentally unfair to place [sic] a defendant... to either go to trial unprepared or waive his right to a speedy trial.... [A] continuance that is compelled by a state's lack of diligence in providing discovery must be charged against the state." (*Id.* at 12)

Taylor also argues that the UMDDL:

[Created] a liberty interest entitling [Taylor] to procedural due process protection under the Fourteenth Amendment. *Vitek v. Jones*, 445 U.S. 480 (1980). Because of this clear UMDDL violation, St. Louis

> County, Missouri lacked the legal authority and power to
> bring petitioner to trial in February of 2008, which
> denied petitioner due process of law.  *Blackledge v.
> Perry*, 417 U.S. 21, 30-31 (1974).

(*Id.*)

Finally, Taylor argues that he has a freestanding constitutional claim under

the Sixth Amendment as determined by *Barker v. Wingo*, 407 U.S. 514 (1972):

> Under the *Barker* test, reviewing courts must assess the
> length of delay, the reasons for the delay, the defendant's
> assertion of the right, and prejudice.  *Id.* at 530.  Each of
> these four factors weigh heavily in favor of [Taylor] on
> this Sixth Amendment claim.
>
> First, since the length of the delay was over three years,
> this lapse of time is presumptively prejudicial.[2]  *See State
> ex rel. Garcia v. Goldman*, 316 S.W.3d 907, 911 (Mo.
> banc 2010).  The reasons for the delay are not attributable
> for petitioner, and petitioner asserted his right to a speedy
> trial more than two and a half years before trial
> commenced.

(*Id.* at 13) (footnote in original).

Respondent argues that the decision of the Missouri Supreme Court denying

this claim on the merits is reasonable and entitled to deference.  The Missouri

Supreme Court stated:

> Taylor invoked his right to a speedy trial pursuant to the
> UMDDL, section 217.450-485.  The UMDDL, including

---

[2] [Taylor] was also prejudiced, as he alleged in one of his *pro se* motions to
dismiss, because the videotaped statements of defense witnesses Gerjuan Rowe
and Beverly and Sherry Conley taken by police either mysteriously disappeared or
were accidentally erased.  [Doc. 29, Ex. C at 74-75; Ex. Q at 15-16].

the right to be tried within 180 days, is reviewed de novo. *State v. Nichols*, 207 S.W.3d 215, 219 (Mo. App. 2006).

The UMDDL provides that a defendant who currently is confined in a department correctional facility may request a final disposition of an untried indictment. Section 217.460 provides that:

> Within *one hundred eighty days* after the receipt of the request and certificate, pursuant to sections 217.450 and 217.455, by the court and the prosecuting attorney *or within such additional necessary or reasonable time as the court may grant, for good cause shown in open court,* the offender or his counsel being present, the indictment, information or complaint shall be brought to trial… (emphasis added).

The trial court has discretion to allow a continuance for good cause. *State ex rel. Wolfrum v. Wiesman*, 225 S.W.3d 409, 412 (Mo. banc 2007). Defense counsel may show good cause for a continuance under the statute even if defendant objects so long as the request is based on reasonable grounds showing the delay is for good cause. *Id.* Once a defendant invokes the right to counsel, counsel has the authority "to seek reasonable continuances for the purpose of assuring effective assistance of counsel." *Id.*

The court had good cause to grant the continuances. Although the continuances were requested over Taylor's objection, the requests were sought to prepare for trial after appointment as well as to respond to newly discovered evidence before trial. Given the complexity of the trial and the amount of preparation and investigation required, counsel established sufficient grounds for good cause for the delay, and the additional time ensured that Taylor received effective assistance of counsel. Further, the requests were granted in open court

with Taylor and counsel present. Taylor fails to show a violation of the UMDDL.

…

The defendant's right to a speedy trial is founded upon the Sixth Amendment of the United States Constitution and Mo. Const. art. I, § 18(a). The United States and Missouri constitutions provide equivalent protection for a defendant's right to a speedy trial. *State ex rel. McKee v. Riley*, 240 S.W.3d 720, 729 (Mo. banc 2007). To assess whether a right has been respected or denied involves a balance of four factors: (1) the length of delay; (2) the reason for the delay; (3) the defendant's assertion of his right; and (4) prejudice to the defendant. *Id.*

It is undisputed that the delay here was lengthy and that Taylor effectively asserted his right to speedy trial. As discussed above, the reason for a substantial portion of the delay was to provide counsel with more time to prepare for trial, which effectively protected Taylor's right to effective assistance of counsel. Moreover, Taylor was not prejudiced by this delay because he was concurrently incarcerated on unrelated charges and serving a sentence of 100 years.

Taylor fails to show a violation of his constitutional or statutory right to speedy trial. Point seven is denied.

*Taylor*, 298 S.W. 3d at 503-504 (footnotes omitted); (*see also* Doc. 29 at 11-14)

Respondent also argues that the portion of Taylor's claim pertaining to the

UMDDL is not cognizable in a federal habeas petition:

The Eighth Circuit has held that "violation by state officials of a state speedy trial law, taken alone, does not present a federal claim reviewable on habeas petition." *Poe v. Caspari*, 39 F.3d 204, 207 (8th Cir. 2004 [sic][3]);

---

[3] Respondent cites *Poe v. Caspari* as a 2004 case. It was decided in 1994. *See Poe*, 39 F.3d 204. I therefore infer that this is typographical error.

> *see also Shigemura v. Moore*, No 4:07-CV-459 (CEJ),
> 2007 WL 2736306, at *4 (E.D.Mo. September 17, 2007)
> ("Issues concerning the interpretation and application of
> a state law are not cognizable in federal habeas review.")

(*Id.* at 14-15)

Finally, Respondent argues that the portion of Taylor's claim pertaining to

his constitutional right to a speedy trial should be denied on the merits:

> Taylor fails to explain how the Missouri Supreme Court
> unreasonably applied the standard set forth in *Barker v.
> Wingo*, 407 U.S. 514 (1971).… While it is clear that
> Taylor asserted his speedy trial right and that the state
> tried him two years and ten months after formal charging,
> the delays were at the request of the *defense*, not the State
> or the court.

> "Delay caused by the defense weighs against the
> defendant… because the attorney is the defendant's agent
> when acting, or failing to act, in furtherance of the
> litigation, delay caused by the defendant's counsel is also
> charged against the defendant." *Vermont v. Brillon*, 556
> U.S. 81, 90 (2009) (internal quotations omitted). Further,
> Taylor's only claim of prejudice, keeping in mind that
> that [sic] he was incarcerated before his trial serving a
> 100 year sentence, is that "videotaped statements of the
> defense witnesses Gerjuan Rowe and Beverly and Sherry
> Conley taken by police either mysteriously disappeared
> or were accidentally erased" [Doc. 19 at 13]. Taylor
> does not provide any more information about the tapes or
> their contents, including whether a transcript of the
> statements exists, if and where police made reference to
> the tapes in their reports, or if and where the tapes are
> referenced in the legal file. Further, Taylor does not
> explain why the delay was the reason such statements
> were lost, what favorable evidentiary value the
> statements would have had, or how the presence of the
> statements would have altered the result of his trial.

(*Id.* at 15-16)

In reply, Taylor argues that *Poe v. Caspari* does not control in this case and

that I may consider his UMDDL claim on the merits. (Doc. 46 at 25) Taylor

makes three separate claims in support of this point:

> First, the decision in *Poe* rests upon a long line of older
> cases that… was implicitly overruled by the United
> States Supreme Court in *Alabama v. Bozeman*, 533 U.S.
> 146 (2001). In *Bozeman*, the Supreme Court granted
> discretionary review to address an [Interstate Agreement
> on Detainers] claim that had been litigated before
> Alabama's state courts. If detainer violations such as the
> one presented here did not present a federal question, it is
> obvious that the United States Supreme Court would not
> and could not have intervened and addressed the question
> before it in *Bozeman*.

(*Id.* at 25)

> Second, a violation of the UMDDL, because it is an
> interstate compact, falls within a federal court's
> jurisdiction under the Compact Clause embodied in Art.
> I, § 10, cl. 3 of the United States Constitution…. The fact
> that Missouri is a signatory to the UMDDL with seven
> other states makes the UMDDL a compact.
>
> The UMDDL is intended to be construed in harmony
> with the Interstate Agreement on Detainers (IAD). *State
> ex rel. Kemp v. Hodge*, 629 S.W.2d 353, 359 (Mo. banc
> 1982). As an interstate compact approved by Congress,
> the Interstate Agreement on Detainers is a federal law
> and its violation presents a federal question cognizable in
> a 2254 action. *Brown v. Wolff*, 706 F.2d 902, 905
> (1983); *see also Cuyler v. Adams*, 449 U.S. 433, 438
> (1981).
>
> The UMDDL too should be considered an interstate
> compact within the Compact Clause of the United States

22

Constitution…. It is ultimately the federal court's duty to interpret and apply congressionally approved compacts given their federalized nature. *Delaware River Joint Toll Bridge Commission v. Colburn*, 310 U.S. 419, 427 (1940)…

(*Id.* at 25-28)

Third… the [state court decisions regarding] the UMDDL arbitrarily deprived petitioner of a liberty interest guaranteed by the due process clause of the Fourteenth Amendment. *See Hicks v. Oklahoma*, 443 [sic][4] U.S. 343, 346 (1980). In such situations, where a constitutional violation removes the authority of a state or federal entity to bring a petitioner to trial, a due process violation occurs. *See Blackledge v. Perry*, 417 U.S. 21, 30-31 (1974).

… there is no relitigation bar under 2254(d)(1) or (d)(2) because the Missouri Supreme Court, in addressing the claim, overlooked a critical factual issue that is central to this claim for relief. The state court failed to take into account the delay occasioned by the state's dilatory behavior in in [sic] failing to seek DNA testing of petitioner's eyeglasses. This delay, by itself, necessitated a continuance delaying the trial beyond the one hundred eight (180) day window, in clear violation of the UMDDL…. the Missouri Supreme Court, in addressing a separate claim that this DNA evidence should have been excluded because of the state's misconduct, did not find any excuse for the dilatory behavior of the prosecution, despite refusing to reverse the trial court's ruling not to exclude this evidence as an abuse of discretion. *State v. Taylor*, 298 S.W.3d at 501-502.

---

[4] Taylor cites *Hicks* in his reply as 443 U.S. 343. That citation leads to *Federal Open Market Committee of Federal Reserve System v. Merrill*, 443 U.S. 340 (1979), a case governing the Freedom of Information Act's interaction with trade secrets and having no applicability to the case at bar. The correct citation for *Hicks* is 447 U.S. 343. I therefore infer that this is typographical error and that Taylor does not attempt to rely on *Merrill*.

(*Id.* at 28-29)

Finally, Taylor argues that the Missouri Supreme Court's decision incorrectly adjudicated his speedy-trial constitutional claim because:

> [It] overlooked the obvious fact that a great portion of the delay was the fault of the prosecutor who "dragged his feet" by over two years before finally subjecting petitioner's sunglasses to forensic testing. By overlooking this critical fact that is central to [Taylor's] claim for relief, the Missouri Supreme Court's decision is both factually and legally unreasonable under 2254(d)(1) and (d)(2). *See Wiggins*, 539 U.S. at 528.
>
> In assessing prejudice, the Missouri Supreme Court merely notes that no prejudice could be established because [Taylor] was imprisoned on other charges. There is no 2254(d) relitigation bar to this Court's *de novo* review of the issue of prejudice for several reasons. First, the court failed to consider… that this delay deprived [Taylor] of the exculpatory evidence contained in the videotaped statements of Gerjuan Rowe, Beverly Conley, and Sherry Conley…. In addition, the appropriate speedy trial analysis should not consider the fact that [Taylor] would otherwise be incarcerated on other unrelated convictions as conclusive evidence of a lack of prejudice. *See Smith v. Hooey*, 393 U.S. 374, 379 (1969). One of the policy considerations at the core of the Sixth Amendment requirement of a speedy trial is to minimize the anxiety, concern and other hardships associated with pending charges hanging over a defendant's head for a prolonged period of time. *Id.*

(*Id.* at 29-31).

Having carefully reviewed the parties' briefs, the Missouri Supreme Court's decision, and the underlying legal file, I find this ground for relief to be without merit.

First, Taylor's claim pursuant to the UMDDL is not cognizable in a federal habeas petition. "Violation by state officials of a state speedy trial law, taken alone, does not present a federal claim reviewable on habeas petition." *Poe v. Caspari*, 39 F.3d 204, 207 (1994) (internal citations omitted).

Second, Taylor's argument that *Poe* does not control is without merit. The United States Supreme Court's decision in *Alabama v. Bozeman* did not implicitly overrule *Poe* or the prior cases upon which *Poe* rests. Instead, *Bozeman* addressed a claim pertaining to the Interstate Agreement on Detainers (IAD), not the UMDDL. The IAD is a federal law enacted and approved by Congress; *see* 18 U.S.C. App. 2 § 2. The UMDDL is a state statute; *see* Mo. Rev. Stat. § 217.450 (2009). The fact that the UMDDL is "intended to be construed in harmony with the [IAD]" does not transform state law into federal law for purposes of a habeas petition. (Doc. 46 at 26) (citing *State ex rel. Kemp v. Hodge*, 629 S.W.2d 353, 359 (Mo. banc 1982)). The UMDDL was never considered and approved by Congress; therefore, it is not a "compact" within the meaning of the Compact Clause of the United States Constitution. *See Cuyler v. Adams*, 449 U.S. 433, 439 (1981) ("The requirement of congressional consent is at the heart of the Compact Clause").

Taylor's citations to *Cuyler*, to *Brown v. Wolff*, 706 F.2d 902 (9th Cir. 1983), and to *Carchman v. Nash*, 473 U.S. 716 (1985), are unavailing because they each deal with applications of the IAD, not the UMDDL. *Hicks v. Oklahoma*, 447

U.S. 343 (1980), in which the Supreme Court reversed a state sentence imposed under an unconstitutional sentencing scheme, and *Blackledge v. Perry*, 417 U.S. 21 (1974), which considered a due process claim raised by a state's retaliatory prosecution after a prisoner asserted his right under a state statute to a *de novo* trial, are even farther removed from the claim at bar and have no applicability.

*Delaware River* cuts *against* Taylor, not in his favor: "[The] construction of such a compact *sanctioned by Congress* by virtue of Article I, § 10, clause 3 of the Constitution, involves a federal 'title, right, privilege, or immunity' which when 'specially set up or claimed' in a state court may be reviewed [in federal court.]" *Delaware River Joint Toll Bridge Commission v. Colburn*, 310 U.S. at 427 (emphasis added). A Congressional sanction, or the lack thereof, is the dispositive factor. Taylor implicitly recognizes this elsewhere in his reply: "Because *Congressional consent* places the interpretation of an interstate compact squarely in the federal courts, those same courts have the authority to enforce the terms and conditions of the compact." (Doc. 46 at 28) (emphasis added)

Third, Taylor's repeated assertions that the prosecutor "dragged his feet" or engaged in "dilatory behavior" are not supported by the record. No evidence supports the proposition that the late inclusion of blood & DNA evidence recovered from Taylor's sunglasses was anything other than a miscommunication between various State agencies. (*See* Doc. 29, Ex. M at 21-22 (transcript of

hearing adjudicating trial counsel's motion to suppress based on the late date of disclosure and the State's explanation of same)

Fourth, Taylor fails to establish that his constitutional right to a speedy trial was violated under the standard established by *Barker v. Wingo*, 407 U.S. 514 (1971). The *Wingo* factors are "[length] of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." *Id.* at 530. No single factor is dispositive: "[rather], they are related factors and must be considered together with such other circumstances as may be relevant." *Id.* at 533. The Court addressed the prejudice prong as follows:

> Prejudice, of course, should be assessed in the light of the interests of defendants which the speedy trial right was designed to protect. This Court has identified three such interests: (i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired. Of these, the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system.

*Wingo*, 407 U.S. at 532. In its analysis of prejudice as a result of the trial continuances the Missouri Supreme Court considered *only* the fact that Taylor was incarcerated at that time as the result of an unrelated conviction. This is only one of three interests the right to a speedy trial was meant to protect. Yet Taylor fails to establish any interest that was prejudiced by the delay. His conclusory assertion in his reply brief that the delay "deprived him of the exculpatory evidence

contained in the videotaped statements of Gerjuan Rowe, Beverly Conley, and Sherry Conley" does not suffice. (Doc. 46 at 30) Taylor fails to explain how the videotaped statements would have differed, if at all, from the in-person testimony Beverly & Sherry Conley actually provided at trial. (*See* Doc. 29, Ex. S at 31-33 (Beverly Conley) and 34-37 (Sherry Conley)) Nor does he explain how they would have differed, if at all, from the excerpts of Gerjuan Rowe's deposition that were read to the jury at trial. (*See id.*, Ex. S at 39) Nor, in fact, does he establish that the videotaped statements were lost *during* the additional time resulting from the delay. (*See id.*, Ex. P at 47 (police detective testifying on direct examination that hard drive containing videotapes had been accidentally erased, but not identifying date on which accidental erasure occurred) and at 53 (cross-examining police detective on same but declining to ask when erasure occurred))

Taylor did clearly and repeatedly assert his right to a speedy trial. The length of the delay was considerable, though not "presumptively prejudicial" as Taylor asserts. (Doc. 19 at 13) "[The] length of delay that will [generate presumptive prejudice] is necessarily dependent upon the peculiar circumstances of the case. To take but one example, the delay that can be tolerated for an ordinary street crime is considerably less than for a serious, complex conspiracy charge." *Wingo*, 407 U.S. at 530-531 (footnote omitted).

The reasons for the delay are substantially attributable to Taylor, his objections notwithstanding, because the continuances were granted at the request of his defense team solely for the purpose of ensuring that he would be effectively represented at his capital trial. This is true even if the defendant himself objects to his counsel's delay. *See Vermont v. Brillon*, 556 U.S. 81 (2009) (reversing Vermont Supreme Court's decision that three-year delay violated defendant's speedy trial rights where defendant's attorneys requested extensions over his objections).

Taylor failed to establish that his ability to defend himself at trial was prejudiced by the delay, his interest in avoiding excessive pretrial detention was negated by the unrelated 100-year sentence he was already serving, and he makes no argument that his "anxiety and concern" were excessively burdened within the meaning contemplated by *Wingo*. I find that the Missouri Supreme Court's determination of this issue was not contrary to, or an unreasonable application of clearly establish Federal law, nor was it a decision based on an unreasonable determination of the facts. As a result, I will deny this ground for relief.

*2. Taylor's constitutional right to present a complete defense was not violated by the exclusion of hearsay evidence where that evidence lacked indicia of reliability and was not otherwise admissible.*

Taylor's trial strategy was to argue that the victims were still alive after his departure from St. Louis on November 26. His trial counsel therefore sought to admit certain statements in support of that strategy which the trial court excluded as hearsay. The Missouri Supreme Court summarized the relevant facts and denied this claim on the merits in Taylor's direct appeal:

### … Hearsay Statements

… Taylor argues that the trial court abused its discretion in excluding certain statements as hearsay. Taylor argues that the statements were admissible pursuant to certain exceptions to the hearsay rule or pursuant to the curative admissibility doctrine.

…

Hearsay is an "out-of-court statement that is used to prove the truth of the matter asserted and that depends on the veracity of the statement for its value." *State v. Kemp*, 212 S.W.3d 135, 146 (Mo. banc 2007). "Generally, courts exclude hearsay because the out-of-court statement is not subject to cross-examination, is not offered under oath, and is not subject to the fact finder's ability to judge demeanor at the time the statement is made." *Bynote v. Nat'l Super Markets, Inc.*, 891 S.W.2d 117, 120 (Mo. banc 1995). Exceptions to the general prohibition against hearsay may apply when circumstances assure the trustworthiness of the declarant's statement. *Id.* The exceptions argued in this case are statements of present sense impression, statements of declarant's present mental condition, verbal conduct, and the constitutionally recognized exception under the due process clause.

For a hearsay statement to be admissible pursuant to the present sense impression exception, the statement must be made simultaneously, or almost simultaneously, with

the occurrence of an event or act, the statement must describe or explain the event; and the declarant must perceive the event with his own senses. *State v. Smith*, 265 S.W.3d 874, 879 (Mo. App. 2008) (*citing* 2 McCormick on Evidence § 271, at 251 (6th ed. 2006)). These statements have certain indicia of trustworthiness to support their admissibility. *Id.* Errors in memory and time for calculated misstatements are not present because the statements are made as declarant perceives the event or immediately thereafter. *Id.* Further, in most cases, "a witness will have observed the event and can corroborate the hearsay statement, and the declarant will often be available at trial for cross-examination to verify his or her credibility." *Id.*

An out-of-court statement of the declarant's present mental condition is also admissible as an exception to the hearsay rule so long as the statements are relevant and their relevancy outweighs their prejudicial effect. *State v. Bell*, 950 S.W.2d 482, 483 (Mo. banc 1997). This exception is generally limited to cases "where the hearsay declarations of mental condition are especially relevant – particularly where the defendant has put the decedent's mental state at issue by claiming accident, self-defense or suicide." *Id.*

A hearsay statement may also be admissible as a verbal act. *State v. Copeland*, 928 S.W.2d 828 (Mo. banc 1996); *See Copeland v. Washington*, 232 F.3d 969 (8th Cir. 2000) (writ of habeas corpus granted on sentencing defect). This includes statements written or oral that have independent legal significance or effect. *See Estate of Oden v. Oden*, 905 S.W.2d 914, 918 (Mo. App. 1995).

Lastly, an out-of-court statement may be admitted pursuant to the constitutionally based exception in the due process clause. This exception applies to hearsay statements that "both exonerate the accused and are originally made and subsequently offered at trial under circumstances providing considerable assurance of their reliability." *State v. Hutchison*, 957 S.W.2d 757, 761

(Mo. banc 1997) (citing to *Chambers v. Mississippi*, 410 U.S. 284, 300… (1973)). Three circumstances of reliability have been recognized: "1) each confession is in a very real sense self-incriminatory and unquestionably against interest; 2) each statement was spontaneously made to a close acquaintance shortly after the murder occurred; and 3) the statements are corroborated by other evidence in the case." *Id.* (internal quotations omitted).

…

In addition to arguing exceptions to the hearsay rule, Taylor argues that several of the statements are admissible pursuant to the curative admissibility doctrine. The curative admissibility doctrine applies when one party introduces inadmissible evidence and allows the opposing party to introduce otherwise inadmissible evidence to rebut or explain inferences raised by the first party's evidence. *State v. Middleton*, 998 S.W.2d 520, 528 (Mo. banc 1999).

### … Gerjuan's Payphone Conversation

… Taylor argues the trial court abused its discretion in excluding Gerjuan's testimony that [Angela] Rowe told her she was calling from a pay telephone on November 28th. Taylor argues that the testimony was admissible as Rowe's present sense impression or under the due process clause. In addition, he argues that the testimony was admissible pursuant to the curative admissibility doctrine to refute the inference that Rowe and Gerjuan did not speak to each other on that date from the absence of a call to Gerjuan in Rowe's home telephone records.

### i. Facts

Gerjuan Rowe was served with a subpoena to testify at trial. Gerjuan did not appear and the court issued a writ of attachment. At the end of the State's case, Taylor's counsel informed the court that the writ had not been served, and that the defense intended to call Gerjuan as a

witness in the case. As a result, the court granted Taylor permission to read portions of Gerjuan's deposition into evidence. The court, however, excluded the following portion as hearsay:

A. [Gerjuan] We was out walking around, and she did call me from a pay phone on Jennings Station Road and West Florissant at the Amoco.
Q. [Defense] Okay.
A. And I was supposed to have been on my way that way, but by my car not being legal and by Jennings police being ass holes, I didn't just go over there.
Q. But you knew she was at a pay phone then on the –
A. Yes.
Q. – on the early morning hours –
A. Yes.
Q. – of the 28th?
A. Yes.
[PROSECUTOR]: How did you know she was on a pay phone?
A. Because I asked her, I asked her, where are you? *And she said she was on the pay phone*. And I said – I was supposed to have been on my way to get her. I was supposed to have been on my way to get her, that's what I was supposed to be doing. That's how I knew she was at the Amoco on Jennings Station Road and West Florissant.
Q. [DEFENSE] Were you ever able to actually hook up with her then?
A. No.

(Emphasis added).

The existence of the telephone call on November 28th was admissible, and testimony regarding such a call was admitted into evidence; however, evidence that Rowe was *calling from a pay telephone* was hearsay and inadmissible.

## ii. Analysis

Gerjuan's testimony that Rowe told her that she was *calling from a pay telephone* on November 28th was hearsay. The statement was offered for the truth of the matter asserted: that Rowe called Gerjuan from a pay telephone on November 28th.

This hearsay statement is not admissible as a present sense impression. The statement was about Rowe's location at a specific time in response to a question from Gerjuan. The statement did not concern an event or describe or explain an event that Rowe perceived. Further, the statement lacks indicia of trustworthiness. Taylor did not offer any evidence corroborating the statement that Rowe made the call from a pay telephone on November 28th. Although Gerjuan's cell phone records show an *outgoing* call to the pay telephone at 4:36 a.m. on November 28th, the statement was offered to prove that [Rowe] *placed the call* from the pay telephone. There is no record of an incoming call from the pay telephone to Gerjuan's cell phone or any telephone, and there is no evidence of outgoing calls from the pay telephone. Lastly, neither Rowe nor Gerjuan was subject to cross-examination to resolve the confusion.

The statement is also not admissible pursuant to the constitutionally based hearsay exception in the due process clause because it lacks circumstances of reliability. The statement was not against Rowe's interest or spontaneously made, and most importantly, as discussed above, this statement is not sufficiently corroborated by other evidence in the case. In addition to the lack of evidence in the phone records, Gerjuan's testimony regarding the dates of events prior to the murders, such as when she last saw Rowe, was

conflicting,[5] and the circumstances of this telephone call were also unclear.[6]

---

[5] Early in the deposition, Gerjuan stated the last time she saw Rowe was:

> … Saturday, the 20th.  I borrowed fifty dollars from her on Sunday, the 21st.  I told her I was going to give it back to her Monday.  I didn't hear from her on Monday, so I called Tuesday, didn't get an answer on Tuesday.  But I – it might have been – because I kept leaving voice messages, I never talked to her, I just left a lot of voice messages, I know that.  My number was on that phone so much to where I don't – but I know Saturday – I seen her Saturday, Sunday, got the fifty dollars, and talked to her Monday.

[A prosecutor] then asked if it was Monday, the 22nd, and she responded "Yeah, talked to her Monday."

Later, Gerjuan was asked about an interview she gave to police on December 3rd, the day the bodies were found.  The relevant portion of the deposition is:

> Q. Now during that interview, do you remember telling the police that you had seen Angela on Saturday morning, the 27th?
> A. (Witness nods.)
> Q. You're shaking your head "yes."
> A. Yes.
> Q.  And that that's when you asked to borrow some money from Angela?
> A. Yes.
> Q. And that Angela actually came over to your house on that Saturday morning and gave you fifty dollars?
> A. Yes.
> Q. Do you remember telling the police that?
> A. Yes, I believe.
> Q. And then do you also remember saying that you got a call from Angela around three or four in the morning on Sunday, the 28th?
> A. Would that be Saturday-Sunday morning?
> Q. Right, into the early morning hours.

Finally, the curative admissibility doctrine does not apply. The State presented evidence of Rowe's home phone records and Gerjuan's cell phone records. This evidence was admissible, and as a result, Gerjuan's inadmissible testimony about the pay phone cannot be admitted pursuant to this doctrine.

Gerjuan's proposed testimony regarding Rowe's statement is hearsay and inadmissible. The trial court did not abuse its discretion.

## … Calendar Notations

… Taylor argues the trial court abused its discretion in excluding Gerjuan's testimony about Taylor's prior communication with Rowe and Rowe's notations in the calendar and in refusing to allow the jury to view the notations in the calendar. Taylor alleges Gerjuan's testimony is admissible as Rowe's present sense impression of Taylor's actions, as statements of Rowe's state of mind and under the due process clause. Lastly, he argues that the testimony and notations were admissible pursuant to the curative admissibility doctrine.

### i. Facts

The trial court prohibited Taylor from reading into evidence the following section of Gerjuan's deposition because it was hearsay:

A. Yes, yes, yes, yes, yes. He was gone maybe six days a week out of seven days.

---

A. Right…

Gerjuan also testified that she spoke with Rowe on Thanksgiving, but Rowe never showed up to dinner. The above portions of the deposition were read into evidence.

[6] Gerjuan testified that on November 28th, she was "out walking around" when Rowe called. She never said if Rowe called her cell phone or house telephone. The only telephone record showing a pay telephone is an outgoing call on Gerjuan's cell phone.

Q. Would there be times when he wouldn't call her even to talk to her once he was on the road?

A. Right.

Q. Just was out of communication?

A. Phone off.  Come over there.

The following portion of Gerjuan's deposition regarding Rowe's calendar was read into evidence:

Q. [Defense counsel] I'm going to show you now what I've marked as Defendant's Exhibit 8, and see if you recognize that.  Just flip those pages, if you would.

A. [Gerjuan] Uh-uh.  Yeah.

Q. Do the notes on that, it's a calendar for 2004, do those notes appear to be also in [Rowe's] handwriting?

A. Yes, some of it.  Yes, these is [Rowe's], yes, I do believe.

The following portion of the deposition was excluded as hearsay:

Q. If you'll go to November of 2004 –

A. Ooh.  Ooh.  Ooh.  And this is us.  I'm telling you, this is what we do.  I might have a calendar like this too.

Q. She keeps track in there of when he's gone and –

A. Yes, yes, yes.

Q. That was just a habit she had, right?

A. Uh-huh.

Q. *Now if you look at November 26th –*

A. Un-huh.

Q. *– does she write "off" there?*

A. *Yes.*

Q. And that's her handwriting as well?

A. Uh-huh.

Q. Now, had Angela discussed with you in November of 2004 that [Taylor] would be leaving town again or what his schedule was going to be?

A. No.  The only time I would know is when he might not answer the phone or she was fed up with him, he had done it too much.

Q. Tell me more what you mean by that.

A. Like I come back Monday, I'm leaving on Wednesday, that's too much. You just got back, you're fixing to leave again.
Q. Right.
A. And when he would go, he stay gone weeks at a time.
Q. Right.
A. Weeks at a time.

(Emphasis added).

Rowe's calendar with her notations was admitted into evidence, but because the calendar contained hearsay, the calendar was not published to the jury. The first month included in the calendar is January 2004 and the last month is January 2005. The notations in the calendar were as follows.

From February to August, the notations include "didn't come home yet," no call today" and "were home" and each of these notations was followed by "L.T." The other entries on these days were personal appointments. From September to November, "paycheck" and "off" are written every other Friday and "work," "off" or "home" are written on every Saturday and Sunday. In addition, written on most days up to November 15th is "home" or "no show, no call," but none of these entries contain "L.T." as in the previous months. The remaining entries from November 15th through January 2005 are personal appointments, with "off" and "paycheck" written every other Friday. Specifically, on November 26th, the notations are "off" and "paycheck."

## ii. Analysis

Rowe's statement to Gerjuan and Rowe's notations on her calendar were hearsay. The statement and notations were offered for the truth of the matter: that it was not unusual for Taylor not to see or talk to Rowe for periods of time.

Neither is admissible as a present sense impression. There is no evidence that Rowe made these statements to

Gerjuan or wrote the notations simultaneously on the discovery of the presence or absence of Taylor or shortly after Rowe spoke to or spent time with him. The statements and notations also lack indicia of trustworthiness as neither Rowe nor Gerjuan was available for cross-examination, there is no corroborating evidence that Taylor was with Rowe or talked to her on those days, and there is no evidence as to when Rowe made this statement to Gerjuan.

The state of mind exception also does not apply to the notations written on the calendar because the notations are not statements of mental condition, and most importantly, Rowe's state of mind is not particularly relevant because Taylor has not placed Rowe's mental state at issue.

The due process hearsay exception does not apply because there exist no circumstances of reliability. These statements and notations are not against Rowe's interest and were not made spontaneously after the event. Further, the statements are not corroborated by other evidence in the case. Although Gerjuan identified the handwriting in the calendar as Rowe's, Gerjuan had no personal knowledge of the calendar and never witnessed Rowe write any of these notations.

The curative admissibility doctrine does not apply. The State's evidence of telephone records from Rowe's home telephone and Taylor's cell phone were admitted to show that telephone calls between Taylor and Rowe ended in November. The State also offered testimony of Rowe's employer to establish that Rowe was absent from work on November 26th. Because this evidence was admissible, the inadmissible evidence of the testimony or notations cannot be admitted pursuant to this doctrine.

Gerjuan's testimony about the calendar and the notations in the calendar are hearsay and inadmissible. The trial court did not abuse its discretion.

### … **Check Carbon Copy**

… Taylor argues that the trial court abused its discretion in refusing to allow the jury to view Rowe's checkbook that contained a carbon copy of a "check" dated November 27th. Taylor argues that the November 27th "check" is relevant and does not contain hearsay. In the alternative, he argues that if the "check" does contain hearsay, it is admissible as a statement of Rowe's state of mind of her "belief that she was alive and physically able to write a check on that date" or admissible as verbal conduct.

### i. Facts

A checkbook was seized from Rowe's home during the investigation. The checkbook is a duplicate check design, which contains a carbon copy paper behind each individual check. Rowe's checkbook contained a duplicate of a "check" dated November 27, 2004. This "check" is made out for the amount of $390.00, but the "pay to the order" line is blank. Rowe's home telephone number is written in the memo line. The checkbook was admitted into evidence, but it was not published to the jury because it contained hearsay.

### ii. Analysis

The "check" dated November 27th is hearsay. It was admitted to prove that Rowe was alive on November 27th, which was one day after Taylor left St. Louis. The "check" lacks reliability, as the payee line is blank, there is no evidence that anyone received the "check," or that anyone had knowledge of the existence of the "check."

Further, Taylor fails to show that an exception to the hearsay rule applies. The date written on the "check" is not a statement of Rowe's present mental condition and does not reflect any belief as to whether or not she was alive on that date, and Taylor has not placed Rowe's mental state at issue.

The check is not admissible as a verbal act, because there is no evidence that Rowe either completed or used the "check" as a legal document. It was not negotiated. There is no evidence that anyone received it, and there is no evidence of the purpose or circumstance under which Rowe wrote it, especially in light of the absence of a person or entity listed as the payee. *Estate of Oden v. Oden*, 905 S.W.2d 914, 918 (Mo. App. 1995), dealt with completed legal documents acknowledged before notaries that were self-authenticated. It does not help Taylor, as this situation does not deal with a completed legal document.

The "check" is hearsay and inadmissible, and the trial court did not abuse its discretion in refusing to publish the checkbook to the jury.

### … Rowe's Statement to Gerjuan

… Taylor argues that the trial court abused its discretion in excluding Gerjuan's testimony of Rowe's statement to Gerjuan that Taylor's relative lived at Rowe's house. Taylor alleges the testimony was admissibility under the due process clause and the curative admissibility doctrine to refute the inference that only Taylor could have committed the crime from the absence of any forced entry and the evidence that only Taylor had access to the home.

### i. Facts

The trial court excluded the following portion of Gerjuan's deposition:

Q. [Defense counsel] And I think you sort of said you knew that [Taylor] had a brother, but do you know anything more about him?
A. No. I don't know if that was the brother or the cousin that was living over there.
Q. But you knew someone was living at the house?
A. Uh-huh, in the basement.
Q. How did you know about that?

A. Because I asked her, I said, is he the only one over there?  She was like, no, his cousin had came from somewhere and was supposedly living over there.
Q. She called him his cousin?
A. Yeah, or the brother, one of them.

There was no evidence that Gerjuan had ever visited Rowe at her current residence prior to the discovery of the bodies.  At trial, Perry Taylor testified that he allowed Rowe to use his vehicle when he was away as a truck driver.  There was also testimony that Perry kept some belongings at Rowe's home.  In addition, Rowe's neighbor testified at trial, stating that she[7] saw a man walking out of Rowe's house around Thanksgiving; however, she did not recall the date and did not recognize the man.

## ii. Analysis

Gerjuan's testimony that Rowe told her that Taylor's brother or cousin lived at Rowe's house was hearsay.  The statement was made out of court and was offered for the truth of the matter: that another person had access to the house.

Taylor fails to show that an exception to the hearsay rule applies to this testimony.  The statement is not admissible pursuant to [the] due process hearsay exception because the statement does not exonerate [] Taylor and lacks any circumstances of reliability.  The statement is not against Rowe's interest, was not made spontaneously after an event, and was not sufficiently corroborated.  Gerjuan had never been to Rowe's residence, and there was no additional evidence that another adult, such as Taylor's brother or cousin, lived in Rowe's home.

---

[7] The Missouri Supreme Court refers to this neighbor as "she."  The trial transcript reflects that defense counsel called Elmer Massey, identified exclusively by the title "Mr."  *See* Doc. 29, Ex. S at 13-17.  My review of the witnesses called at trial confirms that Mr. Massey was the only witness called who was identified as a neighbor of the victims.

The curative admissibility doctrine does not apply. The State introduced testimony of three police officers, all of whom stated that the windows and doors were locked, the front door was undamaged, and the house was not ransacked. The State also introduced several properly admitted photographs depicting the condition of the house, including the doors and windows. Because the State referred to admissible evidence, Taylor cannot introduce inadmissible evidence pursuant to this doctrine.

Gerjuan's proposed testimony about the relative is hearsay and inadmissible. The trial court did not abuse its discretion.

### … **Conclusion**

The evidence at issue… was inadmissible, and the trial court did not abuse its discretion. Furthermore, Taylor was not prejudiced by the exclusion of this evidence. Although the above statements were excluded as hearsay, the jury was able to consider Gerjuan's testimony that she talked to Rowe on November 28th, Gerjuan's telephone records showing a telephone call at that date and time, as well as testimony that Perry left some belongings at Rowe's home. Additionally, this evidence pales in the light of Taylor's confessions and other corroborating evidence.

*State v. Taylor*, 298 S.W.3d at 491-499 (bold typeface and first two footnotes in original) (third footnote added).

In his habeas petition, Taylor cites *Chambers v. Mississippi*, 410 U.S. 284 (1973), for the proposition that "due process and the Sixth Amendment prohibits states from mechanistically applying its rules of evidence, such as the hearsay rule, to prevent a criminal defendant from presenting relevant and reliable evidence in his defense." (Doc. 19 at 17) Taylor also cites *Crane v. Kentucky*, 476 U.S. 683

(1986), for the proposition that "it is unconstitutional to exclude exculpatory evidence based upon state evidentiary rules in the absence of any valid state justification." (Doc. 19 at 18) Taylor argues that "[neither] the trial court nor the Missouri Supreme Court… applied the appropriate balancing of interests tests… Instead, both courts mechanistically applied the hearsay rule 'to defeat the ends of justice.'" (*Id.* (quoting *Green v. Georgia*, 442 U.S. 95, 97 (1979))

Taylor then argues that the excluded evidence was reliable and admissible pursuant to *Chambers v. Mississippi* for substantially the same reasons he unsuccessfully advanced before the state courts. (*See* Doc. 19 at 18 (arguing that phone record showing a call from Gerjuan's cell phone to an Amoco gas station at 4:36 A.M. on November 28 supports reliability of Gerjuan's testimony that Angela *called her* from that gas station)); *see also id.* at 19 (arguing that calendar entries were sufficiently reliable for admission because Gerjuan identified them as Angela's handwriting) and at 20 (arguing that carbon copy of check was similarly reliable because of Gerjuan's identification)).

Taylor also cites half a dozen cases from other federal and state jurisdictions in support of the proposition that other courts have admitted similar evidence under the hearsay exceptions the Missouri Supreme Court found inapplicable. (*See* Doc. 19 at 19 (citing *State v. Newell*, 710 N.W.2d 6 (Iowa 2006), and *McBeath v. Commonwealth*, 244 S.W.3d 22 (Ky. 2007)); *see also id.* (citing *Parle v. Runnels*,

387 F.3d 1030 (9th Cir. 2004), and *Davis v. Allsbrooks*, 778 F.2d 168 (4th Cir.

1985)); *see also id.* at 20 (citing *People v. Howard*, 575 N.W.2d 16 (Mich. App.

1997), and *United States v. Pang*, 362 F.3d 1187 (9th Cir. 2004)).

Finally, Taylor argues that "[because] the evidence submitted by the

prosecution was primarily circumstantial, this constitutional violation cannot be

considered harmless." (Doc. 19 at 20)

Respondent argues that this claim is not cognizable in a federal habeas

petition under *Estelle v. McGuire*, 502 U.S. 62, 72 (1991), and that "this Court

cannot re-examine the state court's evidentiary rulings." (Doc. 29 at 28-29)

Respondent further argues that the decision of the Missouri Supreme Court on this

claim is reasonable and entitled to deference. (*Id.* at 29) In the alternative,

respondent argues that this claim is without merit and distinguishes it from each of

*Chambers, Crane,* and *Green*:

> Unlike *Chambers* or *Green*, wherein a third party
> confessed to the crime for which the defendant was being
> tried, the evidence here did not present "persuasive
> assurances of trustworthiness." *Chambers*, 410 U.S. at
> 302. The statement that the victim called her sister from
> a pay phone was not corroborated by any phone records,
> nor made under circumstances that would point to
> heightened truthfulness. The same is true of the
> statement that there was a male living in the victim's
> house. Similarly, there was no corroborating evidence
> that the victim's calendar notations were accurate or that
> they were made contemporaneously with the events
> about which they were written. Neither the victim nor
> her sister were available for cross-examination on these

points. The victim's check was never negotiated and lacked any indication of the purpose with which it was written. It cannot be said that the trial court excluded these pieces of evidence without "any valid state justification." *Crane*, 476 U.S. at 690-91.

Further, and most importantly, none of the pieces of evidence Taylor discusses exonerate him.... The pieces of hearsay evidence at issue are: a statement that the victim called someone specifically from a pay phone; the victim's handwritten calendar; a check purportedly written by the victim; and a statement that an unidentified male lived in the victim's house. All of these statements lack independent indicia of reliability and the court did not err in keeping them out.

(Doc. 29 at 29-31)

In response, Taylor argues that "[this] claim is not subject to the standard of review provisions of 2254(d) because the Missouri Supreme Court did not directly address the due process component of the claim on direct appeal. Instead, the court based its ruling completely on state hearsay rules. 298 S.W.3d at 491-499. As a result, this Court is free to review this claim *de novo*. *See Skillicorn v. Luebbers*, 475 F.3d 965, 972 (8th Cir. 2007)." (Doc. 46 at 31)

Taylor also argues in his reply that respondent "does not directly respond to the argument that the state courts mechanistically applied state hearsay rules to exclude exculpatory evidence central to petitioner's defense... [and] asserts no countervailing state interest in excluding this evidence. *See Crane v. Kentucky*, 476 U.S. 683, 690-691 (1986)." (*Id.*). Taylor attacks the probative value of the State's trial evidence, particularly the statement of Taylor's brother Perry, and cites

seven cases in which habeas relief was granted "[despite] evidence that was much stronger than the proof utilized here to convict [Taylor.]" (*See* Doc. 46 at 34 (citing *Anderson v. Johnson*, 338 F.3d 382 (5th Cir. 2003), and *Trammell v. McKune*, 485 F.3d 546 (10th Cir. 2007)); *see also id.* at 35 (citing *Spicer v. Roxbury Corr. Inst.*, 194 F.3d 547 (4th Cir. 1999), and *Reynoso v. Giurbino*, 462 F.3d 1099 (9th Cir. 2006)); *see also id.* at 36 (citing *White v. Roper*, 416 F.3d 728 (8th Cir. 2005), *Schlup v. Delo*, 513 U.S. 298 (1995), and *Clemmons v. Delo*, 124 F.3d 944 (8th Cir. 1997)).

Taylor cites *Brecht v. Abrahamson*, 507 U.S. 619 (1993), for the proposition that a constitutional violation must "have a 'substantial and injurious effect or influence in determining the jury's verdict' before it merits reversal on collateral review." (Doc. 46 at 37) (citing *Brecht* at 637) "In addressing this issue, the Supreme Court instructed lower federal courts 'to ask directly, Do I, the judge, think that the error substantially influenced the jury's decision?'" (*Id.*) (quoting *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995)).

After reviewing the parties' submissions, the Missouri Supreme Court's opinion, and the underlying trial record, I find the following:

First, because the admission or exclusion of evidence is primarily a question of state law, an evidentiary determination rarely gives rise to a federal question reviewable in a habeas petition. *Scott v. Jones*, 915 F.2d 1188, 1190–91 (8th Cir.

1990).  Federal courts "may not review evidentiary rulings of state courts unless they implicate federal constitutional rights."  *Evans v. Luebbers*, 371 F.3d 438, 443 (8th Cir. 2004).  To implicate a due process violation, the alleged improper evidence must be "so egregious that [it] fatally infected the proceedings and rendered [the] entire trial fundamentally unfair."  *Anderson v. Goeke*, 44 F.3d 675, 679 (8th Cir. 1995).

Second, Taylor's argument that the Missouri Supreme Court "did not directly address the due process component of the claim on direct appeal" and "based its ruling completely on state hearsay rules" is completely without merit in light of a plain reading of the opinion.  *See State v. Taylor,* 298 S.W.3d at 493, 494-495, 497, 499 (expressly citing *Chambers*, 410 U.S. 284, and analyzing applicability of hearsay rule's due process exception to Taylor's proffered submissions).

Third, Taylor's argument that the circumstantial nature of the State's evidence affects the analysis of prejudice in this claim is without merit. "Circumstantial evidence is 'intrinsically as probative as direct evidence.'"  *United States v. Cook*, 842 F.3d 597, 602 (8th Cir. 2016) (quoting *United States v. Tschacher*, 687 F.3d 923, 934 (8th Cir. 2012) (further internal quotation omitted).

Fourth, a phone record that Gerjuan made a call from her cell phone to a payphone does not corroborate her deposition testimony that she *received* a call

from that payphone.  Taylor asserts that "[clearly], this unassailable business record provided strong corroborating evidence that the victim regularly communicated with her sister from that payphone."  (Doc. 46 at 32).  It does not. The Missouri Supreme Court correctly assessed this argument through the lens of *Chambers* and found it bereft of indicia of reliability: the phone records do not show that Gerjuan received any calls from this payphone, Gerjuan was unavailable at trial for cross-examination, and her testimony in her deposition was contradictory and unclear.  *See* note 7*, supra* at 36-37.

Fifth, the calendar notations were identified as Angela's handwriting only by Gerjuan, who was not present to testify at trial and was not cross-examined on her ability to reliably distinguish her sister's handwriting.  There are no indicia in the record of whether the calendar notations were made contemporaneously with the dates they describe.  Furthermore, the State called Angela Rowe's supervisors to testify during trial.  They each testified that, contrary to the calendar notation describing November 26th as "off," Angela Rowe was scheduled for work on the 26th, 27th, and 28th, and did not appear or call in to work on those days.  (*See* Doc. 29, Ex. Q at 41-44)

Sixth, Gerjuan's ability to identify the carbon copy of the check as her sister's handwriting was not reliably established for the same reasons.  There are

no independent indicia in the record of when the check was written to support

Taylor's argument that it was written on November 27th.

Seventh, Gerjuan's statement that a relative of Taylor's also lived at

Angela's house was not sufficiently supported by independent indicia of reliability.

Angela's neighbor, Elmer Massey, testified at trial that he observed a man exit and

enter Angela's house the week of November 29th, 2004. (*See* Doc. 29, Ex. S at

13-17) Massey could not identify whether he saw the man in question before or

after Thanksgiving, nor could he distinguish the man he claimed to have seen from

Taylor himself.[8] The trial record establishes that Taylor's brother Perry was

known to keep some of his possessions at the victims' home, including his

---

[8] The relevant portions of the trial transcript are as follows:

> Q. [Defense] Mr. Massey, do you see that person in the courtroom?
> A. No, I wouldn't recognize the face at this point.
> Q. But you don't see that person in the courtroom?
> A. No.
> …
> Q. [Prosecutor] Mr. Massey, do you remember the exact date you think you saw the light skinned male at the house?
> A. No, sir.
> Q. Okay. And Thanksgiving was on the 25th of – actually Thanksgiving 2004 was on Thursday the 25th, could you have seen him on the 26th? Do you remember the date?
> A. I don't recall.

(Doc. 29, Ex. S at 15)

personal vehicle. (Doc. 29, Ex. P at 44) However, the trial record also establishes that Perry Taylor's professional vehicle, with which he traveled and which was tracked by GPS as part of his employment as a cargo truck driver, was out of St. Louis until November 25th, was in St. Louis from the 25th through the 29th, and departed St. Louis again on the 30th. (*Id.*, Ex. P at 42) There are no other indicia in the trial record of any other men living at the victims' home, nor are there independent indicia that Gerjuan ever visited her sister's home.

Eighth, all of the cases Taylor cites in his petition are controlling are factually distinguishable and none are sufficient to disturb the deference given to the Missouri Supreme Court's judgment under § 2254(d). I will briefly address each case sequentially. *State v. Newell*, 710 N.W.2d 6 (Iowa 2006), admitted testimony about a phone call made by a murder victim in which she "seemed distressed, spoke in whispers, and stated [defendant] was standing there listening" under the present sense impression exception to the hearsay rule. *Id.* at 17. The testimony was offered by the victim's ex-husband, who was the other party to the conversation and was present at trial for cross-examination. By contrast, a statement "about Rowe's location at a specific time in response to a question from Gerjuan… did not concern an event or describe or explain an event that Rowe perceived." *Taylor*, 298 S.W.3d at 494. The Missouri Supreme Court's finding that the word "event," as contemplated by the present-sense exception to the

hearsay rule, does not encompass the act of making a call from a pay phone is not unreasonable under § 2254(d)(2). "Further, the statement lacks indicia of trustworthiness [because it was not corroborated and neither party to the alleged conversation was available to testify at trial]." *Taylor* at 494. In *McBeath v. Commonwealth*, 244 S.W.3d 22 (Ky. 2007), the Kentucky Supreme Court admitted testimony from a witness who had heard one end of a phone conversation, then had the substance of the other end (which contained the defendant's statement) explained to him immediately after the conversation ended. As in *Newell*, the witness in question testified at trial and was subject to cross-examination.

In *Parle v. Runnels*, 387 F.3d 1030 (9th Cir. 2004), the Ninth Circuit Court of Appeals reversed a district court's holding that a murder victim's diary entries describing physical abuse by the defendant were inadmissible as present sense impressions. The Ninth Circuit noted that:

> Neither the diary itself nor the circumstances surrounding its creation suggests that [the victim] had a motive to fabricate descriptions of abuse in her diary…. She even admits her own wrongdoing, confessing that she falsely accused, deliberately provoked, and physically abused petitioner – one time by stabbing him with a letter opener. The diary contains statements that [the victim] would not be likely to want anyone else to read: statements that are personally damaging and that reveal the most intimate details of her relationship with petitioner. There was nothing unreasonable about the state court's determination that [she] lacked a motive to falsify her own diary.

*Parle*, 387 F.3d at 1041. This is distinguishable from the case at bar, in which there is no indication that the calendar notations were made contemporaneously with the dates marked. Indeed, one of the purposes of a calendar is to note upcoming events *in advance* as an aid to planning, as opposed to a diary which is necessarily filled in shortly after the fact. *Davis v. Allsbrooks*, 778 F.2d 168 (4th Cir. 1985), wherein the Fourth Circuit Court of Appeals affirmed the admission of a murder victim's diary, is distinguishable on similar grounds.

In *People v. Howard*, 575 N.W.2d 16 (Mich. App. 1997), the Court of Appeals of Michigan upheld the admission of a murder victim's appointment book under the state of mind exception to the hearsay rule "as a declaration of where [the victim] intended to go." *Id.* at 30 (internal citation omitted). The present case is distinguishable from *Howard*. In *Howard*, the victim's son testified at trial, was present for cross-examination, and identified the appointment book as his mother's. *Id.* Those indicia of reliability were absent in the present case. In *United States v. Pang*, 362 F.3d 1187 (9th Cir. 2004), the Ninth Circuit Court of Appeals upheld the admission of cancelled checks under the verbal act hearsay exception. *Id.* at 1192 (internal citation omitted). The checks in *Pang*, unlike the check at issue here, were fully filled out and delivered to a second party. *Id.* at 1191-1192.

Ninth, Taylor's contention that Respondent did not address his argument "that the state courts mechanistically applied state hearsay rules" in violation of his constitutional rights is belied by a plain reading of the response. Respondent distinguished Taylor's claim on the merits from *Chambers*, *Crane*, and *Green*. (*See* Doc. 29 at 29-31; *see also supra* at 46-47) Respondent's argument need not cite the exact word "mechanistically" to respond to the substance of Taylor's claim.

Pursuant to *O'Neal v. McAninch*, I have considered whether I think that Taylor's claim of error substantially influenced the jury's decision. *McAninch*, 513 U.S. at 436. I have concluded not only that the alleged error did not substantially influence the jury's decision, but that the Missouri Supreme Court correctly affirmed the trial court's exclusion of hearsay evidence to begin with, because that evidence was not supported by the indicia of reliability required for the due process exception to the hearsay rule. Although the "State [is not] permitted to exclude *competent*, *reliable* evidence… when such evidence is central to the defendant's claim of innocence." *Crane*, 476 U.S. at 690 (emphasis added), the evidence excluded in this matter was neither competent nor reliable. As a result I will deny Taylor's second ground for relief.

*3. Taylor's trial counsel team was not constitutionally ineffective when they declined to object to the admission and use of phone records, despite post-*

*conviction discovery that slightly undermined the probative weight of those*

*records, where the newly-discovered information did not refute the key proposition*

*for which the records were admitted and where Taylor's conviction was*

*independently supported by other evidence; nor did the inclusion of such records*

*violate Taylor's due process rights when neither the prosecution nor the testifying*

*witnesses were aware of the records' discrepancies at trial.*

At trial, the State introduced evidence in the form of phone records from

Charter Communications, which provided service to Angela Rowe's home phone.

(Doc. 29, Ex. R at 62-74) Cathy Herbert, records custodian for Charter, testified

that the Charter records contained all outgoing calls[9] from the victim's phone and

some, but not all, incoming calls[10]. (*Id.* at 63) The State offered the Charter

---

[9] The records' representation of "outgoing" calls include calls in which the victim's home number is identified as the "caller" and Charter's voicemail system is identified as the "called" number. These represent calls made *to* the victim's home phone *from* an outside number which received no answer and were forwarded to voicemail. Calls made by a person inside the home to check the voicemail are instead represented by an entry showing the victim's number calling itself. (*See* Doc. 29, Ex. R at 64; *see also id.*, Ex. AA at 36 (excerpt of records showing forty such "forwarded to voicemail" calls between November 25 and December 1); *see also id.* (showing six such "check voicemail" calls on November 24 and 25, and none from November 25 through December 1)

[10] The records of incoming calls included several that were highlighted in yellow, denoting that they had been provided to Charter by another carrier for internal billing purposes. Six such incoming calls were recorded between November 25 and December 3 in the Charter records. (Doc. 29, Ex. R at 68) At trial, Herbert testified that each of these calls likely went to voicemail or was otherwise unanswered based on the *de minimis* duration of each call. (*Id.* at 68-69) Under cross-examination, Herbert admitted that she could not confirm whether or not

records to demonstrate a) that two outgoing calls were made from the victim's home phone shortly after midnight on November 24 to her sister Gerjuan; b) that all remaining outgoing calls made throughout the 24th and the morning of the 25th were either to check voicemail, to Taylor's brother, to Southwest Airlines, or to a family friend of the Taylors named Valerie Burke; and c) that no further outgoing calls were made from Rowe's home phone after the morning of November 25 until December 3, when police had entered the home and discovered the victims' bodies. (Doc. 29, Ex. S at 49; *see also id.*, Ex. AA at 36)

Two defense witnesses, Beverly Conley and Sherry Conley, had previously told police during their investigation that they last spoke with the victims on November 27 and 28. (Doc. 29, Ex. S at 32, 35) Upon seeing the Charter records, which did not support their statements to the police, Beverly and Sherry[11] recanted their earlier statements upon the belief that they must have incorrectly remembered the dates of their last conversations. (*Id.,* Ex. S at 33, 36) The Charter records showed that the last contact between Beverly Conley and the victims' home phone was on November 21 and that there had been no contact between Sherry Conley and the victims' home phone between November 26 and November 30. (*Id.*)

these calls had, in fact, been answered by someone inside the victim's residence. (*Id.* at 73)

[11] On direct examination, Sherry Conley did not recall her initial statements to police. Defense counsel attempted to refresh her memory with her deposition, during which she had stated that she had last spoken with the victims on November 27. (Doc. 29, Ex. S at 34-35)

The State also introduced evidence through Dan Jensen, records custodian for Sprint, who testified regarding Sprint records for cell phones belonging to Taylor, Taylor's brother Perry, and Gerjuan Rowe. (Doc. 29, Ex. R at 38) Jensen testified that these records contained all outgoing and incoming calls "in the [Sprint] network." (*Id.*, Ex. R at 39) These records demonstrated a) that Gerjuan called the victims' home phone seventeen times on November 23, b) that Gerjuan did not call the victims' home phone between November 24 and December 3, and c) that Taylor's last call to the victims' home phone was on November 22. (*Id.*, Ex. R at 42) The Sprint records further demonstrated that Taylor and his brother Perry made several calls during the late evening of November 23, the early morning of November 24, and on December 4 after the bodies of the victims had been discovered. (*Id.* at 40-41) These calls were made to each other, to their mother Jessie Bland, and to Taylor's wife Debrene Williams. (*Id.*)

The State used the Charter and Sprint records to support its argument that Taylor killed Rowe and her children prior to his departure from St. Louis on November 26, most likely in the early morning hours of November 24:

> Let's go back to Angela Rowe. One thing Angie did consistently was talk on the phone. Thirty-six calls a day she averaged from November 1st through November 23rd. Thirty-six calls. November 24th, 25th there's eleven calls made. Final nine calls, the first two calls from that house are to Gerjuan Rowe, and they're at – excuse me, twenty-two minutes after midnight. On the 24th there's a call from the victim's house to Gerjuan

> Rowe, that's the last time. The next nine phone calls in this graph… [are] Valerie Burke[,] [who] Perry Taylor said [was a] long time friend of the [Taylor] family. Perry Taylor, Valerie Burke, Perry Taylor, Southwest Airlines, Southwest Airlines, Perry Taylor, Perry Taylor, Perry Taylor. Those are not calls that Angela Rowe would have made; they're the calls the defendant's making. Her calls stop at 12:22 [A.M.]… The day her phone calls stopped is the day she died.

(Doc. 29, Ex. S at 49)

In Taylor's post-conviction proceedings, Taylor's counsel discovered several discrepancies within the Charter and Sprint records. Side-by-side comparison of the Charter and Sprint records revealed that a total of four calls from the victims' home phone to Taylor's cell phone on November 22 and 23, and one call from the victims' home phone to Perry Taylor's cell phone on November 24, appeared on the Sprint records but did not appear on the Charter records. (Doc. 29, Ex. AA at 13-14) This contradicted the testimony of Cathy Herbert, records custodian for Charter, who had testified at trial that the Charter records contained all outgoing calls. Herbert was again called to testify at Taylor's post-conviction hearing. (Doc. 29, Ex. DD at 38-91) When presented with the side-by-side comparison, Herbert stated that:

> A. If I were provided these records I would have acknowledged there was a discrepancy. I can't testify to the accuracy of [Sprint's records], but I would have acknowledged there is obviously a discrepancy, and it is possible that one or the other could be incorrect or not contain all of them.

58

> Q. Okay. So you would at least have been able to
> acknowledge if you were asked to make this comparison
> and testify at the trial February 2008, you would have
> then been able to at least acknowledge the possibility
> those Charter records do not show all outgoing calls?
> A. Could not, yes.
> Q. Can you explain why the Charter records, at least
> comparing these, appear not to show all outgoing calls?
> A. No.

(Doc. 29, Ex. DD at 55-56)

Taylor's post-conviction counsel also elicited the fact that the victims' home

phone appeared to have misidentified Gerjuan Rowe's cell phone with a different

number on seventeen occasions. (*Id.*, Ex. DD at 67) Herbert was unable to give a

definitive explanation for this misidentification, but opined that it might be the

product of technical errors or of calls being passed through another carrier's

network. (*Id.*, Ex. DD at 86)

Taylor's post-conviction counsel also discovered that seven calls made from

the victims' home phone to Gerjuan Rowe's cell phone, all on November 22 and

23, appeared in the Charter records but did not appear in the Sprint records. (*Id.*,

Ex. DD at 68-71) This contradicted the testimony of Dan Jensen, records

custodian for Sprint, who had testified at trial that the Sprint records included all

outgoing and incoming calls on their network. Herbert opined, based on her

experience and training, that that discrepancy meant "[that] Sprint did not have

those incoming calls on their records." (*Id.*, Ex. DD at 71)

Jensen was also called to testify at Taylor's post-conviction hearing. (Doc. 29, Ex. DD at 102-111, Ex. EE at 1-21) He was presented with the same discrepancies and, like Herbert, was unable to identify a definitive cause, though he testified that billing protocol, roaming on another carrier's network, and technical glitches were all possible explanations.[12] (*Id.*, Ex. EE at 2, 5, 8, 10) When asked if Sprint "[guaranteed] a hundred percent accuracy of its records," Jensen answered "No." (*Id.*, Ex. EE at 7)

In addition to identifying discrepancies between the Charter and Sprint records, Taylor's post-conviction counsel raised the issue of Charter's disclaimer policy to attack the accuracy of the Charter records. Christopher Avery, senior counsel for Charter, was called to testify. (Doc. 29, Ex. DD at 92-102) Avery testified that Charter began using a standard disclaimer in March or April of 2009. (*Id.*, Ex. DD at 95) Avery testified that prior to that, Charter's disclaimer policy was as follows:

> Q. … [What] if any disclaimer language was used by Charter in responding to a record request to an outside party in 2004 [at the time of the murders?]
> A. No disclaimer language was used.
> Q. And what if any disclaimer language was used by Charter in responding to law enforcement requests or subpoenas for outside – or for records in 2005?

---

[12] Because the questions for Jensen were, as described by post-conviction counsel, "virtually the same questions we asked Ms. Herbert," discussing them at equal length would serve no additional analytical purpose. (*See* Doc. 29, Ex. DD at 102)

A. For the first six months no disclaimer language was used, some period after June 2005 but before March 2006, the 2006 disclaimer was used.

…

Q. Okay. And what if any disclaimer language was used by Charter in responding to records request [sic] to an outside party in 2007?

A. … "Please be aware that Charter's billing records from which the above information is obtained are subject to human error, and Charter cannot always guarantee the accuracy of such records. You should not rely solely on this information, you should always independently corroborate the information Charter provides you with other information you have concerning the identity of the individual."

Q. Why did Charter include this disclaimer language in response to parties requesting records?

A. To make clear that to the requesting party that our records are what they are, and they may contain errors or omissions in them.

…

Q. From 2005 up to January 2008, if an attorney had asked you if Charter guarantees the accuracy of its telephone landline records, what would you have told that attorney?

A. I would have told them that we don't guarantee those records.

Q. Okay. And from 2005 to January 2008 if an attorney asked you about disclaimer language used by Charter from 2004 to 2007, in regards to its cell phone landline records, would you have told them what you have testified to here today?

A. I would.

(Doc. 29, Ex. DD at 96-100)

The State cross-examined Avery to elicit the fact that he had, in fact, been present during Herbert's depositions and had not given any such disclaimers:

Q. Mr. Avery, she just asked you some questions about what you would have done, but in this case you appeared in two depositions with Cathy Herbert; is that correct?

A. That's correct.

…

Q. In either – in both of those cases you actually appeared discussing things on the record; is that correct?

A. That's correct.

Q. But you never mentioned anything about the disclaimer?

A. I did not.

Q. Never mentioned anything about any concerns about the accuracy of the records or what Ms. Herbert was testifying to?

A. No.

Q. As a matter of fact you reviewed it as the attorney for Charter, went over waiver of signature and whether to review the deposition for Ms. Herbert; is that correct?

A. That's correct.

Q. And during that deposition she's saying look the outgoing calls come from Charter records and we believe in the accuracy of our records; is that correct?

A. That's correct.

Q. But the incoming calls we get information from other carriers and we are not as certain about those records?

A. That's right.  That's correct.

…

Q. Okay.  Given the opportunity at deposition you didn't say anything about a disclaimer?

A. No.

Q. Or the reliability of the information?

A. No.

Q. And did you, in your review of the records for this case did you see anything where a disclaimer was sent by Charter with any records that were received by either the defense or law enforcement in this case?

A. No, no disclaimers were included.

(*Id.*, Ex. DD at 100-101)

In his habeas petition, Taylor argues that his trial counsel was constitutionally ineffective under *Strickland* for failing to object to the admission of these phone records, for failing to adequately examine the phone records for the discrepancies that later arose during post-conviction review, and for failing to adequately attack their accuracy during direct and cross-examination. (Doc. 19 at 21-22) Taylor argues that the discrepancies discovered during post-conviction proceedings prove that the Charter records did not show all outgoing calls, and therefore "[if] the Charter records did not show all outgoing calls, then the Charter records were not reliable to prove calls not made." (*Id.* at 31) Taylor further argues that his due process rights were violated because "the Charter records custodian testified falsely that Charter's records of the victims' telephone contained all outgoing calls." (*Id.* at 21-22)

Taylor claims that an objection to the admission of the phone records would have been sustained at trial because "1) a comparison of the available phone records demonstrated that the records contained inaccuracies and omissions; and 2) the State adduced no evidence that the companies' computer systems reliably produced accurate results." (*Id.* at 34) Taylor cites *State v. Dunn*, 7 S.W.3d 427 (Mo. App. W.D. 1999)[13], for the proposition that "the reliability of a computer system or accuracy of the computer system's results is a prerequisite to the

_____

[13] Taylor's petition cites *State v. Dunn* as 73 S.W.3d 427, which is an incorrect volume number. The correct citation for *Dunn* is 7 S.W.3d 427.

admission of computer-generated records." (Doc. 19 at 34) Taylor argues that his trial counsel's failure to discover the records' discrepancies was prejudicial to his defense and constituted ineffective assistance under *Strickland*. (*Id.* at 35)

In addressing the due process portion of his claim, Taylor cites to *Napue v. Illinois*, 360 U.S. 264 (1959), and argues that "[it] is well settled that a conviction based on false testimony violates due process if it affected the judgment of the jury. *See United States v. Bagley*, 473 U.S. 667, 678 (1985); *see also Durley v. Mayo*, 351 U.S. 277 (1956)." (Doc. 19 at 41) Taylor also argues that "Ms. Herbert's false testimony… implicates the Eighth Amendment's ban on cruel and unusual punishment." (*Id.*) Taylor cites *McClesky v. Kemp*, 107 S.Ct. 1756 (1987), and *Schiro v. Farley*, 114 S. Ct. 783 (1994), for the proposition that "[a] decision in a capital case must reflect a heightened degree of reliability to satisfy the Eighth Amendment… in all stages of a capital proceeding." (*Id.* at 41-42)

Respondent argues that this claim was properly denied on the merits by the Missouri Supreme Court on Taylor's appeal from denial of post-conviction relief. The Missouri Supreme Court's decision held that:

> … [Taylor] has failed to make a sufficient showing to support *Strickland's* prejudice prong because of the overwhelming evidence presented that established his guilt. He fails to demonstrate by a reasonable probability that *but for* counsel's alleged errors the result of the proceeding would have been different. *Id.* at 694, 104 S. Ct. 2052.

64

The State presented overwhelming evidence of [Taylor's] guilt at trial. The phone records and the testimony in question were but pebbles in the mountain of evidence used to convict [Taylor] and are insufficient to undermine confidence in the outcome of the trial as required by *Strickland*. *Id.* The information presented at trial, and set forth below, was more than sufficient to support the jury's verdict.

The State theorized that the murders took place before [Taylor] left St. Louis November 26, [14] more specifically, sometime late on the night of November 23 into the early morning hours of November 24.[15] The evidence at trial as to when the murders took place was as follows: Victim, described as a "good employee," called in to work November 21 but missed all of her shifts beginning November 26 without calling her employer. Victim's children did not return to school Monday, November 29 following the Thanksgiving break. Newspapers in victim's yard started accumulating November 26, and her mailbox was full of mail. All of the windows and doors of victim's home were locked when the police entered December 3, and there were no signs of forced entry. The police found [Taylor's] fingerprints on a can of Glade air freshener in victim's kitchen. They recovered 10 bullets from the home, victim[,] and her children. All had been fired from the same gun – a .38 or .357-caliber revolver.

In addition to the evidence found in victim's home, [Taylor] confessed to his brother that he killed victim and her children.[16] [Taylor's] brother gave a taped interview to the police on December 8. In that interview, he stated that [Taylor] called him on November 24 and asked to borrow money. [Taylor] said that he needed to get away and that he had killed victim after she came at him with a knife. He killed her children because they were

---

[14] All dates referenced… occurred in 2004 unless otherwise noted.

[15] Thanksgiving Day fell on November 25 in 2004.

[16] [Taylor's] brother later claimed that his statement was coerced.

witnesses. The next day, [Taylor] again spoke with his brother, telling him that he was still in victim's home with the bodies because he was waiting for a letter from his wife.[17] The police found an opened, unsigned letter in victim's home dated November 22 and postmarked from California. The letter contained four short sentences: "Is your man faithful??? Eventually it all comes out. Enjoy it now. Because he's not yours." In addition to telling his brother about the letter, [Taylor] also said that he had turned on the air conditioning in victim's home. When the police entered and located the bodies December 3, they noticed that the thermostat was set to the lowest setting, the air conditioning was on and it was noticeably cool inside the home, unusual for December in Missouri. All of this evidence supported the jury's verdict.

[Taylor's] actions just prior to leaving St. Louis November 26 also permitted an inference of guilt. [Taylor] went to his sister-in-law's home November 26 asking for a ride to the airport. His sister-in-law saw him throw what appeared to be a long-barreled revolver into the sewer near her home. [Taylor] told his sister-in-law that he was leaving town because people were trying to kill him and that she would not see him alive again. He also warned her that she would hear things about him that were not true. After she dropped him off at the airport, he boarded a flight to Phoenix, then California, traveling under the name Louis Bradley.

The vehicle [Taylor] drove to his sister-in-law's home presented additional evidence of guilt. He had parked the vehicle, his brother's Chevrolet Blazer, outside his sister-in-law's home prior to leaving for the airport. The next day, [Taylor's] wife called her sister ([Taylor's] sister-in-law). [Taylor] could be heard in the background yelling that the Blazer should be put into the garage. Later that week, [Taylor's] brother picked up the Blazer. The

---

[17] [Taylor] lived with victim when he was in St. Louis but was married to a woman who lived in California.

66

police found a partial box of Winchester .38 special ammunition inside the car.

[Taylor] was arrested December 9 as he tried to leave another girlfriend's home in Kentucky. He attempted to avoid authorities by lying on the floorboard of a car leaving the home. After his arrest, he gave the police a false name and Missouri identification with that name. The police found additional identification with yet another false name, as well as pamphlets about creating a new identity, in [Taylor's] belongings. A pair of glasses he had been seen wearing before the murders was found in his luggage. Forensic testing revealed the possible presence of blood on one of the nose guard areas. The sample was too small for further testing, but a partial DNA profile extracted from the area eliminated the children, but not victim, as a source. The DNA profile was found in 1 in every 12,930 African-American persons.

These facts indicate overwhelming evidence of guilt and demonstrate that [Taylor] is unable to show that, *but for* any alleged unprofessional errors of counsel, the result in his trial would have been different. Having failed to meet the "but for" prejudice test of *Strickland*, it is unnecessary to review [Taylor's] claims of ineffective assistance of counsel under the alternative prong of *Strickland*. …

[Taylor] also urges this Court to reexamine the law as to when a defendant is denied due process because he was convicted through the use of false testimony. The Court declines. For [Taylor] to prevail on his claim that due process was violated and post-conviction relief is warranted, he must show that: 1) the testimony given was false; 2) the State knew it was false; and 3) his conviction was obtained as a result of the perjured testimony. *See State v. Statler*, 383 S.W.2d 534, 537 (Mo. 1964). [Taylor] asks that the second requirement of the burden be eliminated.

Such a change would lead to the nonsensical result of expecting the State to be able to read the mind of its witnesses to refrain from having convictions overturned when a witness gives testimony that he later learns is false. Additionally, such a change would not be helpful to [Taylor.] In this case, as the basis of his due process violation, [Taylor] alleges that the Charter representative's trial testimony regarding its landline records showing all outgoing calls from victim's Charter landline was false testimony. At the post-conviction hearing, the Charter representative acknowledged that when she testified at trial, she was under the impression that Charter records did contain all outgoing calls; only later did she discover that was not true. There is no dispute that, at the time of trial, the State believed that her testimony was true. Even if this Court chose to revise the burden as [Taylor] urges, he still would be unable to demonstrate that his conviction was obtained as a result of the "false" testimony for the reason already thoroughly discussed: there was overwhelming evidence of [Taylor's] guilt without the testimony of the Charter representative.

(Doc. 29, Ex. II at 5-9) (emphasis and footnotes in original)

Respondent argues that this determination is reasonable and entitled to deference under § 2254(d). (Doc. 29 at 35) Respondent also argues that this claim is meritless, because despite the discrepancies in the records discovered during post-conviction review, "[Taylor] *still* can point to no evidence of outgoing calls from the victim's home after Taylor left the state." (*Id.* at 36) (emphasis in original) Respondent argues that:

Counsel did not act unreasonably in failing to tire the jury by nitpicking inaccuracies in phone records that do not ultimately support Taylor's defense theory…. Even

had the trial court known that the phone records contained minor errors, there is no support for the proposition that it would have excluded them for "insufficient foundation" ([Doc. 19 at] 35). No evidence comes with a guarantee of "one hundred percent accuracy" ([Doc. 19 at] 34). As Taylor can point to no evidence to prove his assertion that the victim was, *in fact, alive* after he left the state, he cannot show prejudice in the face of overwhelming evidence of guilt.

As to Taylor's due process claim, he does not assert, as he must, that the State knew their witness's testimony was false at the time it was given. *See Napue v. People of State of Ill.,* 360 U.S. 264 (1959) (State may not *knowingly* use false evidence). Taylor, in fact, concedes this point by saying "At the time of trial, Ms. Herbert believed that the Charter records contained all outgoing calls" ([Doc. 19 at] 27).

(*Id.*) (emphasis in original)  Respondent distinguishes *United States v. Bagley* as

having dealt with the prosecution's knowing use of false testimony, and further

distinguishes *Durley v. Mayo* as inapposite because it does not discuss the use of

false testimony at all.  (*Id.* at 37)

In reply, Taylor argues that the Missouri Supreme Court made an

unreasonable determination of facts for purposes of § 2254(d)(2) by finding that he

was not prejudiced under *Strickland*.  (Doc. 46 at 39)  Taylor attacks the

sufficiency of the evidence as "closer to a 'mole hill' than a mountain[:]"

Again, there were no eyewitnesses to the murders, [Taylor] made no incriminating statements to the police after his arrest, no clear motive was established by the state, and no ballistic or other physical evidence linked him to the crime…. the medical examiner conveniently and suspiciously changed his opinion regarding the time

of the death of the victims after learning of [Taylor]'s alibi. Also… the Missouri Supreme Court assigned great weight to [Taylor]'s alleged "confession." Again, this is an unreasonable determination of the facts because this alleged "confession" was to [Taylor]'s brother who later recanted his statements and testified at [Taylor]'s trial that he had been coerced into giving this statement by the police.

Similarly, the other "overwhelming" evidence that the Missouri Supreme Court lists is purely circumstantial, (e.g., [Taylor]'s fingerprints on air freshener, bullets found at victim's home, [Taylor] allegedly throwing something into the sewer, [Taylor] parking his vehicle at his sister-in-law's house, circumstances surrounding [Taylor's] arrest in Kentucky), and not direct evidence of petitioner's guilt. Finally, regarding the speck taken from [Taylor's] glasses, the chemical analysis made no definitive determination that this genetic material was blood… Given the romantic relationship between [Taylor] and the victim, she could have left a speck of DNA on petitioner's glasses in any number of ways. Because the Missouri Supreme Court made an unreasonable determination of the facts under 2254(d)(2), this Court is free to review this ground for relief *de novo*.

(Doc. 46 at 39-41) Regarding the due process component of this claim, Taylor argues in his reply that "the state should have known that the records custodian's testimony was false." (Doc. 46 at 44) Taylor also cites *Tuggle v. Netherland*, 516 U.S. 10 (1995), for the proposition that "a jury's consideration of materially inaccurate information in support of an aggravating factor cannot support a death sentence," and *Gregg v. Georgia*, 428 U.S. 153 (1976), for the statement that "accurate sentencing information is an indispensable prerequisite to a reasoned

determination of whether a defendant shall live or die by a jury of people who may never before have made a sentencing decision." (Doc. 46 at 44-45)

After review of the parties' submissions, the trial transcript, and the record of Taylor's post-conviction review proceedings, I find the following:

First, the decision of the Missouri Supreme Court affirming the denial of post-conviction relief is reasonable and entitled to deference under § 2254(d). As discussed in the excerpt of the Missouri Supreme Court's decision, *supra*, the pillar of evidence before the jury was sufficiently solid as to support Taylor's conviction even absent the use of the phone records. Taylor made the same attempts to undermine that evidence at trial as he makes here, and the jury evaluated them and found them unconvincing. (*See, e.g.,* Doc. 29, Ex. S at 52-53) (questioning whether Perry Taylor's admission of Taylor's guilt to police was coerced);[18] *id.* at 53 (attacking probative value of material analyzed on Taylor's glasses); *id.* at 54 (arguing that use of alias and attempts to avoid police in Kentucky indicative of forgery but not murder); *id.* (attacking witness' ability to accurately identify firearm allegedly disposed of in sewer by Taylor); *id.* at 55-56 (accusing forensic examiner of changing testimony in response to Taylor's alibi); *see also id.*, Ex. Q at 53-56 (cross-examination of forensic examiner on this point), at 56-57

---

[18] I note that the reliability Perry Taylor's admission to the police that his brother committed the murders was bolstered at trial by Perry Taylor's friend Betty Byers. Ms. Beyers testified at trial that Perry Taylor told her within a day or so of the murders that Leonard had called Perry and said he had killed Angela Rowe and her three kids. She also testified that Leonard called Perry while he was at Ms. Beyers house on Thanksgiving and told Perry he was still in the house with the bodies and had turned down the air conditioning. Doc. 29, Ex. Q at 21-22.

(rehabilitation of same on redirect), and at 57-58 (re-cross of same). Taylor also argues that the evidence of guilt cannot be overwhelming because there is no direct evidence of guilt. However, "[c]ircumstantial evidence is 'intrinsically as probative as direct evidence.'" *United States v. Cook*, 842 F.3d 597, 602 (8th Cir. 2016) (quoting *United States v. Tschacher*, 687 F.3d 923, 934 (8th Cir. 2012) (further internal quotation omitted).

Second, the discrepancies Taylor's post-conviction counsel identified in the phone records and on which he now relies do not, in fact, establish the falsity of Charter's records. All they establish is that among the nearly *four thousand* combined entries[19] in the Charter and Sprint call records, a total of five appear on Sprint's but do not appear on Charter's, a total of seven appear on Charter's but do not appear on Sprint's, and a total of seventeen appear on Charter's but were listed under a different number. That could mean the Charter records are less complete than they were represented to be at trial, but it could also mean the same of the Sprint records, or of both simultaneously. Critically, it does not logically refute the central point for which the State admitted the records: that after November 25, 2004, the complete absence of outgoing calls from the victims' home phone supported the proposition that they had been killed prior to Taylor's departure from

---

[19] (*See* Doc. 29, Ex. CC at 63 (decision of post-conviction court describing "over 2200 entries" from Angela Rowe's home phone, "857 entries" from Perry Taylor's cell phone, and "805 entries" from Taylor's cell phone).

St. Louis on November 26. Taylor's trial counsel argued at trial that the phone records were incomplete and could not be relied upon to prove a lack of activity at the victims' home; the jury considered that argument and rejected it. (*See* Doc. 29, Ex. R at 63, 72-73; *see also id.*, Ex. S at 51-52) An objection to the admission of the phone records, even with knowledge of their discrepancies, would not have been meritorious and Taylor's counsel team was not ineffective under *Strickland* for declining to make meritless objections. At best, Taylor's trial counsel might have been able to point to their discrepancies as additional cumulative support for the unsuccessful argument that the phone records did not give a reliable picture of activity at the victims' home. That does not meet *Strickland's* exacting requirement that *but for* counsel's alleged error, there was a reasonable probability that the outcome of trial would have been different. *Strickland*, 466 U.S. at 694.

Third, the due process portion of Taylor's claim fails because a) as previously discussed, he does not establish that the testimony given was false, and b) he does not establish that the State was aware of any falsity, if it existed. Each of the cases he cites on this point deals with the *knowing* use of false testimony by the State, and his argument that the State "should have known" something of which *the testifying witnesses themselves were unaware* is completely unpersuasive. *Tuggle v. Netherland* and *Gregg v. Georgia* are inapposite on this point both because they deal with the use of aggravating sentencing factors rather

than evidence introduced during the guilt phase, but more critically because they deal with "*materially* inaccurate evidence," not the technical glitches and discrepancies at issue here. *Tuggle*, 516 U.S. at 14 (emphasis added).

The Missouri Supreme Court's decision on this claim is reasonable and entitled to deference under § 2254(d). My independent review of the record, including the call log excerpts contained in Taylor's post-conviction review briefs, has not revealed errors "sufficient to undermine confidence in the outcome" of Taylor's trial. *Strickland*, 466 U.S. at 694. As a result, I will deny Taylor's third ground for relief.

*4. The inclusion of evidence regarding blood- and DNA testing of Taylor's sunglasses did not violate his constitutional rights, despite the late disclosure and limited probative value of such evidence, where multiple continuances had already been granted to defense counsel and where the jury was adequately instructed as to the inconclusive nature of the tests concerned.*

The Missouri Supreme Court accurately summarized the facts relevant to this claim in its denial of Taylor's direct appeal as follows:

> When Taylor was arrested in December 2004, police recovered a pair of sunglasses from a bag in Taylor's possession. On September 15, 2005, Taylor requested notice of whether the State intended to use DNA evidence, the type of DNA testing that would be conducted, and whether the State had physical evidence submitted for analysis or examination.

On May 25, 2006, Taylor filed a motion, requesting the return of his personal property, including the sunglasses. In August 2006, the State took possession of the sunglasses from the police, and three months later in November, the bag and sunglasses were brought to the crime lab for testing. The phenolphthalein test was performed in November 2006, and the DNA tests were performed from December 2006 to January 2007. The DNA report was completed in April 2007.

Taylor received the report from the phenolphthalein test in March 2007 and the DNA report in April 2007. At this time, the trial was set to begin on May 30, 2007. In April 2007, Taylor filed a motion to exclude the evidence of the phenolphthalein and DNA testing based on the late disclosure, and alternatively, if the evidence was not excluded, Taylor requested a continuance.

A hearing was held in May 2007 at which the State explained that they disclosed the reports as soon as they received them and did not withhold the evidence purposely. The trial court overruled the motion to exclude the DNA evidence and granted Taylor a continuance until February 2008 with the "understanding that the request is being made reluctantly and only due to the facts and circumstances that gave rise to this motion."

*State v. Taylor*, 298 S.W.3d 482, 501-502 (2009).

Although blood was not visually apparent on the sunglasses, a phenolphthalein test – a presumptive test used to determine if there is a possible presence of blood – revealed a positive result on the sunglasses' nose guard. Because of the small size of the sample, a confirmatory test was not conducted.

The stain on the sunglasses was also tested for the presence of DNA. The analyst could not obtain a full genetic profile because of the small size of the sample. The results from the partial DNA profile eliminated Rowe's children as the contributors. Rowe was not

eliminated as a contributor. The partial DNA profile obtained occurs in only one in 12,030 persons in the African-American population. The source of the DNA, whether from blood, hair, or saliva, could not be determined from the test.

In May 2007, Taylor filed a motion to exclude these test results. After a hearing, the trial court overruled the motion to exclude and granted Taylor's request for a continuance to prepare and respond to the evidence. In January 2008, Taylor filed a motion in limine to exclude any evidence that the phenolphthalein test showed that the substance found was or presumptively was blood. The court conducted a hearing under *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), about the admissibility of the phenolphthalein test results and overruled Taylor's objection, allowing evidence of the phenolphthalein test results as a presumptive test for the presence of blood.

At trial, Taylor objected to the admission of this evidence and the trial court overruled the objections. The forensic scientist who conducted the tests testified that the phenolphthalein test is a presumptive test because it also can give a positive reaction to potatoes, rust, bleach[,] and nickel. She emphasized that the substance on the glasses was only "possibly blood" because there was no confirmatory test.

During closing arguments, the State commented that the sample was Rowe's blood, not the children's blood.[20]

---

[20] The relevant portion of the State's closing argument is:

[PROSECUTOR]: … DNA. Big fight about it. Small amount. One in twelve thousand nine hundred thirty, I believe, that it's the victim. But the one thing [a forensic scientist] was consistent on, it's the victim's blood, it's not the kids it's the victim –
[DEFENSE COUNSEL]: Objection, that's a misstatement of the testimony.

Taylor objected that the argument was a misstatement of the testimony. The trial court overruled the objection.

*Id.* at 499-500 (footnote in original).

---

THE COURT: The jury will recall the testimony.
…
[PROSECUTOR]: Remember that, the one nose piece is where they swab, and detected I mean it .03 nanograms of blood, but that's one –
[DEFENSE COUNSEL]: Objection, Your Honor, I have to object, nobody testified that it's blood.
[PROSECUTOR]: I will take that back, Your Honor. It was presumptively tested for blood. There wasn't enough to take a chance on not being able to test a confirmatory test without doing DNA. That was a call by [a forensic scientist], that was the right call to make. It was presumptive blood. We have a bloody room, a bloody struggle, and a piece of blood of Angela Rowe's on his glasses…

Taylor's closing argument on this point is:

… Now, [the prosecutor] wanted to keep calling that blood on those glasses. Oh, no. Nobody can tell you that. The best you have is a lab technician who runs this phenolphthalein test where she adds some chemicals and she watches it, and then she gets to decide independently if there's a change in color after she applies those chemicals. There's no machinery, there's no computer, there's no chart to gauge a color change but it's a judgment call… What do we know about that phenolphthalein test? What did you learn about that science? Blood is not the only thing that reacts. Horse radish, potatoes, vegetables, rust, bleach, nickel, mental alloyed [sic]. What was in the bag that they claim those glasses came out of? Batteries. What's in batteries? Nickel. Where did these glasses come from? You're going to have to answer that question…

In his habeas petition, Taylor argues that the introduction of this evidence violated his constitutional rights both a) because of the delay between the sunglasses' seizure and their testing, resulting in unfairly close proximity between the disclosure of the testing and the trial date, and b) because the limitations of the phenolphthalein test diminished its probative value to the point that its introduction denied Taylor a fundamentally fair trial. (Doc. 19 at 42)

With regard to the delay in testing and disclosure, Taylor cites *Ashker v. Class*, 152 F.3d 863 (8th Cir. 1998), for the proposition that a prosecutor's reasons for late disclosure are among the factors a reviewing court will consider in determining whether that disclosure satisfied due process requirements. (*Id.* at 45) Taylor further argues that:

> Although the State was aware of [Taylor's] speedy trial request, it inexcusably waited almost two years to send his sunglasses to the crime laboratory for testing and then only weeks before the May 30th trial date disclosed the results. Again, the trial court's denial of [Taylor's] motion to exclude forced the defense to seek another continuance over petitioner's objections. The State's late disclosure violated the fair notice requirement of the due process clause and petitioner's rights to a fair and speedy trial. *See, e.g., Lankford v. Idaho*, 500 U.S. 110, 120-121 (1991).

(*Id.* at 46) With regard to the tests' probative value, Taylor argues that habeas relief is warranted where evidence is erroneously admitted and it "… 'is almost entirely unreliable and… the fact finder and the adversary system will not be

78

competent to uncover, recognize, and take due account of its shortcomings.'"

(Doc. 19 at 48) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 889 (1983), *superseded on other grounds by* 28 U.S.C. § 2253).  Taylor argues that:

> … because no confirmatory [blood] test was performed on the material, any probative value the evidence had was outweighed by its prejudicial nature.… This evidence misled the jury into believing that the material on [Taylor's] glasses was in fact blood.  Also, the fact that the State performed a DNA test on the material did not make this evidence any more admissible because the DNA test could not confirm that it was blood instead of some other substance…. Even if the DNA material belonged to Ms. Rowe it could have been skin, hair, or saliva, and given that she and [Taylor] lived together, there was [sic] a number of ways it could have been transferred to the glasses.  Finally, it is uncertain how long the material had been on the sunglasses.

(Doc. 19 at 49-50)

Respondent argues that this claim was denied by the Missouri Supreme Court on the merits and that its decision was reasonable and entitled to deference under § 2254(d).  With regard to the timeliness of disclosure, the Missouri Supreme Court held as follows:

> The trial court has discretion to impose sanctions for discovery violations under [Missouri Supreme Court] Rule 25.03.  *State v. Edwards*, 116 S.W.3d 511, 534 (Mo. banc 2003).  "A trial court's denial of a requested sanction is an abuse of discretion only where the admission of the evidence results in fundamental unfairness to the defendant."  *Id.*  Such fundamental unfairness exists if there is "a reasonable likelihood that the failure to disclose the evidence affected the result of

79

the trial." *Id.* Rule 25.03 governs discovery in a criminal proceeding and requires the State to disclose upon request any reports or statements of experts including results of scientific tests, experiments, or comparisons.

The State had access to this evidence since Taylor's arrest in December 2004, but the tests were not performed until shortly before trial. However[,] the State disclosed the results as soon as they were completed, and the record does not reveal bad faith on the part of the State. Taylor was also provided additional time for discovery and to prepare for trial on account of this disclosure. Most importantly, trials are truth-seeking procedures and exclusion of relevant evidence is not favored.

The trial court's decision to admit the evidence and grant Taylor a continuance to determine how or if to respond to this evidence was not an abuse of discretion.

(Doc. 29 at 41); *see also State v. Taylor*, 298 S.W.3d at 502. Respondent further

argues that this claim amounts to an attack on a state court's interpretation of state

evidence law and is therefore not cognizable in a federal habeas petition under

*Estelle v. McGuire*, 502 U.S. 62 (1991). (Doc. 29 at 41) Respondent distinguishes

Taylor's case from *Lankford v. Idaho*:

[*Lankford* was] a case in which a court unilaterally sentenced a defendant to death without notice to either side that the court considered capital punishment a possible penalty. Here, the trial court accepted the State's blood evidence *two and a half months* before trial and the DNA evidence *five weeks* before trial and *still* allowed the defendant more time to complete his preparation.

(Doc. 29 at 43) (emphasis in original).  Respondent also distinguishes Taylor's

citation to *Ashker v. Class*, 152 F.3d 863: "[the] State is under no constitutional

obligation to even disclose inculpatory evidence… [and *Ashker*] is a case

evaluating late disclosure of *exculpatory* evidence under the requirements of *Brady*

*v. Maryland*, 373 U.S. 83 (1963).  (Doc. 49 at 42) (emphasis in original)

Respondent argues that "[the] trial court was at liberty to allow late disclosure of

inculpatory evidence…. [and] *protected* Taylor's rights to due process by allowing

the defense more time to react and prepare."  (*Id.*) (emphasis in original)

   With regard to the probative value of the phenolphthalein and DNA tests,

Respondent argues that the Missouri Supreme Court's decision on the merits was

reasonable and entitled to deference:

> Scientific tests do not have to be conclusive to be
> admissible.  Although some states require that the test be
> conclusive, other states have held that presumptive blood
> tests are admissible as long as the test is accurately
> described so it is helpful to the jury.  *See State v. Canaan,*
> 265 Kan. 835, 964 P.2d 681, 694 (1998); *State v.*
> *Stenson*, 132 Wash.2d 668, 940 P.2d 1239, 1264-65
> (1997).  If the jury is fully informed, the fact that the test
> may react positively to substances other than blood
> affects the weight given to the evidence, not its
> admissibility.  *See State v. Ferguson*, 20 S.W.3d 485, 495
> (Mo. banc 2000); *Canaan*, 964 P.2d at 694.
>
> The test results were relevant and admissible.  Although
> a conclusive test for blood was not performed, the
> scientific testimony at trial informed the jury that the
> phenolphthalein test was only a presumptive test,
> indicating only the possible presence of blood, and that

no confirmatory test had been performed because of the size of the sample. The evidence of the test results was not misleading because the jury was informed of the size of the sample and the nature and limitations of the test performed and the respective results.

Taylor's reliance on the decision in *State v. Daniels*, 179 S.W.3d 273 (Mo.App. 2005), is misplaced. *Daniels* found that the trial court erred in permitting evidence of positive luminol test results as conclusive proof of the presence of blood in the defendant's car and house without conducting a *Frye* hearing to determine if such tests are conclusive. *Id.* at 285.

In this case, the court conducted a *Frye* hearing prior to admitting the results and the jury was well informed that the test results only indicated the possible presence of blood. Further, the DNA test results were consistent with the positive presumptive test result for blood, producing a partial DNA profile for which Rowe was a potential contributor.

The trial court did not abuse its discretion in admitting the test results.

(Doc. 29 at 39-40) (quoting *Taylor*, 298 S.W.3d at 500-501). Respondent

distinguishes Taylor's case from *Barefoot v. Estelle*, 463 U.S. 880 (1983), by

arguing that:

Taylor simply presents no evidence that the [phenolphthalein and DNA testing] was "entirely unreliable and… the fact finder and the adversary system [were not] competent to uncover, recognize, and take due account of its shortcomings."… The adult victim's sunglasses passed a presumptive test for blood, a test that admittedly could have been skewed by the presence of several other substances. The expert witness informed the jury about the limitations of the test… A DNA test on the glasses excluded the children [sic] victims as

> contributors but not the adult victim.  The State argued
> [as much.]

(Doc. 29 at 43) (quoting *Barefoot*, 463 U.S. at 899); *see also* Doc. 29, Ex. R at 35

(relevant expert witness testimony) and Ex. S at 49 (relevant closing argument).

In reply, Taylor argues that the portion of his claim pertaining to the delay in

disclosure is cognizable in a federal habeas petition because:

> [Taylor] does not merely contend that the trial court
> erroneously admitted evidence based on state law but that
> error resulted from its admittance that rendered the trial
> so fundamentally unfair as to deny [Taylor] due process
> of the law.  *See Evans v. Luebbers*, 371 F.3d 438, 443
> (8th Cir. 2004) (holding that federal courts may review
> state court evidentiary rulings if they implicate federal
> constitutional rights)…

(Doc. 46 at 45-46) (internal citation omitted)  Taylor also disputes the trial court's

ability to admit late-disclosed inculpatory evidence by claiming that "[in] *Gray v.*

*Netherland*, 518 U.S. 152 (1996), the United States Supreme Court took seriously

the notion that due process could be violated if a prosecutor knowingly and

affirmatively acts to deceive the defendant by concealing inculpatory evidence."

(Doc. 46 at 46)  Taylor argues that his citation to *Lankford*, 500 U.S. 110, is apt

because "*Lankford* holds that a capital defendant has a legitimate interest in the

character of the proceedings that leads to the death penalty.  That interest embraces

the right to '[n]otice of the issues to be resolved by the adversary process.'"  (*Id.*)

(quoting *Lankford*, 500 U.S. at 126).

With regard to the probative value of the tests, Taylor's reply reiterates his argument that the tests were too unreliable and prejudicial to be admitted under *Barefoot v. Estelle*, 463 U.S. 880:

> No confirmatory test was performed. This evidence was highly misleading because it led the jury to believe that the victim's blood was on [Taylor's] glasses when there was no reliable proof that this material was blood. This error was not cured by the DNA test because it also could not confirm that the speck was blood…. The admission of this evidence is even more troubling in light of the state's improper argument in closing that the speck was blood splatter from the crime scene.

(Doc. 46 at 47)

After a review of the trial transcript, the Missouri Supreme Court's opinion, and the parties' submissions in this matter, I find the following:

First, the portion of Taylor's claim relating to the timing of disclosure is cognizable in a federal habeas petition because his argument is not solely that the trial court erred in a matter of state evidence law, but that the erroneous introduction of this evidence violated his federal constitutional rights. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (considering on the merits a challenge to a state court's admission of evidence on the grounds that such admission violated petitioner's due-process rights).

Second, the trial court did not violate Taylor's due-process rights in allowing late admission of the phenolphthalein and DNA tests several weeks before trial,

particularly because the trial court granted defense counsel a continuance as a result. Taylor's citation to *Gray,* 518 U.S. 152, does not support his position. To the contrary, in denying the petitioner's claim that he received insufficient notice of penalty-phase evidence that was only disclosed to his counsel *the preceding evening*, the Supreme Court stated in *Gray* that:

> [While] a defendant's right to notice of the charges against which he must defend is well established… a defendant's claim that he has a right to notice of the *evidence* that the state plans to use to prove the charges stands on quite a different footing. We have said that "the Due Process Clause has little to say regarding the amount of discovery which the parties must be afforded." *Wardius v. Oregon*, 412 U.S. 470, 474… (1973). In *Weatherford v. Bursey*, 429 U.S. 545… (1977), we considered the due process claim of a defendant who had been convicted with the aid of surprise testimony of an accomplice who was an undercover agent. Although the prosecutor had not intended to introduce the agent's testimony, he changed his mind the day of trial. *Id.*, at 549… To keep his cover, the agent had told the defendant and his counsel that he would not testify against the defendant. *Id.*, at 560… We rejected the defendant's claim, explaining that "[t]here is no general constitutional right to discovery in a criminal case, and *Brady*," which addressed only exculpatory evidence, "did not create one," *id.*, at 559… To put it mildly, these cases do not compel a court to order the prosecutor to disclose his evidence; their import, in fact, is strongly against the validity of petitioner's claim.

*Gray*, 518 U.S. at 167-168 (emphasis in original). Taylor had a full and fair opportunity to prepare a response to the phenolphthalein and DNA tests and to attack their probative value before the jury. His right under *Lankford* to effective

"[notice] of [the] issues to be resolved by the adversary process" was not impeded. *Id.*, 500 U.S. at 126. Beyond his bare assertion that the State delayed introduction of this evidence in bad faith, Taylor presents no evidence supporting this assertion. (Doc. 19 at 45) As I addressed in my analysis of Taylor's first ground for relief, I conducted a review of the record and did not find any evidence that the state deliberately delayed the testing or otherwise proceeded in bad faith.

Third, and with regard to the probative value of the tests, Taylor has failed to show that they were "almost entirely unreliable [such] that the factfinder and the adversary system will not be competent to uncover, recognize, and take due account of its shortcomings." *Barefoot,* 463 U.S. at 899. The Missouri Supreme Court reasonably found that the presumptive nature of the phenolphthalein test affected its weight, not its admissibility. My review of the trial transcript confirms that the jury was properly made aware of the test's limitations:

> Q [DEFENSE COUNSEL]. Now, this phenolphthalein test that you use in the lab is not – does not exclusively react to blood; is that right?
> A. [EXPERT WITNESS]. Correct.
> Q. It will react to vegetables?
> A. There are certain substances that forensic literature states that can cause or produce the same result, color change result [in the examination.]
> Q. A pink reaction?
> A. Yes.
> Q. And that includes vegetables?
> A. Some potato, horseradish.
> Q. Rust –
> A. Rust.

Q. – will give you a reaction?  Bleach will give you a reaction?
A. Possibly.
Q. Nickel will give you a reaction?
A. I believe so, I would have to check some literature.
Q. And these items can give the same pink reaction that you get when you do the phenolphthalein test, whether it's blood of one of these items – or some of the other items in the literature that reacts to this test?
A. It can.
Q. So when you get this pink reaction that doesn't tell you firmly that that is blood that you're looking at?
A. No, all I can say is that it's possibly blood.
Q. Now, you only tested one pair of eyeglasses; is that right?
A. Yes.
Q. And that's the pair that's sitting in front of you?
A. Correct.
Q. And that has a nose guard that's missing from one side of it?
A. Correct.
Q. That's all I have.

(Doc. 29, Ex. R at 35); *see also id.,* Ex. S at 53-54 (reminding jury during closing argument about the limitations of the presumptive test).

As a result, I will deny Taylor's fourth ground for relief.

*5. The exclusion of a prospective juror who expressed general opposition to the death penalty did not violate Taylor's constitutional rights when that juror failed to clearly assert the ability to set aside her beliefs and follow the law in considering the full range of applicable punishment.*

In capital cases, "a criminal defendant has the right to an impartial jury drawn from a venire that has not been tilted in favor of capital punishment by

selective prosecutorial challenges for cause." *Uttecht v. Brown*, 551 U.S. 1, 9

(2007) (citing *Witherspoon v. State of Illinois*, 391 U.S. 510, 521 (1968)).  The

State, however, "has a strong interest in having jurors who are able to apply capital

punishment within the framework state law prescribes."  *Id.* (citing *Wainwright v.

Witt*, 469 U.S. 412, 416 (1985)).  To balance these interests, "a juror who is

substantially impaired in his or her ability to impose the death penalty under the

state-law framework can be excused for cause; but if the juror is not substantially

impaired, removal for cause is impermissible."  *Id.* (citing *Witt*, 469 U.S. at 424.)

"[In] determining whether the removal of a potential juror would vindicate the

State's interest without violating the defendant's right, the trial court makes a

judgment based in part on the demeanor of the juror, a judgment owed deference

by reviewing courts."  *Id.* (citing *Witt*, 469 U.S. at 424-434).

Taylor argues that the exclusion of a potential juror violated his

constitutional rights under the Sixth, Eighth, and Fourteenth Amendments.  (Doc.

19 at 50)  During voir dire, the following exchanges were had between counsel, the

trial court, and venireperson Kathleen Tumminia:

> MR. KEY [prosecutor]: Anybody else on the panel of ten
> here?  Anybody else has a deep rooted personal belief
> against the death penalty that you would not be allowed
> to consider the full range of punishment?  It's important
> for us, as it is for them, that you weigh the evidence, you
> look at everything, you take your time and you
> legitimately can consider life to death as punishment;
> okay?

PANELIST TUMMINIA: I would have qualms about it. I would have difficulty.

MR. KEY: You would have –

PANELIST TUMMINIA: I'm not certain I could go for death.

MR. KEY: Okay. And this is – your name is Kathleen Tumminia?

PANELIST TUMMINIA: Tumminia.

MR. KEY: Tumminia?

PANELIST TUMMINIA: Yes.

MR. KEY: And when I first asked the question Andrea's the only one that raised her hand. Are you on the fence or are you saying now after listening to what I'm explaining you don't think you could ever give the death penalty?

PANELIST TUMMINIA: I find this an overwhelming question – I find your question overwhelming at this point, I'm not certain how I feel because I've never considered it seriously before.

MR. KEY: Okay. And obviously when you all walked in today you had no idea what kind of case you were going to be walking into.

PANELIST TUMMINIA: Right.

MR. KEY: It's not a stealing case, not a robbery case; it's the most serious case you can have in the State of Missouri. So as you speak now, after you've listened to all the facts in the case, thought there was enough facts to convict him of Murder in the First Degree and then you go to the second stage, and you're sitting here now, and there's aggravating facts put on, mitigating fact put on. Are you saying now that the shock of being here today, the fact that you've never really considered, really thought too much about the death penalty is what I'm assuming, that you're not sure you can follow the Judge's instruction, consider the full range of punishment?

PANELIST TUMMINIA: Well, I just think it's such a thorny issue, I don't know if it's a black/white, I can't see it being drawn very clearly right now because of all the words like aggravated, mitigating, Judge's instructions; there's so many things to take into consideration here.

And I don't understand the whole ball of wax. To say yes or no when you don't understand the situation is difficult.

MR. KEY: What we're asking you though is if you can consider the full range of punishment. What I'm looking for is people absolutely could not ever consider death. They're against the death penalty, they think it's wrong, they can never sit on a jury no matter, they will always vote for life no matter what the facts are; is that what you're saying?

PANELIST TUMMINIA: I'm not sure which way I would go.

MR. KEY: It's not so much which way you'll go, if you're on the fence. You can never go for death if you were put in this situation.

PANELIST TUMMINIA: Perhaps.

MR. KEY: So it's not so much, you would say, life or death. It's at the point of the second phase you're not sure you can be back there and go, I don't believe I'm here, I can never give the death penalty?

PANELIST TUMMINIA: I don't know if I could sleep at night.

MR. KEY: But the question I'm asking you, if you got to the second stage do you think you would get back there, I don't know if I can consider the full range of punishment, I think I might only consider life; is that what you're saying now?

PANELIST TUMMINIA: I'm just saying I'm on the fence, and I don't know if I could be open to the whole range of possibilities that you're offering.

MR. KEY: That's all I need.

(Doc. 29, Ex. N at 13-14)

MR. WOLFRUM [defense counsel]: Any members of the panel engaged in earnest discussions with others about your views on the death penalty, o rwritten something for – I don't know a class or publication about your views about the death penalty? And I know I saw a hand, is it – am I pronouncing –

PANELIST TUMMINIA: Tumminia, yes.

…

MR. WOLFRUM: I'll go to Ms. Tumminia.  Was it a writing?

PANELIST TUMMINIA: I teach argumentation, I am the debate coach for Lincoln-Douglas Debates.  I've published various balance sheets on both sides.  I've been involved politically, down in Potosi along the lines of vigils, a member of Amnesty International.

MR. WOLFRUM: Okay.  So you have written things arguing both sides?

PANELIST TUMMINIA: Yes.

MR. WOLFRUM: Okay.  And I know on the initial questioning, I tried to write down what you say.  So you – sort of an overwhelming question?

PANELIST TUMMINIA: It is too huge to even, you know, get your hands around for me, there's so many sides and issues involved.

MR. WOLFRUM: And that's what we're trying to do is get our hands around it here, and you've had some time to listen to both Mr. Key and me talk.  If you found a person guilty of the charges as I've described them, and nobody's asking you to commit to what you would do at this point in time, understand that, would you be able to give realistic consideration to both punishments that have ben described?

PANELIST TUMMINIA: I think I could be fair and firm, I think I could isolate what takes place from my emotional concern about life, my more – I guess spiritual leanings toward my faith and such.  I think I could be fair, if I had a balance sheet in front of me.

MR. WOLFRUM: And I don't know about a balance sheet, but do you think you could follow the Court's written instructions –

PANELIST TUMMINIA: Yes.

MR. WOLFRUM: – as they've been described to you here this morning?

PANELIST TUMMINIA: I think I could deal realistically with it.

MR. WOLFRUM: And could you give realistic consideration to both punishments?

PANELIST TUMMINIA: And I don't think economics has anything to do with it.[21]

THE COURT: I'm sorry, I didn't hear the last part?

PANELIST TUMMINIA: I don't think economics has anything to do with it.

(*Id.*, Ex. N at 22)

MR. KEY [prosecutor]: Your Honor, State would move [to strike Panelist Tumminia] for cause.

THE COURT: Any objections?

MS. BEIMDIEK [defense counsel]: Yes. [Panelist Tumminia], she did indicate she could consider both punishments.

MR. KEY: Your Honor, the State feels she was being untruthful. When the State was talking to her she said she wasn't sure, she actually said she may not consider death. And then when the defense is talking to her she states she's doing vigils down in Potosi. Obviously she's not doing the vigil hoping somebody will get the death penalty. She's on a debate team, she's a teacher, she's down there doing a vigil against the death penalty. And she never said that, when we bring it up during State's questions. Obviously there's only one way she's down there doing a vigil. And when she says, when the State was talking to her, she would probably not consider death. And then when the defense is talking to her she jumps on their side, and you know.

MS. BEIMDIEK: She did not say she was protesting one way or the other. She described being in an academic setting, argued both sides, studied both sides. She didn't say I'm down there saying don't execute them. And the State didn't ask that specific question of her. She said I could be fair. I'm a debate coach. Argued on both sides

---

[21] This appears to be a reference to another venireperson's prior statement that the economic cost of life imprisonment would influence that venireperson's willingness to impose the death penalty. (*See* Doc. 29, Ex. N at 19)

of this issue. And so I think the mere presence at a vigil does not necessarily mean she was protesting against a death sentence.

THE COURT: I don't think she ever came out and said – I don't know she was – she was asked the direct question about five times, I don't know that she ever gave a direct answer to can you consider both punishments, life without parole and death. I don't think she was ever – she ever answered that question. She – the last time it was asked she said I think I could be fair, she never said yes I can. I found that when she was responding to the questions propounded by Mr. Key, that she said she wasn't certain, she was equivocating, she said I just can't – it's such a big issue, I just can't get my hands around it. And she never answered the question one way or the other.

MR. WALDEMER [prosecutor]: Judge, I have in my note she indicated she doesn't know she could sleep at night with the death penalty. She indicated she doesn't know she's open to the whole range of punishment. As you said she indicated I'm not certain, she couldn't say one way or the other. So our position would be she certainly equivocated and can't assure us that she can consider both punishments.

MS. KRAFT [defense counsel]: Judge, I have in my notes I have – the last question I have she was asked could you realistically consider both punishments and she said yes.

THE COURT: I was looking for that from her and I didn't hear it. Can you go back the read her answers back to us?

[Whereupon the court reporter read the questions and answers of defense counsel and venireperson Tumminia].

THE COURT: So that's not what she said. I will allow the strike.

(*Id.*, Ex. N at 24)

The Missouri Supreme Court addressed this claim on the merits:

Juror Tumminia's testimony regarding her ability to consider the death penalty was conflicting. During the State's voir dire, she states that she would have "difficulty" considering the death penalty and was not certain if she could consider the full range of punishment. During [Taylor's] voir dire, she states that she could be "fair and firm." Further, she never directly answers whether she could consider the full range of punishment. Given this testimony, the trial court that observed Juror Tumminia had broad discretion in determining her qualifications. Taylor has not shown an abuse of discretion. Point nine is denied.

*State v. Taylor*, 298 S.W.3d 482, 509 (2009).

In his habeas petition, Taylor cites *Wainwright v. Witt*, 469 U.S. 412, 424-426 (1985), for the proposition that jurors morally opposed to capital punishment may be removed only if their views would substantially impair their performance and leave them unable to faithfully and impartially apply the law. (*Id.* at 51).

Taylor further argues that *Witherspoon v. Illinois*, 391 U.S. 510, 522, n. 21 (1968), requires that death sentences resulting after such improper exclusions must be treated as reversible error. (*Id.*). Taylor claims that Juror Tumminia's answers:

… clearly did not indicate her views on the death penalty would substantially impair or prevent the performance of her duty as a juror. *Witt*, 469 U.S. at 424. While she expressed general reservations about the death penalty, there was no showing she could not faithfully and impartially apply the law. *Id.* at 426. … The key passage from *voir dire* establishing a constitutional error is Juror Tumminia's unequivocal answer that she could follow the court's instructions. *See Gray v. Mississippi*, 481 U.S. 648, 653 (1987). Although Ms. Tumminia never expressly stated she could impose the death penalty, she

did emphatically state she could follow the court's instructions and "realistically deal with it."

(Doc. 19 at 53)  Taylor argues that his case is analogous to *Adams v. Texas*, 448 U.S. 38 (1980), in which the United States Supreme Court reversed a habeas petitioner's death sentence after determining that the trial court had erroneously excluded jurors whose conscientious objections to the death penalty did not substantially impair them from follow the law.  (Doc. 19 at 53)  Taylor also cites *Lockhart v. McCree*, 476 U.S. 162 (1986), in further support of the same proposition.[22]  (Doc. 19 at 53-54)

Respondent argues that the Missouri Supreme Court's determination is reasonable and entitled to deference.  (Doc. 29 at 51)  Respondent further argues that Taylor's claim is without merit, because:

> … [This] juror could *not once* give a straight answer as to whether she could consider both punishments… She was not even able to state clearly that she could follow the

---

[22] While the Supreme Court in *Lockhart* ultimately reached the opposite result and denied that petitioner's habeas claim on the merits, the relevant language is as follows:

> It is important to remember that not all who oppose the death penalty are subject to removal for cause in capital cases; those who firmly believe that the death penalty is unjust may nevertheless serve as jurors in capital cases so long as they state clearly that they are willing to temporarily set aside their own beliefs in deference to the rule of law.

*Lockhart*, 476 U.S. at 176.

> court's instructions; she first equivocated, then answered
> affirmatively, then added a confusing statement at the last
> second about "realistically dealing" with the court's
> instructions instead of following them.

(Doc. 29 at 52) (emphasis in original)  Respondent maintains that Juror Tumminia

"was not excluded simply because she had generalized objections to the death

penalty.  She was excluded because she simply could not state unequivocally that

she would be open to both kinds of punishment or that she could follow, rather

than 'deal,' with the court's instructions."  (*Id.* at 52-53)

Respondent argues that Taylor's case is distinguishable from *Gray, Adams,*

and *Lockhart*:

> In *Gray*, the [trial] court allowed a cause strike of a juror
> who stated that she could consider the death penalty and
> could reach either a guilty or not guilty verdict.  This
> could not be farther from the situation at bar, where Juror
> Tumminia *never once* stated that she could consider the
> death penalty despite being asked numerous times by
> both sides…. Juror Tumminia's inability to *ever* commit
> to a firm answer went beyond what would be expected of
> one "taking her responsibility with special seriousness."
> *Adams*, 448 U.S. at 50.  Nor did she ever "state clearly
> that [she] [was] willing to temporarily set aside [her] own
> beliefs in deference to the rule of law."  *Lockhart*, 476
> U.S. at 176.

(*Id.* at 53) (emphasis in original)

In reply, Taylor argues that his case "closely mirror[s]" *Wheeler v. Simpson*,

779 F.3d 366 (February 20, 2015), in which the Sixth Circuit reversed the

imposition of a Kentucky inmate's death sentence based on the exclusion of a

death-scrupled juror.  (Doc. 46 at 49)  The facts of *Wheeler* include a voir dire in

which the excluded juror gave answers materially similar to those of Juror

Tumminia.  *See Wheeler*, 779 F.3d at 371-372 (finding that venireperson stated

that he "probably" could consider death penalty "after some deep reflection" when

questioned by trial judge, but that he agreed with prosecutor's characterization that

he was "not absolutely certain whether [he] could realistically consider [the death

penalty] or not").

However, the United States Supreme Court later overturned the Sixth

Circuit's decision in *Wheeler* subsequent to the filing of his reply brief.  (*See* Doc.

46 (filed March 23, 2015); *see also White v. Wheeler*, 136 S.Ct. 456 (decided

December 14, 2015).

The Supreme Court found that the Sixth Circuit:

> … did not properly apply the deference it was required to
> accord the state-court ruling.  A fairminded jurist could
> readily conclude that the trial judge's exchange with
> Juror 638 reflected a "diligent and thoughtful *voir dire*";
> that she considered with care the juror's testimony; and
> that she was fair in the exercise of her "broad discretion"
> in determining whether the juror was qualified to serve in
> this capital case.  *Uttecht*, 551 U.S. at 20.  Juror 638's
> answers during *voir dire* were at least as ambiguous as to
> whether he would be able to give appropriate
> consideration to imposing the death penalty.  And as this
> Court made clear in *Uttecht*, "when there is ambiguity in
> the prospective juror's statements," the trial court is
> "'entitled to resolve it in favor of the State.'"  *Id.*, at 7
> (quoting [*Wainwright v. Witt*, 469 U.S. at 434]).

*White*, 136 S.Ct. at 461 (string citations omitted).

After reviewing of the voir dire transcript, *supra*, I conclude that the United States Supreme Court's reversal of *Wheeler* on materially similar facts controls in this case. As with Juror 638 in *Wheeler*, Juror Tumminia's contradictory answers failed to clearly demonstrate to the trial court's reasonable assurance that her conscientious objections to the death penalty would not substantially impair her ability to faithfully follow the law. I find that the Missouri Supreme Court's determination of this issue is entitled to deference. As a result, I will Taylor's fifth ground for relief.

*6. The prosecutors' statements during voir dire and closing argument did not violate Taylor's constitutional rights, and Taylor's counsel was not constitutionally ineffective for declining to object to those statements.*

A prosecutor's objective is not merely "that [the state] shall win a case, but that justice shall be done." *Berger v. U.S.*, 295 U.S. 78, 88 (1935). "It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." *Id.* But federal habeas relief should be granted on the basis of a prosecutor's improper closing argument only where the impropriety is "so inflammatory and so outrageous that any reasonable trial judge would have *sua sponte* declared a mistrial." *James v. Bowersox*, 187 F.3d 866, 869 (8th Cir. 1999). The question is

whether prosecutors' statements "so infected the trial with unfairness as to make the resulting conviction a denial of due process… it is not enough that the prosecutors' remarks were undesirable or even universally condemned." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986).

Taylor argues that prosecutors' statements during voir dire and during closing argument merit reversal.  (Doc. 19 at 54)  Taylor claims that the State:

> [Made] an improper and prejudicial remark during *voir dire* suggesting to several small panels of jurors that it was appropriate and proper for them to lean in favor of the death penalty because this case involved the murders of three small children.  ([Doc. 29, Ex. N at 29, 45-46, 86-87]).  Two veniremen who heard these improper and prejudicial remarks, Raymond Hartgraver and Arthur Pruett, served on the jury.

(Doc. 19 at 56)  Respondent first argues that this claim is procedurally defaulted, because Taylor did not raise it in his direct appeal or on appeal from denial of post-conviction relief.  (Doc. 29 at 60)  In the alternative, respondent argues that this claim is meritless because it is "a blatant misstatement of the events."  (*Id.*)

In reply, Taylor argues that this claim was not procedurally defaulted, because Supreme Court precedent requires only that he "have 'fairly presented' his claims in state court."  (Doc. 49 at 50) (quoting *Picard v. Connor*, 404 U.S. 270, 275 (1971)).  Taylor argues that "[a] federal habeas claim need only be 'closely related' to the one advanced in state court, and the case law requires only an 'arguable factual commonality' between the two."  (*Id.* at 50-51) (quoting *Kenley*

99

*v. Armontrout*, 937 F.2d 1298, 1302-1303 (8th Cir. 1991)).  Therefore, Taylor

argues:

> [It] is clear that petitioner fairly raised a constitutional
> challenge to several aspects of the prosecution's
> improper arguments during his state court direct appeal.
> The fact that neither the state court brief nor his petition
> quoted verbatim every improper argument does not mean
> that the same substantive challenges to the same
> improper arguments were not presented…. There is no
> exhaustion or procedural bar issue precluding merits
> review of this claim.

(Doc. 49 at 51)

I find some support for the claim that Taylor's current argument attacking

prosecutors' statements during voir dire was fairly presented in state court.  (*See*

Doc. 29, Ex. U at 129 (direct appeal brief alleging improper prosecution argument

at closing but making no mention of voir dire); *but see also id.*, Ex. Z at 104 (post-

conviction review brief arguing that trial counsel was constitutionally ineffective

for failing to object to allegedly improper prosecutors' statements during voir dire);

*id.*, Ex. CC at 55-56 (post-conviction review court's analysis of that claim on the

merits); *id.*, Ex. FF at 129 (appeal from denial of post-conviction relief, again

raising grounds that trial counsel improperly failed to object to prosecutors' voir

dire statements); *and id.*, Ex. II at 9, n.9 (Missouri Supreme Court's denial on the

merits of appeal on that ground).  I will therefore consider the merits of this portion

of Taylor's claim.

Taylor's contention that the prosecutor improperly sought to sway potential jurors towards the death penalty during voir dire is belied by a plain reading of the trial transcript. The relevant portions of the State's questioning to which Taylor cites are as follows:

> [Even] though the evidence is going to be, along with a lot of other facts, that a mother and her three children were killed, that the jury never, ever has to impose a sentence of death, can everybody assure me that they will be able to follow that and keep an open mind? Now, it doesn't matter if you might have leanings one way or another, what matters is that you're able to keep an open mind and keep an open mind up until the point that you're asked to deliberate and follow the Court's instructions about deciding unanimously on aggravation. Can everybody assure me that they will do that?

(*Id.*, Ex. N at 29)

> [Do] you understand it is the obligation of the jury, even with those facts that a mother and her three children, three young children were killed is that – it's still an obligation to listen to evidence in aggravation and hold the State to its burden of proof. And that if the State does not prove a statutory aggravating circumstance beyond a reasonable doubt to a unanimous jury of twelve, that the jury must then return a punishment of life without parole, can you all assure me of that? Does that present a problem for anyone?

(*Id.*, Ex. N at 45)

> Can you keep an open mind through the entire case, listen to mitigating evidence and still consider a verdict of – or consider the option of life without the possibility of parole, even know [sic] it's a mother and three children killed?

(*Id.*, Ex. N at 86)

> I don't expect any of you to hear that a mother and her children were killed and you're thinking I'm leaning towards one particular sentence or another. And that's okay. The question to you now is can you keep an open mind and still consider both punishments knowing what you know at this point, and knowing that there will be much more facts [sic] to come out in the trial; can you do that for us?

(*Id.*, Ex. N at 87)

These excerpts reflect the conduct of prosecutors who, far from attempting to improperly sway potential jurors, were performing their due diligence in *separating out* potential jurors for whom the sex and age of the victims would prove so inflammatory as to overwhelm their capacity for reasoned deliberation at sentencing. This line of questioning is not improper.

Taylor also argues that the State's following closing arguments merit habeas relief: first, "[the] argument that no phone records existed to corroborate Gerjuan Rowe's testimony that she spoke with her sister on November 28 because the call did not show up on Angela Rowe's home phone records" (Doc. 19 at 55) (citing Doc. 29, Ex. S at 50, 57); second, "[the argument] that [Taylor's] failure to call Angela meant he must have known she was already dead, despite the fact that this theory was expressly contradicted by entries on Angela's calendar" (*Id.*) (citing Doc. 29, Ex. S at 47); third, "a clearly improper remark calling attention to [Taylor's] failure to take the stand at the penalty phase to express remorse" (*Id.* at

56) (citing Doc. 29, Ex. T at 18); and fourth, "[urging] the jury to convict because the defense did not call an independent expert witness to challenge the time of death testimony provided by [the] medical examiner[.]"  (*Id.*) (citing Doc. 29, Ex. S at 58)

Respondent argues that this claim was denied on the merits by the Missouri Supreme Court and that this decision is reasonable and entitled to deference.  The Missouri Supreme Court stated:

> At trial, Gerjuan Rowe's deposition was read into evidence.  The trial court found Gerjuan's testimony that Rowe called Gerjuan from a pay phone on November 28th was hearsay and inadmissible.  However, testimony as to the phone call was permitted.  During closing arguments, the State argued:
>
>> … what you know from these facts is that the… last outgoing call to Gerjuan Rowe was on the 24th at 12:22 a.m.… from the victim[.]  And if you look at the records… you will not find the victim's number after 11/23….  there's absolutely no communication between these two women, sisters, from 11/24 after the – after twenty-two minutes after the hour ever again…
>
> The State did not refer to the inadmissible statement in Gerjuan's testimony that Rowe had told Gerjuan that she was calling from a pay telephone.  In making its closing arguments, the State referred to Gerjuan's and Rowe's telephone records to refute Gerjuan's testimony that she spoke to Rowe after November 24th.  The telephone records as well as Gerjuan's testimony that she spoke to Rowe on November 28th were admitted as evidence.  It was not plain error to allow these statements.

…

Dr. Burch, the medical examiner, testified on direct examination that Rowe and her children had been deceased for two to three weeks before being discovered on December 3rd. On cross examination, Dr. Burch acknowledged that he previously stated in his first deposition that the victims had been deceased for two to three days before being discovered and that it was unlikely they had been deceased since November 23rd. Dr. Burch explained this discrepancy, stating that his testimony in the first deposition did not account for the fact that the air conditioner was turned to 50 degrees, which affected the temperature in the house and his assessment as to time of death.

During closing arguments, Taylor argued:

> … What does Dr. Burch say in his initial deposition before he got prepared by learning that [Taylor] left on the 26th? Most likely time of death was two to three days before they were discovered. They're discovered on the 3rd, what did Dr. Burch say? Most likely time are [sic] these two to three days before they're discovered. That is his medical opinion … [Taylor continues to discuss the condition in which the bodies were found] … And Dr. Burch wanted to make some distinction which maybe you understood, about 50 degrees. Well, my opinion changed when I realized that here was an air conditioner running in that house.

In rebuttal, the State argued:

> … And believe me if there's somebody else that could refute Dr. Burch they would have put them on the stand. And in his deposition he said three to ten days. It happens on the tenth day.

It is permissible for the State to make retaliatory arguments at closing in response to issues raised by the defense. *State v. Clayton*, 995 S.W.2d 468, 479 (Mo. banc 1999). Here, the State's argument responded to Taylor's argument regarding the credibility of Dr. Burch's testimony. The State's comment that Taylor could have called another witness to testify about the date of death pertained to Taylor's failure to present additional evidence about this issue, not the failure to call a particular witness.

(Doc. 29 at 54-58) (quoting *State v. Taylor*, 298 S.W.3d at 509-511). Respondent

further argues that each of Taylor's contentions is meritless, procedurally

defaulted, or both:

Taylor takes issue with the argument that no phone records corroborated [Gerjuan] Rowe's testimony that she spoke with her sister on November 28. This was the truth. The fact that Gerjuan Rowe's phone records show that *she called* a gas station on that date does not corroborate her testimony that the victim *called her* from a gas station.

As for Taylor's argument that the state unfairly commented on the failure of the defense to hire an expert to refute the State's expert evidence, "the government may comment on the failure of the defense, as opposed to the defendant, to counter or explain the evidence [unless] the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." *United States v. Gardner*, 396 F.3d 987, 991 (8th Cir. 2005).

…

Taylor also objects to the argument that he did not call the victim after November 26 because he knew she was dead. Taylor suggests that calendar entries made by the victim show that Taylor did not call simply because he was routinely negligent in calling her. Taylor did not

raise this claim in his direct appeal ([Doc. 29,] Ex. U, pp. 26-37) or on appeal from denial of post-conviction relief ([Doc. 29,] Ex. FF, pp. 37-42). This claim, therefore, is procedurally defaulted. It is also meritless. The victim's notations of when Taylor did and did not call her has absolutely no bearing on *Taylor's* motivation for not calling her after he left the state. The State was free to hypothesize as to his motive.

…

Taylor also claims the State "call[ed] attention to [his] failure to take the stand at the penalty phase to express remorse" ([Doc. 19], p. 56). Again this could not be further from the truth. The State, in describing the defendant, simply said "No remorse, no care" ([Doc. 29, Ex. T at 18]). The Eighth Circuit has held that federal habeas relief is not warranted for a claim that the State referenced a lack of evidence regarding the petitioner's remorse. *Edwards v. [Roper]*, 688 F.3d 449, 460 (8th Cir. 2012). The Supreme Court has never clearly established that a prosecutor cannot comment on the evidence in a way that indirectly refers to a defendant's silence. *Id.*

(Doc. 29 at 58-61)

I find that the Missouri Supreme Court's disposition of this claim is reasonable and entitled to deference under § 2254(d)(2). I further find that Taylor's claim is without merit for substantially similar reasons to those argued by respondent, *supra*. As a result, I will deny Taylor's sixth ground for relief.

*7. Taylor's Eighth Amendment right to a fair and reliable sentencing proceeding, as determined by Deck v. Missouri, was violated by the application of handcuffs in front of the jury after the pronouncement of jury's guilty verdict.*

Upon receiving the jury's verdict, the trial court read it out and had the jury polled to confirm its accuracy. (Doc. 29, Ex. S at 60) Immediately thereafter, the trial court instructed the jury not to discuss the case any further pending the completion of the next day's sentencing phase. (*Id.*) The trial court then directed that Taylor be removed from the courtroom, whereupon the following colloquy occurred:

> [TRIAL COURT]: Gentlemen, would you please remove the defendant.
> (Whereupon the defendant was removed from the courtroom.)
> [TRIAL COUNSEL]: Can we approach?
> THE COURT: Sure.
> (Whereupon the attorneys approached the bench and the following occurred outside the hearing of the jury.)
> THE COURT: Yes, ma'am.
> [TRIAL COUNSEL]: Judge, as the Court instructed the bailiff to remove the defendant from the courtroom one of the bailiffs – or one of the transportation officers placed handcuffs on Mr. Taylor's wrists right in front of everybody.
> THE COURT: He's just been convicted of four counts of Murder in the First Degree.
> [TRIAL COUNSEL]: I understand. United States Supreme Court case State vs. Carmen [sic] Deck says that putting shackles or any kind of restraints on a defendant in the presence of the jury is a violation of his constitutional rights regardless of him being convicted, and I request a mistrial.

> THE COURT: I understand. That request would be
> denied.

(*Id.*)

The record contains no indication that Taylor was visibly restrained during

any portion of the sentencing proceedings the following day. (*Id.*, Ex. T at 1-20)

At judgment several weeks later, counsel for the State asserted the following:

> Just on one issue there was an issue concerning the
> handcuffing of the defendant at the end of the reception
> of the verdict of Murder in the First agree [sic], and the
> other charges in the first phase of the trial. I believe
> defense counsel objected and included that in their
> motion for New Trial.

> From the State's perspective I just wanted to include a
> couple of things for the record. Throughout the trial the
> Department of Justice Services had informed the State
> that defendant had an intention to act out, that there may
> be a problem in the trial. I know that I did conveyed [sic]
> that to the Court. From our perspective, from what we
> were aware of.

> I think also there was no prejudice to the defendant, in
> the first phase of the trial it was made very clear from
> both parties the defendant was confined throughout the
> trial. The State in its case in chief played a tape of a
> telephone call he made from the jail to his brother Perry
> Taylor. So there was no prejudice to him in any event
> because the jury was clearly aware of the fact he was in
> custody the entire time.

(*Id.*, Ex. T at 20) Taylor's trial counsel took immediate exception to

the State's argument:

> [TRIAL COUNSEL #1]: Judge, there was no hearing
> held on that, and there was no discussion of the sources

of that information, and that was never given prior to the – to the time of the shackling, and no justification for it.

[TRIAL COUNSEL #2]: So the record is clear, Mr. Taylor did nothing during the course of the trial to disrupt the proceedings.

(*Id.* at 20-21)  The trial court responded as follows:

I think I commented at the time at the side bar when the motion for mistrial was made by counsel for the defendant that the jury that had just seen the defendant handcuffed was the same jury that sat through the evidence for the first four days of the trial, had in fact just returned verdicts of guilty against this defendant on four counts of Murder in the First Degree and four counts of Armed Criminal Action.  And I think that was my only comment at the time, and I denied the motion for mistrial.

(*Id.* at 21)

In his habeas petition, Taylor argues that there "was no justification for handcuffing [him] in front of the jury, which was obviously prejudicial by suggesting to the jury that [he] was dangerous."  (Doc. 19 at 58)  Taylor argues that this, in turn, denied him his Eighth Amendment right to a fair and reliable sentencing proceeding as determined by *Deck v. Missouri*, 544 U.S. 622 (2005). (*Id.*)  In *Deck*, the United States Supreme Court held that "the Constitution forbids the use of visible shackles during the penalty phase, as it forbids their use during the guilt phase, *unless* that use is 'justified by an essential state interest' – such as the interest in courtroom security – specific to the defendant on trial."  *Deck*, 544

U.S. at 624 (internal citations omitted) (emphasis in original). The Supreme Court

explained in *Deck* that:

> Although the jury is no longer deciding between guilt and
> innocence, it is deciding between life and death…. The
> appearance of the offender during the penalty phase in
> shackles, however, almost inevitably implies to the jury,
> as a matter of common sense, that court authorities
> consider the offender a danger to the community – often
> a statutory aggravator and nearly always a relevant factor
> in jury decisionmaking, even where the State does not
> specifically argue the point.
> …
> The constitutional requirement, however, is not absolute.
> It permits a judge, in the exercise of his or her discretion,
> to take account of special circumstances, including
> security concerns, that may call for shackling…. But any
> such determination must be case specific; that is to say, it
> should reflect particular concerns, say, special security
> needs or escape risks, related to the defendant on trial.

*Id.* at 632-633.

Respondent argues that the Missouri Supreme Court denied this claim on the

merits and that its decision is entitled to deference under the AEDPA. (Doc. 29 at

62-64; see also *id.*, Ex. U at 37) The Missouri Supreme Court's analyzed this

claim is as follows:

> The trial court has discretion to grant a mistrial, which is
> a "drastic remedy and should be employed only in the
> most extraordinary circumstances." *State v. Brooks*, 960
> S.W.2d 479, 491 (Mo. banc 1997).

> A defendant cannot routinely be visually shackled in the
> guilt or penalty phase of a criminal trial "unless that use
> is 'justified by an essential state interest' – such as the

interest of courtroom security – specific to the defendant on trial." *Deck v. Missouri*, 544 U.S. 622, 624… (2005). "Although shackling in the presence of the jury should be avoided if possible, not every incident in which a jury observes the defendant in shackles requires a mistrial." *Brooks*, 960 S.W.2d at 491 (internal citations omitted). In fact, "brief, inadvertent exposure of the jury of a handcuffed defendant while he is being taken from one place to another does not deprive defendant of a fair trial." *State v. McMillian*, 779 S.W.2d 670, 672 (Mo.App. 1989)…

In *Brooks*, the defendant was handcuffed when the guilty verdicts were read. 960 S.W.2d at 491. This Court found that a mistrial was not warranted because the defendant's appearance in handcuffs was brief, occurred only at the end of the guilt phase, and the defendant was not otherwise restrained during the trial. *Id.* at 491-92.

The only time Taylor was visually handcuffed in front of the jury was when he was escorted out of the courtroom after the guilty verdicts were read. The jury had just found Taylor guilty of four counts of first degree murder. Taylor was not prejudiced, and the trial court did not abuse its discretion in denying the mistrial request.

*State v. Taylor*, 298 S.W.3d at 511-512. In addition to arguing that the Missouri Supreme Court's decision is entitled to deference, Respondent distinguishes *Deck* by arguing that Taylor was only shackled briefly, not "routinely" as prohibited by *Deck*, and that the necessities of prisoner transportation and security concerns articulated by the state were essential state interests justifying the use of visible restraints. (Doc. 29 at 65)

In reply, Taylor argues as follows:

111

There is nothing in *Deck* that limits its holding to situations where a defendant is continuously shackled throughout the trial. The actual holding of *Deck* is that "the Fifth and Fourteenth Amendments prohibit the use of physical restraints visible to the jury absent a trial court determination, in the exercise of discretion, that they are justified by a state interest specific to a particular trial." (*[Deck*, 544 U.S.] at 629). In a close case like this… a single act of shackling raises a strong presumption in the jury's mind that the defendant is dangerous and very likely influenced the jury's penalty phase verdict.

In addition, the Missouri Supreme Court's mention of the trial judge's concern that he had information that petitioner might try to disrupt the trial proceedings is a "red herring" and totally irrelevant to the merits of this due process claim. The inescapable fact remains that petitioner did absolutely nothing to disrupt the proceedings either before or after he was shackled at the completion of the guilt phase of trial. Therefore, there was no essential state interest to justify the bailiff's shackling of the defendant, and any finding to the contrary is unreasonable under 2254(d)(2). In *Deck*, the [United States Supreme Court] held that shackling is "inherently prejudicial" and is only permissible in "exceptional case[s]" where there are "indisputably good reasons for shackling." *Deck*, 544 U.S. at 635. Therefore, habeas relief is warranted because the Missouri Supreme Court's decision is contrary to and unreasonably applied *Deck*.

(Doc. 46 at 53-55)

Taylor argues that under *Deck*, he need not prove injury once he has

established the existence of a shackling error. (Doc. 19 at 59) The Supreme Court

stated in *Deck* that "where a court, without adequate justification, orders the

defendant to wear shackles that will be seen by the jury, the defendant need not

demonstrate actual prejudice to make out a due process violation. The State must prove 'beyond a reasonable doubt that the [shackling] error complained of did not contribute to the verdict obtained.'" *Deck*, 544 U.S. at 635 (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967).

Respondent argues that *Deck* is distinguishable because:

> Taylor was not "routinely shackled in front of the jury" without "an essential state interest." [*Deck* at 632]. The shackling was brief and necessary for the purposes of prisoner transport, not routine throughout trial as in *Deck*. The State had previously made the trial court aware of security concerns with Taylor so an essential state interest had been articulated.

(Doc. 29 at 65)

I find that Respondent has proven beyond a reasonable doubt that the shackling error did not contribute to the imposition of the death penalty, because the jury's opportunity to view Taylor in handcuffs was *de minimis* in duration and of negligible weight next to graphic evidence of aggravating factors.

Taylor's argument that this "single act of shackling raises a strong presumption in the jury's mind that the defendant is dangerous and very likely influenced the jury's penalty phase verdict" is unpersuasive. (Doc. 46 at 54) The jury had, by that point, observed gruesome photographic evidence of the murders of four victims by gunshot wounds to the head, three of whom were children aged ten and younger. (Doc. 29, Ex. P at 59-62, Ex. Q at 46-50) At sentencing the next

day, the jury heard evidence of Taylor's prior convictions, including possession of cocaine with intent to distribute, forgery, and two forcible rapes, one of which was perpetrated against his sixteen-year-old stepdaughter. (Doc. 29, Ex. T at 7-9) The jury heard testimony from family members of the victims describing the emotional toll taken by the murders of their loved ones. (*Id.* at 9-11) Because Taylor forbade his trial counsel from arguing a case in mitigation at the penalty phase, this testimony was unopposed. The argument that the jury's decision to impose the death penalty was "very likely" influenced, amidst this evidence, by a momentary glimpse of Taylor being handcuffed as a precursor to transport is without merit. As a result, I will deny Taylor's seventh ground for relief.

*8. Taylor did not receive constitutionally ineffective assistance of counsel when his trial counsel obeyed Taylor's decision to not make a closing argument at the penalty phase of the trial.*

After being convicted, Taylor directed his trial counsel team not to present any mitigation evidence or closing argument at the penalty phase of the trial. To ensure that Taylor was fully informed of the consequences of that decision, the trial court engaged in the following colloquy:

> THE COURT: Mr. Taylor, do you want to come up with your lawyers?
>
> (Whereupon the attorneys approached the bench and the following occurred outside the hearing of the jury.)

THE COURT: Mr. Taylor, we're about to proceed with this, the second stage of the trial, the punishment phase on the jury's finding of guilt to four counts of Murder in the First Degree. Just a few moments ago I was approached by your attorneys who indicated to me that you have instructed them in this phase of the trial that you do not want them to – well, let me ask you, first, you've given them certain instructions about how you want them to conduct this second phase of the trial. Why don't you tell me what it is that you told them, what limitations you're putting on them.

THE DEFENDANT: I have instructed my attorneys not to argue anything in this portion of the trial, this penalty phase. As a Muslim we do not ask for other men something they cannot give us or take from us. I would never ask another man or jurors for a dime which they could give me, and being that I definitely wouldn't ask them for my life, which they can't take nor can they give. Only Allah can do that. So to concede to that would be giving them a false sense of authority they don't have. Neither they have that nor you. And if it's Allah's will I'll die tonight, tomorrow, fifty years from now.

THE COURT: The second phase procedure following the second phase, both sides, the State and your lawyers are allowed to make opening statements. And the opening statements are basically confined to what they expect to present as evidence in this second phase of the trial. It's my understanding, and I'll direct this to [trial counsel], you do have some evidence that you were going [to] present on behalf of Mr. [Taylor]; is that correct?

[TRIAL COUNSEL]: Well, I've discussed this with Mr. Taylor and I think he is okay with us basically indicating [to] the jury not much more than we do have some evidence by stipulation regarding his behavior while incarcerated, and think he's indicated he's okay with that.

THE COURT: And that's correct?

THE DEFENDANT: That's the only thing I will allow them to enter into stipulation as to whatever my conduct has been while incarcerated, or so forth. So on that matter not either – whatever else will be.

THE COURT: Once the evidence has been concluded then both sides are going to have an opportunity to argue this case and argue – I guess they'll argue the evidence that has been presented. And I'm sure if it follows, the course followed in the past, the State will be asking the jury to impose the death penalty. Your lawyers, if allowed, would ask the jury to spare your life. Are you asking them not to do that?

THE DEFENDANT: Your Honor, I would never ask another man not to do something they have no power to do. Only Allah can spare my life, only Allah gave me life. So if they impose a death sentence that means nothing to me, okay?

THE COURT: I understand. The position you're taking is going to severely hamper your attorneys in their efforts to try to spare your life, do you understand that?

THE DEFENDANT: I'm not going – I wouldn't ask you to spare my life, I would not allow them to do that because you have no power to do that, you have no power to take my life.

THE COURT: I guess my question to you, do you understand you're really hamstringing them in terms of presenting a defense for you?

THE DEFENDANT: What I understand is this here, Your Honor, I'm leaving the power of life and death in the hands of Allah who's the only person who has that power. It would not be the prosecutor, no juror, no one else for my life, only Allah can give that, only Allah can take that. At birth every man was sentenced to death, it may be a day, it may be a year, it may be a hundred eyars, but you're guaranteed to die, you know, so we're not afraid of that if it be that. It may not be that.

THE COURT: It is your decision, I'm satisfied it's not a decision forced on you by anybody. You're taking this position through your own volition and this is your decision; is that correct?

THE DEFENDANT: I'm a Muslim.

THE COURT: I understand.

THE DEFENDANT: And as we establish ourselves through positive action and live by that, whatever the course may be, and we except [sic] that. Now if they want to argue for death, go ahead, but we're not going to beg them or anybody else.

THE COURT: I want this record to be perfectly clear this is your decision.

THE DEFENDANT: It's my decision. It's a last decision.

THE COURT: You've gone through and communicated to your lawyers and now you've communicated to me it is your decision.

THE DEFENDANT: Yes, sir.

THE COURT: All right.

THE DEFENDANT: Ma sha Allah.

(Doc. 29, Ex. T at 5-6) Upon the closing of the state's presentation of evidence,

the trial court invited Taylor's trial counsel to read the stipulation of his good

behavior while incarcerated, which resulted in the following colloquy:

[TRIAL COUNSEL]: Judge, we do not have any evidence.

THE COURT: Ladies and gentlemen, at this time I'm going to – we're going to take a brief recess. There are some additional instructions that we're going to have to work on now. …

(Whereupon the Court admonished the jury, after which there was a recess, after which the following occurred in open court outside the presence of the jury.)

THE COURT: Mr. Taylor, it was my understanding after our discussion here at the bench a few minutes ago you were going to permit your attorneys to offer evidence by way of stipulation as it related to your behavior and conduct while incarcerated. When I called on [trial counsel] to present any evidence that she might have on your behalf, at that time you motioned to her, she went over, she had a whispered conversation with you, and she offered no evidence. Was that at your direction?

THE DEFENDANT: Yes, sir, it was.

THE COURT: You haven't changed your mind.

THE DEFENDANT: I didn't want her the [sic] read it.

THE COURT: I thought you told me earlier you had no problem with the stipulation?

THE DEFENDANT: We were to stipulation that it could be entered but not that she would read it, that's not –

THE COURT: Well, without her reading it, it won't get in front of the jury; do you understand that?

THE DEFENDANT: That's fine.

THE COURT: I mean, I guess they could ask it be passed to the jury or the jury may be allowed the [sic] read it at some later time.

THE DEFENDANT: That was my understanding that would take place.

THE COURT: The jury would be allowed to view it but it would not be read to them, is that what you're saying?

THE DEFENDANT: Yes, sir.

[DEFENSE COUNSEL]: We would ask leave to mark it and offer it in evidence. There was a misunderstanding.

> THE COURT: All right.  Sure.  All right.  You can have
> a seat.
>
> [DEFENSE COUNSEL]: Your Honor, at this time we
> would – we've marked the stipulation concerning
> corrections records as Defendant's Exhibit RR and we
> ask that it be admitted at this time.
>
> [PROSECUTOR]: No objection.
>
> THE COURT: It will be received.

(*Id.* at 12)

Taylor now argues that his trial counsel team was unconstitutionally

ineffective under *Strickland v. Washington*, 466 U.S. 668 (1984), because they did

not disregard Taylor's instructions and present closing argument.  Taylor asserts

that his trial counsel should have made a closing argument based on residual doubt

and Taylor's good behavior during his incarceration. Taylor argues that:

> … tactical decisions such as the best theory of defense or
> how to argue the case to a jury are decisions that counsel
> must make, regardless of the defendant's wishes.  *See
> Florida v. Nixon*, 543 U.S. 175, 187 (2004).  Despite
> petitioner's desire that counsel make no effort to spare
> his life, counsel had a professional duty to deliver a
> closing argument raising available arguments supported
> by the evidence to try to convince the jury to reject the
> death penalty.  Based upon the facts… a powerful
> argument could have been made to the jury that they
> should spare petitioner's life based on residual or
> lingering doubt of guilt.  Defense counsel could also have
> advanced another, albeit less compelling argument, that
> petitioner's good behavior during his prior incarcerations
> was a mitigating factor.

(Doc. 19 at 60)

Respondent argues that this claim was not raised in Taylor's motion for post-conviction relief and is therefore procedurally defaulted. (Doc. 29 at 65) In the alternative, respondent argues that the post-conviction trial court properly denied Taylor' closely related claim in his amended motion for post-conviction relief[23] – that his waiver of his right to present penalty-phase evidence and argument was not knowing or voluntary. (*Id.* at 65-67) In addition, Respondent argues that this closely-related claim was also procedurally defaulted because Taylor did not raise it on appeal from the denial of post-conviction relief. (*Id.* at 65) Finally, respondent argues that this claim should be denied on the merits because "…'certain decisions regarding the exercise or waiver of basic trial rights are of such moment that they cannot be made for the defendant by a surrogate.'" (*Id.* at 68) (quoting *Nixon*, 543 U.S. at 187)

In reply, Taylor argues that his procedural default is excused by *Martinez v. Ryan*, 566 U.S. 1 (2012), because "[a] reasonably competent attorney would have recognized and raised this obvious issue in petitioner's amended [motion for post-conviction review]. As noted in the petition, there is precedent from other courts and the ABA guidelines that provided strong legal grounds to raise such a claim." (Doc. 46 at 55) Taylor further argues on the merits of the claim that:

---

[23] I note that Taylor also made an additional closely related claim: that his trial counsel was ineffective for failing to put forward *evidence*, rather than argument, during the penalty phase. (*See* Doc. 29, Ex. Z at 66) Neither Taylor nor respondent address this additional similar claim in their briefs.

> *Nixon* clearly holds that strategic matters such as closing argument are not among those fundamental rights that requires the defendant's personal and expressed consent…. Both *Nixon* and the ABA guidelines, in a capital case, require counsel to do everything in their role as an advocate to attempt to convince the jury to spare the defendant's life.

(*Id.* at 56)

As a threshold issue, *Martinez*[24] does not appear to excuse Taylor's procedural default. In support of his argument that reasonably competent post-conviction review counsel would have raised this claim, Taylor cites to *U.S. ex rel. Emerson v. Gramley*, 883 F.Supp. 225 (N.D. Ill. 1995), and to *Kubat v. Thieret*, 867 F.2d 351 (7th Cir. 1989). (Doc. 19 at 61) Taylor also argues that "[counsel's] waiver of closing argument in a capital case is also contrary to the ABA guidelines regarding the performance of counsel in capital cases. *See* Commentary to ABA Guideline 10.11. ('Personal argument by counsel in support of a sentence less than death is important.')" (*Id.*).

*Gramley* was a capital case in which the defendant Dennis Emerson was sentenced to death. Emerson expressly directed his counsel to not present any

_____

[24] In *Martinez*, the United States Supreme Court held that the ineffective assistance of the initial post-conviction counsel to raise a claim of ineffective assistance of trial counsel may establish cause to overcome a procedural default. 566 U.S. at 17. A petitioner must show that his counsel in the initial post-conviction proceeding was ineffective under the *Strickland* standard. *Id.* at 14. The under lying ineffective assistance of trial counsel claim must be a substantial one. *Id.* A substantial claim should be measured by the standards for a certificate of appealability. *Id.*

evidence in mitigation or closing argument at the penalty phase of his trial. The

United States District Court for the Northern District of Illinois found that trial

counsel's compliance with his client's decision constituted ineffective assistance,

because counsel had made no attempt to investigate what mitigating evidence was

available:

> [Defendant presented] affidavits from his family members stating that they were not contacted by [counsel] about presenting possible mitigation evidence, as well as his own affidavit indicating that [counsel] failed to discuss with him any possible sources of mitigation. In his deposition [counsel] either fails to remember conducting any specific investigation or admits that he prepared nothing before the conclusion of the guilt-innocence phase of the trial…. [W]hen counsel has failed to conduct a reasonable investigation into possibly mitigating evidence, he cannot possibly advise his client as to the propriety of a particular course of action…. In this case, there is no indication that [defense counsel] alerted [defendant] to the fact that unless he presented some mitigating evidence, a death sentence was certain. Moreover, [counsel] was incapable of adequately advising [defendant] as to value of potentially mitigating evidence, since he had conducted no investigation…. Given that [defendant] faced an almost certain sentence of death, counsel was remiss in not presenting some evidence of mitigation on his behalf, and his failure to do so constituted deficient performance.

*Gramley*, 883 F.Supp. at 242-244 (internal footnotes omitted).

However, the circumstances in *Gramley* and the underlying relationship

between Emerson and his trial counsel are factually distinct from the circumstances

and relationship between Taylor and his trial counsel in the present case. During

the guilt phase of the trial Emerson expressed to the judge his "displeasure with the performance of his lawyer." *Id.* at 230. Emerson "lamented that [his attorney] had not previously discussed trial strategy with him and resisted calling any witnesses." *Id.* After the judge rebuffed his complaints, Emerson declared he would have nothing to do with the rest of the proceedings and would sit in the back of the courtroom for the remainder of the trial. *Id.* at 231. However, when his lawyer stated that the defense was going to rest without calling any witnesses, Emerson "demanded that certain witnesses be called in his defense." *Id.* Emerson himself asked questions of one witness. *Id.* Emerson's counsel "failed to conduct any investigation or preparation into possible mitigation evidence." Id. at 242. He met with his attorney only twice before trial and neither he nor his counsel had any recollection about speaking with each other about the case. *Id.* at 235.

The present case is distinguishable from Gramley. There is nothing in the record that indicates that Taylor had a bad relationship with his trial counsel. His counsel vigorously defended him in pretrial proceedings and in the guilt phase of the trial. Taylor's counsel objected to the introduction of evidence and testimony, advocated for the admission of evidence that was excluded, diligently cross-examined the State's witnesses, and called and examined witnesses in Taylor's defense. At the penalty stage of the trial Taylor's counsel objected to the admission of evidence, made an opening statement, and raised objections to the

State's examination of a witness. There are indicia in the record that Taylor's trial counsel discussed investigating mitigating evidence with him "months before trial," and refrained from gathering such evidence only because Taylor expressly ordered them not to. (Doc. 29, Ex. AA at 92) Taylor's argument in his amended post-conviction motion appears to acknowledge that his trial team had begun investigating mitigation evidence as a matter of course, and ceased to do so only after receiving Taylor's orders to that effect. (*Id.*) Taylor unequivocally informed the trial court of his religious based decision directing his counsel not to put on mitigating evidence or make a closing argument at the penalty phase of the trial. Unlike the turbulent circumstances in *Gramley*, Taylor's decision was not the result of the ineffective preparation of his trial counsel, it was a knowing and voluntary decision.

Taylor's citation to *Kubat* on this claim is inapposite. The defendant in *Kubat* had specifically asked his counsel to present mitigation evidence at the penalty phase and named an "impressive array of character witnesses," including neighbors, co-workers, and a deputy sheriff, all of whom were willing to testify on his behalf. *Kubat*, 867 F.2d at 366-367. Counsel disregarded defendant's directions, called no witnesses, and presented only a closing argument that:

> … cannot, even charitably, be called a plea for mercy. The argument was, as the district court said, "a rambling, incoherent discourse… that may actually have strengthened the jury's resolve to impose a death

sentence."… In less than three pages of trial transcript, [defendant's] counsel stumbled (or, perhaps, breezed) through references to the Old Testament, vengeance, "an eye for an eye," the New Testament, forgiveness, punishment, rehabilitation, deterrence, the boilermakers (beer and whiskey) that [defendant] had consumed on the day of the murder, a hopeless sounding admission that counsel was "not going to convince" the jury, and then ended with a bizarre statement which asked the jury to "decide the way you feel, Robert Kubat or Lydia Hyde." As the district court said, "[i]t was utter lunacy for defense counsel to invite such a comparison" between [defendant] and the victim.

*Id.* at 368 (internal citations omitted).

Finally, nothing in the text or commentary of the ABA's guidelines supports the claim that defense counsel is obligated to investigate mitigation evidence over their client's express orders to the contrary. *See American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, 31 Hofstra L. Rev. 913, 1055-1070 (2003); *see also Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases*, 36 Hofstra L. Rev. 677 (2008). The ABA guidelines presume that defense counsel will enjoy the assistance, or at least the compliance, of their client in presenting mitigating evidence.

Even if *Gramley* suffices to excuse Taylor's procedural default under *Martinez* and that reasonably competent post-conviction counsel would have raised this claim, Taylor's claim fails on the merits. The United States Supreme Court

held in *Nixon* that trial counsel, having tried and failed to obtain express direction

from an unresponsive defendant, was not constitutionally ineffective for deciding

to admit his client's guilt in the hope of sparing his life at sentencing. *Nixon*, 543

U.S. at 178. In so doing, the Supreme Court reiterated the distinction between

"'every tactical decision'" left to counsel's professional discretion and "certain

decisions regarding the exercise or waiver of basic trial rights [which] are of such

moment that they cannot be made for the defendant by a surrogate." *Id.* at 187

(quoting *Taylor v. Illinois*, 484 U.S. 400, 417-418 (1988)). Examples of the latter

include "'whether to plead guilty, waive a jury, testify in his or her own behalf, or

take an appeal.'" *Id.* (quoting *Jones v. Barnes*, 463 U.S. 745, 751 (1983)).

The United States Supreme Court revisited the distinction between trial

counsel's ability to direct trial strategies and decisions that are basic trial rights of

the defendant in *McCoy v. Louisiana*, 2018 WL 2186174 (2018). The Court

distinguished *Nixon* and held that trial counsel's decision to admit his client's guilt

*against his client's express opposition*, for the same purpose in *Nixon* of seeking to

spare his client's life at sentencing, violated his client's Sixth Amendment right to

counsel. The Supreme Court held in *McCoy* that:

> Just as a defendant may steadfastly refuse to plead guilty
> in the face of overwhelming evidence against her, or
> reject the assistance of legal counsel despite the
> defendant's own inexperience and lack of professional
> qualifications, so may she insist on maintaining her
> innocence at the guilt phase of a capital trial. These are

> not strategic choices about how best to *achieve* a client's objectives; they are choices about what the client's objectives in fact *are*.

*McCoy*, 2018 WL 2186174 at *6 (emphasis in original).

Taylor's argues that his trial counsel was constitutionally ineffective for not disregarding Taylor's express directive forbidding a closing argument at the penalty phase of his trial. This argument is without merit in light of *Nixon* and *McCoy*. *How* to present argument in the fashion calculated to best persuade the jury is a strategic decision subject to the professional discretion of learned counsel. *Whether* to present argument at all, as opposed to simply holding the state to its burden of proof, is one of the "basic trial rights" the Constitution reserves to the defendant. *Nixon*, 543 U.S. at 187. The record reflects that Taylor was aware of his attorneys' objective of averting the imposition of the death penalty and that he made a conscious and informed decision to value a different objective more highly, adhering to his religious tenets. (Doc. 29, Ex. T at 5-6) Taylor continued to prioritize his religious objective despite extensive warnings from the trial court as to the likely consequences his decision would have for his chances of averting execution. (*Id.* at 12) Taylor had the ultimate authority to determine whether to waive his basic trial right of a closing argument at the penalty phase of his trial. As a result, I will deny Taylor's eighth ground for relief.

***A certificate of appealability is warranted.***

I have considered whether to issue a certificate of appealability in this matter under 28 U.S.C. § 2253. To grant such a certificate, I must first find a substantial showing of the denial of a federal constitutional right. *See Tiedeman v. Benson*, 122 F.3d 518, 522 (8th Cir. 1997). A substantial showing is "a showing that issues are debatable among reasonable jurists, [that] a court could resolve the issues differently, or [that] the issues deserve further proceedings." *Cox v. Norris*, 133 F.3d 565, 569 (8th Cir. 1997) (citing *Flieger v. Delo*, 16 F.3d 878, 882-83 (8th Cir. 1994)).

Upon a final review of Taylor's claims I conclude that Taylor's counsel's decision to comply with Taylor's directive to forego a closing argument at the penalty stage of his trial may have violated Taylor's substantial right to constitutionally effective counsel at trial. Whether the decision to forego a closing argument at the penalty stage of a capital murder trial is a tactical decision for counsel or a basic trial right decision for the defendant is debatable among reasonable jurists. This is a question of law that the United States Supreme Court has not directly considered. Another court could resolve this issue differently and the issue deserves further review.

Accordingly,

**IT IS HEREBY ORDERED** that the petition of Leonard S. Taylor for a writ of habeas corpus is **DENIED**.

**IT IS FURTHER ORDERED** that the Court will issue a certificate of appealability in a separate document.

_____
RODNEY W. SIPPEL
UNITED STATES DISTRICT JUDGE

Dated this 31st day of March, 2018.